**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**FLORENCE DIVISION**

| | |
|---|---|
| DHD JESSAMINE, LLC,       ) | Civil Action No.: 4:22-cv-_____-_____ |
|     ) | |
|     Plaintiff,    ) | **COMPLAINT** |
|     ) | |
| vs.    ) | (*Jury Trial Demanded*) |
|     ) | |
| FLORENCE COUNTY, SOUTH    ) | *(Violation of Fair Housing Act of 1968;* |
| CAROLINA; FRANK J. BRAND; JASON    ) | *Violation of Civil Rights Acts of 1871 and* |
| SPRINGS; ROGER M. POSTON;    ) | *1964; Violation of 42 U.S.C. § 1983; Violation* |
| ALPHONSO BRADLEY; JERRY W.    ) | *of Due Process; Conspiracy to Interfere with* |
| YARBOROUGH; STONEY C. MOORE;    ) | *Civil Rights; Promissory Estoppel;* |
| WAYMON MUMFORD; and WILLARD    ) | *Negligence/Gross Negligence; and* |
| DORRIETY, JR. as the elected members of    ) | *Declaratory Judgment)* |
| the FLORENCE COUNTY COUNCIL; and    ) | |
| JOHN DOES 1-15,    ) | |
|     ) | |
|     Defendants.    ) | |
|     ) | |

COMES NOW Plaintiff DHD Jessamine, LLC ("Plaintiff"), by and through its counsel, and states its Complaint against Defendants Florence County, South Carolina; Frank J. Brand; Jason Springs; Roger M. Poston; Alphonso Bradley; Jerry W. Yarborough; Stoney C. Moore; Waymon Mumford; and Willard Dorriety, Jr., as the elected members of Florence County Council,[1] and John Does 1-15 (collectively "Defendants")[2] as follows:

**INTRODUCTION**

1.    This action arises out of the unlawful and discriminatory actions of Defendants Florence County, Frank J. Brand, Jason Springs, Roger M. Poston, Alphonso Bradley, Jerry W. Yarborough, Stoney C. Moore, Waymon Mumford, and Willard Dorriety, Jr., as the elected

---

[1] Councilman Kent Caudle has not been named as a Defendant in this action, as he abstained from any discussion or vote relating to the illegal adoption of Florence County Ordinance No. 17-2021/22 that is the subject of this litigation, and was otherwise not, upon information and belief, a participant in the conspiracy to violate Plaintiff's civil rights.

members of Florence County Council, and John Doe, which had the purpose and effect of disallowing, delaying, blocking, and otherwise interfering with Plaintiff's development of a 60-unit workforce housing development targeted for low-income family households, known as "the Jessamine." As such households are disproportionately African American, this discriminatory conduct has a disparate impact upon minorities and perpetuates historical patterns of segregation.

2.      On this basis, this action is brought under the Fair Housing Act of 1968 as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601, *et seq*., (the "FHA"), the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*., the Civil Rights Act of 1871, 42 U.S.C. § 1983, the United States Constitution, and the South Carolina Constitution seeking redress for violation of Plaintiff's rights and to vindicate the rights of those affected, including minorities and low-income families with children. Additionally, this action is brought under the statutory and common law of South Carolina, as the conduct of Defendants gives rise to liability for promissory estoppel, negligence, gross negligence, and violation of state law and local ordinances.

3.      Congress enacted the FHA to ensure that certain protected classes, including racial minorities, are not victimized by of discrimination relating to housing.  To further this objective, the Act makes it unlawful to "interfere" with someone (like Plaintiff) who has "aided or encouraged" racial minorities to enjoy their statutory "right" to housing by seeking to develop workforce housing. *See* 42 U.S.C. § 3617.

4.      When the Jessamine became publicized in January 2022, residents of the nearby Florence Country Club, including "Country Club Estates" and "Country Club Forest" neighborhoods ("the Country Club Residents")[3] initially approached Plaintiff and offered to pay

_____

[3] The Country Club Residents have consistently identified themselves in writing and when speaking in public forums against the Jessamine as "residents of the country club" or the two referenced

Plaintiff to abandon the plan to develop the Jessamine. When this offer was rejected by Plaintiff, the Country Club Residents, in concert with others, began a vehement, organized campaign to oppose and kill the development. The opponents have succeeded in persuading Florence County officials to delay and obstruct the Jessamine indefinitely and unlawfully through the adoption of a targeted, unlawful moratorium.

5.     This obstruction prevents Plaintiff from using federal Low-Income Housing Tax Credits and South Carolina state housing tax credits that have already been awarded totaling $**17,890,344.40**. These credits are issued by the South Carolina Housing Finance and Development Authority (the "Housing Authority") specifically for the development of the Jessamine. If the illegal conduct of Defendants is not rectified, the discriminatory aims of Defendants will be achieved by blocking the Jessamine. This will have a disparate impact upon low-income African American families with children in Florence County who are in need of quality affordable housing. Additionally, Defendants' illegal, improper, and discriminatory actions will prevent Plaintiff from developing and owning the Jessamine, a development that would have a completed value of **$15,750,000.00**.

6.     But for the actions of Defendants, the Jessamine would be constructed. Plaintiff either has or would have successfully obtained all approvals, permits, and financing necessary. However, the illegal adoption of Florence County Ordinance No. 17-2021/22 (the "Illegal Moratorium") on a rushed and unlawful basis and Florence County's outright refusal to follow its own procedural requirements is precluding low-income families with children from receiving the benefits of this affordable housing development.

---

neighborhoods. The petition supporting Ordinance 17-2021/2022 was signed on behalf of these two neighborhoods and delivered to Florence County Council as such.

7.     The preclusive impact of the Illegal Moratorium arises for several reasons: (i) the terms of the Illegal Moratorium were crafted specifically to ensnare the Property; (ii) the Illegal Moratorium was drafted to have an indefinite and undefined duration; (iii) the timeline, scope and criteria of the upcoming "zoning study" that the Illegal Moratorium is purported to enable are themselves indefinite and undefined (the "Undefined Zoning Study"); and (iv) the timeline within which the County will apply revised zoning to the unzoned properties is also indefinite and undefined.  According to Shawn Brashear, Florence County's Planning Director, the process of applying new zoning classifications (which will constitute additional illegal actions on the part of these Defendants if the ability to build a multifamily affordable housing development is affected) would take at least four (4) months *after* the Undefined Zoning Study would be completed, which completion date is also unknown.

8.     The intended result of this concerted and targeted effort on the part of Defendants is that Plaintiff is unable to proceed with development of the Jessamine. This places Plaintiff in a position where the low-income housing tax credits awarded by the Housing Authority cannot be used by Plaintiff unless the Illegal Moratorium is immediately repealed or declared void and Defendants cease and desist from their discriminatory conduct.

9.     If Defendants continue their Illegal Moratorium to obstruct, delay, and "run out the clock" on the Jessamine, Plaintiff will be required to surrender the awarded low-income housing tax credits that are specific to the Jessamine, which precludes the project from being economically feasible to pursue.  This is the unmistakeable goal of Defendants.  As noted above, this will have a disparate impact on minority families with children and has the purpose and effect of perpetuating historical racial segregation in Florence County. African Americans families should not be denied the opportunity to live in new affordable housing with good access

to essential goods and services, employment centers, medical care, transit corridors, and educational facilities just because the Property is close to the Florence Country Club.

10.     Minorities are already negatively affected by the lack of affordable housing in Florence County and would benefit from the availability of the Jessamine. Blocking the development deprives these citizens from access to affordable housing and the many benefits that it provides to those families and the community as a whole.

11.     Plaintiff hereby seeks a judgment and declaratory relief to address Defendants' interference with the development of the Jessamine, which was a discriminatory practice in violation of the FHA. *See* 42 U.S.C. § 3613(c)(1). Plaintiff further seeks monetary damages pursuant to the FHA, additional federal laws, state laws, the common law, the United States Constitution and the South Carolina Constitution, which damages include actual damages, consequential damages, special damages, and punitive damages. In accordance with the statutes allowing for such recovery, Plaintiff is also entitled to an award of reasonable attorney's fees and costs along with other relief that this Court deems just and proper.

## **PARTIES**

12.     Plaintiff is a limited liability corporation duly organized under the laws of the State of South Carolina, organized for the express purpose of developing and owning the Jessamine. The three owner-members of DHD Jessamine, LLC are highly experienced and capable developers of affordable housing with a combined portfolio that includes numerous similar communities throughout Maryland, North Carolina, South Carolina, Tennessee, and Virginia, including developments made possible through low-income housing tax credits. Plaintiff's owner-members, through several companies, are the owners of sixty-two (62) affordable housing developments consisting of 4,235 units.

13.     Defendant Florence County, South Carolina ("Florence County") is a political subdivision of the State of South Carolina, as defined in S.C. Code § 15-78-10, *et seq.* Florence County takes official action through its governing body, the County Council of Florence County. Florence County also takes official action through its employees, agents, and representatives. At all times relevant to Plaintiff's Complaint, the employees, agents and representatives of Florence County were all operating within the scope of their officially assigned and/or compensated duties, and acting under the color of state law.

14.     Defendants Frank J. Brand, Jason Springs, Roger M. Poston, Alphonso Bradley, Jerry W. Yarborough, Stoney C. Moore, Waymon Mumford, and Willard Dorriety, Jr. are elected members of, and currently comprise, Florence County Council, who are being sued herein in their official capacities. At all times relevant to Plaintiff's Complaint, these members of Florence County Council acted under color of state law.

15.     Defendants John Doe 1-15 represent any citizens who conspired with the individually named members of County Council, agents or employees of Florence County, or any other public agency or official to interfere with and deprive Plaintiff of its protected constitutional rights. It is well-settled law that private persons who willfully participate in joint action with a state official also act under the color of law within the meaning of Section 1983, notwithstanding the official's potential personal immunity from civil liability on an individual basis. *See, e.g., Black v. Bayer,* 672 F.2d 309, 318 (3 Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 230, 74 L.Ed.2d 182 (1982). *Scott v. Greenville Cty.*, 716 F.2d 1409, 1422 (4th Cir. 1983).

## JURISDICTION AND VENUE

16.     The FHA allows an "aggrieved person" to commence a civil action in an appropriate United States District Court to obtain relief from a discriminatory housing practice.

*See* 42 U.S.C. § 3613(a)(1)(A).  Plaintiff is an "aggrieved person," both in its own right and for the benefit of minorities and low-income families with children in Florence County, South Carolina. Therefore, this court has jurisdiction because Plaintiffs' claims arise under the laws of the United States. *See* 28 U.S.C. § 1331.  The declaratory relief requested by Plaintiffs is authorized by 28 U.S.C. §§ 2201-2202.

17.     This Court also has jurisdiction pursuant to the Civil Rights Act of 1866 and 1871, 42 U.S.C. § 1983 ("The Civil Rights Acts") and pursuant to the Fifth and Fourteenth Amendments to the United States Constitution.

18.     Venue is proper in the District of South Carolina under 28 U.S.C. § 1391(b)(1) because the subject events, omissions, or violations of law occurred in this District, and because Defendants perform their official duties in this District.

19.     For these reasons, this Court has personal jurisdiction over the parties to this action and has subject matter jurisdiction over the claims asserted in the Complaint. Furthermore, venue is proper.

## FACTUAL ALLEGATIONS

### *The Low-Income Housing Tax Credit Program*

20.     In 1986, Congress enacted Section 42 (the "Low Income Housing Credit Program" or "LIHTC Program"), of the Internal Revenue Code (the "IRC"), which was signed into law by President Ronald Reagan as part of the Tax Reform Act of 1986.  The purpose was to provide incentives to encourage new construction and rehabilitation of existing buildings as low-income rental housing for households with income that is at or below specified income levels. This was based on the realization that private-sector developers would often not receive enough rental income from a low-income housing project to both cover the costs of development and

provide a sufficient return to investors in order to attract the equity investment required to pursue such development projects.

21.     Specifically, the LIHTC Program provides Low-Income Housing Tax Credits ("LIHTCs") as incentives for investors to make equity investments that promote development of affordable housing.  LIHTCs assist developers of low-income housing projects and encourage investment of private capital in these developments by providing a dollar-for-dollar income tax credit that offsets an investor's federal income tax liability.

22.     Recipients of LIHTCs use them to cover certain development costs that, in turn, reduces the amount of debt that is carried, allowing the housing units to be offered at below-market rents.  The amount of tax credits received is based on a formula that considers the costs of the development and the number of qualified low-income units for a given project.  Under the LIHTC Program, state and local housing agencies allocate the state's credit "ceiling" among low-income housing projects whose builders and developers apply and qualify for the tax credits. The tax credits are received each year for ten years.  The taxpayer claims the credit on its federal income tax return every year over the course of the ensuing decade, on an equal *pro rata* basis.

23.     Frequently, a "syndicator" purchases tax credits from several LIHTC development projects, manages them as part of a fund, and sells-off interests to institutional investors including banks, insurance companies and corporations. The LIHTC Program and tax credits provide the development community with the equity needed to construct high-quality affordable housing that is similar to "market rate" housing but has less debt, thereby allowing for lower rents to be charged.  For the Jessamine, Plaintiff received an equity commitment from RBC Community Investments ("RBC") of $0.8225 for Federal Tax Credits and $0.65 for State Tax Credits for a total financial contribution to the Jessamine of **$13,171,027**.

24.     The amount of federal tax credit allocated to a state is determined by population, with each state receives roughly $2.75 per capita. *See* Internal Revenue Code § 42(h)(3)(C).

25.     The LIHTC Program requires each state agency that allocates tax credits, generally called a "housing finance agency," to have a Qualified Allocation Plan ("QAP") for awarding the tax credits.  The QAP sets out the state's eligibility priorities and criteria for awarding federal tax credits to housing properties.  It is a document that states, and certain municipalities, must develop in order to be authorized to distribute federal LIHTCs.  Ultimately, the LIHTCs can be awarded only to a development project that fits the QAP's priorities and criteria.  Each QAP must spell out the housing finance agency's priorities and specify the criteria used to select among the projects/applicants competing for tax credits.

26.     The State of South Carolina is authorized to grant and administer the award of LIHTCs under the IRC to qualifying low-income housing projects in South Carolina.  The South Carolina State Housing Finance and Development Authority ("SCSHFDA" or the "Authority") is responsible for administering the LIHTC program for qualifying projects in South Carolina.

### *The 2021 QAP*

27.     On December 23, 2020, Governor Henry McMaster signed the Housing Authority's 2021 QAP (the "2021 QAP"), which provided the governing standards, criteria and procedures by which the Housing Authority would evaluate housing projects and determine their eligibility for LIHTC awards for the 2021 cycle.  In 2021, South Carolina awarded a total of **$20,685,295**[4] in federal LIHTCs and **$20,685,295**[5] in South Carolina state tax credits, which

---

[4] This is an annual federal credit, which will be taken by the investor for a ten (10) year period after the development is completed and placed in service.

[5] This is an annual state credit, which will be taken by the investor for a ten (10) year period after the development is completed and placed in service.

were awarded to the twenty-three top scoring applications pursuant to the 2021 QAP.  A copy of the 2021 QAP is attached as Exhibit 1.

28.    The 2021 QAP utilizes the Palmetto Opportunity Index (the "POI") to provide every census tract in South Carolina with one of the following five ratings to which the 2021 QAP awards a corresponding point total that is used to score applications submitted for LIHTCs:

1.  **Very High**    **40 points**
2.  High            30 points
3.  Moderate        20 points
4.  Low             10 points
5.  Very Low         0 points

See 2021 QAP, at ¶ VI.A.1.  The POI is the largest single point category in the 2021 QAP.  It ranks census tracts across South Carolina based on the following criteria: (i) Housing; (ii) Economy; (iii) Transportation; and (iv) Health, all as further defined below, within the given census tract.  The census tracts scoring the best among these four criteria receive forty (40) points and are classified as "Very High."  Those scoring the worst receive zero (0) points and are classified as "Very Low."  The POI includes the following data sources, which are to be weighted equally:

Housing:

*Affordable housing supply - National Housing Preservation Database*

*Eviction rate (if available) - Eviction Lab, Princeton University*

*Median gross rent - American Community Survey*

Economy:

*Individual poverty rate - American Community Survey*

*Median household income - American Community Survey*

*Unemployment rate - American Community Survey*

Transportation:

      *Average commute time - American Community Survey*

      *Location affordability - Center for Neighborhood Technology*

      *Walkability index - Environmental Protection Agency*

Health:

      *Average life expectancy - Centers for Disease Control and Prevention*

      *Environmental distress - Environmental Protection Agency*

      *Healthy food access - USDA Food Atlas*

*See* 2021 QAP, at pg. C-1.  The Jessamine would be located in Census Tract 12, which is rated **<u>Very High</u>** by the POI.  A copy of the POI that includes the specific scoring for Census Tract 12 is attached as <u>Exhibit 2</u>.

29.      The 2021 QAP divides the counties of South Carolina up and breaks them down into three groups.  The county Groups are:

1. **Group A**: Aiken, Anderson, Beaufort, Berkeley, Charleston, Dorchester, Georgetown, Greenville, Horry, Jasper, Lancaster, Lexington, Richland, Spartanburg, and York.

2. **Group B**: Allendale, Barnwell, Calhoun, Chester, Chesterfield, Clarendon, Colleton, Darlington, Dillon, Edgefield, Fairfield, Greenwood, Hampton, Lee, Marlboro, Marion, Orangeburg, Union, and Williamsburg.

3. **Group C**: Abbeville Bamberg, Cherokee, Florence, Kershaw, Laurens, McCormick, Newberry, Oconee, Pickens, Saluda, and Sumter.

*See* 2021 QAP, at ¶ IV.A.

30.      Pursuant to the 2021 QAP, the Housing Authority places applications for LIHTCs into one of four "set-aside" categories, each of which receives an assigned percentage of the total allocation of LIHTCs in order to best serve the state's needs.  The four set-asides are:

1. **High-demand new construction** (45-50%)
New construction projects located in a Group A county.

2. **High-demand rehabilitation** (10-15%)
   Rehabilitation projects located in a Group B county or developments with USDA Rural Development operating assistance (RD) funds. The Authority will award $600,000 of this set-aside to RD projects (or the total among eligible applications if less)

3. **General new construction** (10-15%)
   New construction projects located in a Group B or **Group C county**.

4. **General rehabilitation** (5-10%)
   Rehabilitation projects located in a Group A or Group C county that were not originally built using RD funds.

   The Authority will award LIHTCs starting with eligible applications earning the highest scores within each of the set-asides and continuing in descending score order through the last application that can be fully funded within the range of LIHTC available in each of the set-asides.

*See* 2021 QAP, at ¶ IV.B (emphasis added).

### *Plaintiff's Proven Track Record of Developing LIHTC Affordable Housing Communities*

31.     Plaintiff's owner-members and their related entities have a proven track record in obtaining LIHTC allocations from the Housing Authority and successfully developing low-income housing communities for senior citizens and families.  The owner-members are: (i) Douglas Development, LLC; (ii) Holliday Development, LLC; and (iii) Schaumber Development, LLC.  As noted above, the combined experience of these three companies includes sixty-two (62) low-income rental housing multifamily developments, ranging in size from thirty-two (32) units up to two hundred seventy-six (276) units.  In total, the owner-members have built and continue to own a total of 4,235 units throughout South Carolina, North Carolina, Tennessee, Maryland, and Virginia.

32.     The owner-members of DHD Jessamine, LLC and their related entities have developed the following projects that are currently located in the greater Florence area:

- Crescent Villas is a 48-unit low-income apartment community targeted for senior citizens over 55-years-old. Completed in December 2016, it is located at 340 Troxel Boulevard, Florence, SC 29501 (1.3 miles from the proposed site of the Jessamine). The current occupancy rate is 89.58%. Among the 48 units at the Crescent Villas, **72.9% of the units are rented by African Americans**, 12.5% are rented by white families, 2% are rented by Asian families, 2% of the units' tenants did not disclose this information, and 10.41% of the units are vacant.[6]

- Crescent Villas II is a 49-unit low-income apartment community targeted for senior citizens over 55-years-old. Completed in February 2020, it is located at 320 Troxel Boulevard, Florence, SC 29501 (1.3 miles from the proposed site of the Jessamine). The current occupancy rate is 95.92%. Among the 49 units at the Crescent Villas II, **89.8% of the units are rented by African Americans**, 2% are rented by white families, 4% of the units' tenants did not disclose this information, and 4.1% of the units are vacant.

- Palmetto Station is a 48-unit low-income apartment community targeted for working families.  Completed in October 2014, it is located at 2407 Freedom Boulevard, Florence, SC 29501 (4.8 miles from the proposed site of the Jessamine).  The current occupancy rate is 97.92%. Among the 48 units at the Palmetto Station, **85.4% of the units are rented by African American families**, 4.2% are rented by white families, and 10.42% of the units' tenants did not disclose this information.

- The Belmont is a 40-unit low-income apartment community targeted for working families.  Completed in February 2020, it is located at 719 S. Irby Street, Florence, SC 29501 (2.6 miles from the proposed site of the Jessamine).  The current occupancy rate of this property is 100%.  Of the 40 units at the Belmont, **60% of the units are rented by African American families**, 2.5% are rented by white families, and 37.5% of the units' tenants did not disclose this information.

As these statistics demonstrate, the overwhelming majority of the tenants in these affordable housing developments in the greater Florence area are African American, as would be the case with the Jessamine that Defendants have conspired to block.

---

[6] Following this calculation, three (3) units were recently vacated in this development, but the units are being actively marketed.

### *The Planning and Development Process for the Jessamine*

33.     Using its experience and expertise with the LIHTC Program, Plaintiff identified the subject property in Florence County as an ideal site.  The property was selected due to its location in Census Tract 12, which receives the maximum allowable points under POI ratings in the 2021 QAP.  The property that Plaintiff identified is an assemblage of three parcels totaling 5.93 acres,[7] which are located at 421 Cashua Drive in Florence (the "Property").  The Property is adjacent to a Harris Teeter grocery store, McAllister's Deli, a tobacco market, a dry-cleaning business, and a chiropractor's office.  The Property is within an unincorporated area of Florence County and is unzoned.  On this basis, Plaintiff, ***by right***, could build and develop the specific intended use (multifamily) at the specific intended density (60-units) under applicable ordinances and land use regulations.  *See* Florence County Code of Ordinances, Chapter 30, Article III § 111, "*Development Standards for Unzoned Areas*."  For these reasons, Plaintiff submitted an initial offer to purchase the Property from the current owner in an amount of $750,000.00.

34.     The Property was so suitable for this purpose it had drawn the attention of multiple developers, which caused a bidding war to ensue. However, Seller agreed to sell the Property to Plaintiff based on Plaintiff's successful track record (both within the state and specifically Florence County), the existing zoning rights, and Seller's overall level of confidence in Plaintiff.  Following a negotiation process, on February 8, 2021, Plaintiff entered into a contract to purchase The Property for $1,150,000.00.

35.     After placing the Property under contract, Plaintiff immediately initiated its pre-development efforts for the Jessamine, undertaking a year-long planning and design process to secure financing and meet every requirement of applicable zoning ordinances and land

---

[7] The three parcels Plaintiff contracted to purchase were TMS No. 90018-03-006, 90018-03-007, and 90018-03-008.

development regulations.  The goal was to qualify the Jessamine under the 2021 QAP and secure LIHTCs.  These goals were successfully achieved.

36.     The Jessamine would include 60 units targeted for low-income family households with children.  The units would include: (i) three-bedroom units; (ii) two-bedroom units, and (iii) one-bedroom units.  The architectural style chosen for the Jessamine is classified is a "Townhome" style, with direct entry to each apartment home from the ground level which has the aesthetic appeal of an attached single-family community, rather than large apartment buildings.  During the planning process, Plaintiff circulated the rendering below to Florence County, Florence County Council, and other stakeholders to represent the appearance and scale of the Jessamine:



37.     Plaintiff has planned the Jessamine so that six (6) of its units would be rented to tenants with annual household income at or below $13,080.00, which is 20% of the 2021 Area

Median Income ("<u>AMI</u>") for the Florence Primary Market Area ("<u>Florence PMA</u>").[8]   The remaining fifty-four (54) units would be rented to tenants with annual household income at or below <u>$39,240.00</u>, which is 60% of the 2021 AMI for the Florence PMA, as determined by the United States Department of Housing and Urban Development ("US-HUD").   This group of potential tenants in the Jessamine is hereafter referred to as the "<u>Eligible Tenants</u>."

38.     In order for the Jessamine to be financially viable, an award of LIHTCs was required. If the LIHTCs were not awarded and utilized, the Jessamine would not be financially viable and would be unable to proceed in any fashion.  Plaintiff, utilizing its expertise, prepared and presented a proposed development that met or exceeded all requirements to receive an award of LIHTCs.

39.     While navigating the 2021 QAP application process, Plaintiff was also diligently and successfully pursuing all required land use, zoning, and infrastructure permits needed from state and local agencies to develop the Jessamine.

40.     Plaintiff was in constant contact with officials in the stormwater, zoning, planning, and engineering departments of Florence County, as well as other necessary regulatory agencies from outside of Florence County, at every step of the process as development plans were finalized.  As specific examples, Plaintiff completed the following:

- coordinated with Florence County to confirm that the "unzoned" classification assigned to the Property allowed the intended use (multifamily) and intended density (60 units);

- coordinated with the US Army Corps of Engineers and received a non-jurisdictional wetlands determination letter;

---

[8] The Florence PMA consists of the City of Florence and the immediate surrounding area.  More specifically, the Florence PMA is comprised of 21 census tracts and reaches approximately 4.4 miles to the north, 10 miles to the south, 9 miles to the east, and approximately 5 miles to the west of The property.

- confirmed that the South Carolina Department of Transportation ("<u>SCDOT</u>") had no objection to the proposed driveway locations and the number of units;

- confirmed that Plaintiff's development plans met SCDOT's requirements necessary to receive encroachment permits; and

- confirmed that water and sewer utilities were available for the Jessamine from the City of Florence.

### ***The LIHTC Application***

41.     With the accumulated experience of its owner-members and their related entities in successful LIHTC development, the Property under contract, and zoning and availability of utilities having been confirmed, Plaintiff applied for LIHTCs for the Jessamine by submitting an application to the Housing Authority in accordance with the 2021 QAP.

42.     On February 18, 2021, Plaintiff submitted a preliminary application for LIHTCs for the Jessamine, along with a non-refundable $<u>1,500.00</u> application fee. In addition to Plaintiff's application for the Jessamine, the owner-members of Plaintiff submitted five (5) additional preliminary applications for LIHTCs pursuant to the 2021 QAP relating to other possible developments, as is common in the industry.  In total, eighty-one (81) preliminary applications submitted for the 2021 LIHTC Program cycle.

43.     On March 5, 2021, the Housing Authority posted a list of the seventy-three applications and QAP scores resulting from preliminary review for applications that were no otherwise disqualified.  Plaintiff's preliminary application for the Jessamine received fifty-eight (58) total points.

44.     With the preliminary application process completed, Plaintiff began the more arduous and costly process of completing and submitting a full application to the Housing Authority for an award of LIHTCs for the Jessamine.

45.     One significant threshold criteria that must be met prior to submitting an LIHTC application is "site control."  Specifically, to demonstrate site control, an applicant must include one of the following documents executed by a principal of the applicant:

    a.   A recorded deed;

    b.   A purchase option with date certain performance;

    c.   A purchase contract with date certain performance;

    d.   A land lease or option on a land lease either of which must not be for a term of less than fifty (50) years in term; or

    e.   A legally valid assignment of one of the above.

*See* 2021 QAP, at ¶ V.B.1.  Plaintiff met this requirement based on its binding contract to purchase the Property, which was dated February 8, 2021.

46.     Another threshold participation criteria requirement of Plaintiff under the 2021 QAP was confirmation that applicable zoning allows for the intended development to be built.  Specifically, an applicant must include proof of proper zoning being in place at the time of application submission, including approval of any necessary special or conditional uses.  A letter provided by the applicable City/County official (in this case, Florence County) is needed to verify that the proposed development site currently meets the local zoning or land use restrictions.  *See* 2021 QAP, at ¶ V.C.

47.     On April 26, 2021, Plaintiff received a letter dated April 23, 2021, from Derrick Singletary, an authorized employee of Florence County, confirming that the Property was "unzoned" and that multifamily housing units are permitted at the specific location.  A copy of the letter from Florence County is attached as <u>Exhibit 3</u>.

48.     Another threshold participation criteria requirement of the 2021 QAP was that Plaintiff's application must include a valid determination regarding the presence or absence of

wetlands, including non-jurisdictional wetlands, in accordance with the 1989 Federal Manual for Identifying and Delineating Jurisdictional Wetlands. Plaintiff was required to retain a wetland professional to complete the Housing Authority's Identification of Wetlands form. *See* 2021 QAP, at ¶ V.D. A copy of the Approved Jurisdictional Determination completed by the U.S. Army Corps of Engineers, which confirmed that any wetlands on the Property were non-jurisdictional, is attached as Exhibit 4.

### *County Council Pledges Financial Support for the Jessamine*

49.     In April 2021, representatives of Plaintiff were working with Florence County and County Council as the full LIHTC application was finalized. Florence County and Florence County Council were aware that additional points under the 2021 QAP were available if Florence County made a written commitment to pay the cost of infrastructure improvements or provide a financial contribution toward infrastructure improvements that would be located on or adjacent to the intended development. The qualifying infrastructure improvements would not be constructed after the approval of the LIHTC application, but would be completed before the Jessamine would be occupied.

50.     Florence County Councilman Kent Caudle emailed representatives of Plaintiff and stated that he had discussed this with the Florence County Administrator, who indicated to Mr. Caudle that he did not see any issue with Florence County paying for a fire hydrant to assist Plaintiff's application for the Jessamine in obtaining a higher 2021 QAP score. Mr. Caudle went on to state that while the Property is not in his district, he had spoken to the councilman that represents the district (Defendant Brand) and that they would likely be splitting the cost of a fire hydrant for the purpose of assisting Plaintiff's application. A copy of this April 26, 2021 email exchange is attached as Exhibit 5.

51.    To confirm Florence County's support in this regard, Defendant Dorriety, the Chairman of Florence County Council, signed a letter dated April 27, 2021 that was sent to Plaintiff for the purpose of being submitted with Plaintiff's LIHTC application.  The letter from Florence County provided a glowing endorsement for the development of 60 affordable multifamily apartment units on Cashua Drive. Specifically, the letter from Florence County (on Florence County letterhead) included the following statements in full support of the Jessamine:

> *"Florence County supports the potential development of 60 affordable multifamily apartment units located on Cashua Drive behind the Harris Teeter shopping center."*

> *"If your development receives tax credits it would serve a great need within the County and align with our objective to provide affordable housing in close proximation to essential services, transit corridors, and employment centers."*

> *"Florence County would like to support your development by agreeing to cover the costs to supply and install a new fire hydrant on or adjacent to your parcel along Cashua Drive…. The County will contribute funding… not to exceed $10,000"*

A copy of the Florence County letter signed by Defendant Dorriety letter is attached as <u>Exhibit 6</u>.

### ***Florence County Additional Letter of Support for the Jessamine***

52.    Shawn Brashear, Director of Florence County's Planning and Building Department, was informed by Plaintiff's representatives that the 2021 QAP criteria would award five (5) additional points to the Jessamine's application if it is part of a concerted community

revitalization plan ("CCRP"), which can be shown through a letter from the municipality detailing measures it is taking to increase the quantity of affordable housing and to develop a more resilient community.

53.    During the months of March, April, and May 2021, Plaintiff's representatives communicated often with Mr. Brashear and other employees of Florence County through many emails, phone calls, and multiple webinars as Plaintiff coordinated with Florence County relating to a CCRP, working together to identify the measures that Florence County was taking that would satisfy the relevant terms of the 2021 QAP.

54.    On May 11, 2021, Shawn Brashear, Florence County's director of planning, engineering, building, and zoning, provided a letter to Plaintiff's representatives, which made the following specific statements showing that Florence County was in full support of the Jessamine:

> *"The Jessamine… would serve a great need by promoting housing for a mix of incomes and backgrounds in the community and from a location standpoint aligns well with our targeted areas for new affordable and mixed-income housing."*

> *"We are also aware of your intent to include a set aside of units within the community for persons with disabilities.  Florence County is highly supportive of this initiative as it supports our goal to provide integrated housing solutions for persons of all backgrounds and needs."*

> *"The Jessamine's location represents the ideal location for an affordable community in an area*

> *with a very high barrier of entry for Florence*
> *County, and City of Florence for that matter."*
>
> *"Florence County supports the addition of new*
> *affordable housing in the county and in the specific*
> *area of The Jessamine."*

A copy of Shawn Brashear's May 11, 2021 correspondence is attached as <u>Exhibit 7</u>.

### *Plaintiff Provides Notification Letters to Defendants about the Jessamine*

55.     On May 24, 2021, in order to satisfy another threshold participation criteria requirements of the 2021 QAP, Plaintiff sent formal Notification Letters to Florence County and required elected officials in accordance with the terms of the 2021 QAP, at ¶ V.J.   The notification letters included the following information: (i) the name, phone number, and mailing address of the proposed owner of the Jessamine; (ii) the type of construction; (iii) the location and total acreage of the Property; (iv) the intended density of 60-units; (v) the fact that the Jessamine would target low-income families with children; (vi) the fact that Plaintiff was seeking an award of LIHTCs in order to develop the Jessamine.  Copies of the May 24, 2021 Notification Letters that were sent via USPS Certified Mail are attached as <u>Exhibit 8</u>.

56.     The May 24, 2021 Notification Letters invited the recipients, including any member of Florence County Council, who had any questions or would like to meet to discuss the proposed development to contact representatives of Plaintiff.  None of the Defendants contacted any representative of Plaintiff to discuss the proposed development.  Furthermore, as noted above, Florence County had already (and repeatedly) expressed profound support for the Jessamine in writing.

57.    Before submitting a full application, the 2021 QAP also required applicants to commission a market study of their projects, which must be conducted by independent, third-party analysts from a list of vendors who have been approved by the Housing Authority.

58.    Plaintiffs commissioned and paid $4,000.00 for a rental housing market feasibility analysis to examine and analyze Florence County, South Carolina as part of their application for the Jessamine (the "Jessamine Market Study").  Plaintiff also paid a non-refundable fee of $600.00 to the Housing Authority associated with its review of the Jessamine Market Study.

59.    The Jessamine Market Study, issued May 21, 2021, was performed by Shaw Research and Consulting, LLC, an independent third-party market consultant with no financial stake or interest in Plaintiff's development. The Jessamine Market Study concluded that the Florence Primary Market Area (the "Florence PMA") would be the geographic area from which the Jessamine were expected to draw the majority of its residents.  Among the Market Study's findings are:

a)  That sufficient evidence has been presented for the successful introduction and absorption of the subject property, as proposed, within the Florence PMA.

b)  There are numerous factors supporting the introduction of a newly constructed rental alternative targeted to low-income households, including but not limited to (1) The fact that positive occupancy rates were recorded within the area's family LIHTC properties; (2) Of the six stabilized tax credit properties included within the survey, a combined occupancy rate of 98.9 percent was calculated – with each reporting a waiting list, many of which were quite extensive, and; (3) The most recent family LIHTC development entered the market on May 4, 2021 (The Belmont), and was 65 percent leased within two weeks of opening[9]. Further, deposits have been received for the remaining 14 units, with another seven applicants on a waiting list. As such, this extremely positive absorption provides perhaps the strongest evidence of the need for affordable housing locally.

---

[9] The Belmont currently has an occupancy rate of 100%.

*See* Jessamine Market Study, attached as <u>Exhibit 9</u>.   The Jessamine Market Study concluded that the proposed facility should maintain at least a 93% occupancy rate into the foreseeable future with no long-term adverse effects on existing local rental facilities, either affordable or market rate.   In addition to the cost of the Jessamine Market Study, which further underscored the need for the Jessamine, Plaintiff also incurred additional costs related to architectural and engineering plans, an appraisal, legal review, etc., for submission of the final LIHTC application.   These costs exceeded $<u>30,000.00</u>.

### *The Jessamine's Final Point Score Under 2021 QAP*

60.    The Housing Authority established the scoring criteria for the "New Construction" set-aside in the 2021 QAP, at ¶ VI, whereby ranks the applications within this set-aside on a point system.  Points are awarded (or subtracted) based on a project's satisfaction (or failure) of certain criteria.

61.    Plaintiff's application for the Jessamine received the **<u>maximum of forty (40) points</u>** based on Census Tract 12's rating of "Very High" on the POI.

62.    In terms of the employment criterion, Plaintiff's application for the Jessamine received the **<u>maximum of ten (10) points</u>**, as there were more than 5,000 qualifying jobs paying between $1,251.00 and $3,333.00 per month within a two-mile radius of the Property.  This income band is targeted for points because it represents the salary range for the majority of households who would qualify to live at the Jessamine.  Of the seventy-three (73) applications that received preliminary scoring, only six (6) applications in the entire state, including the Jessamine, received the maximum allowable 10 points for this scoring category.

63.     Plaintiff's application for The Jessamine received **five (5) points awarded to applications that are not being located in a Racially or Ethnically Concentrated Area of Poverty** (R/ECAP) as defined by the US-HUD, which reinforces the program goal of seeking to place affordable housing in areas with greater economic opportunity, such as Census Tract 12.

64.     Plaintiff's application for The Jessamine received the **maximum of three (3) points** based on an *identified shortage of affordable housing* in Florence County. It is relevant and significant to note that the under the scoring guidelines of the 2022 QAP, applications in Florence County may now receive up to 8 points in this same scoring category, due to the increasing shortage of affordable housing in Florence County, which is only being exacerbated by the conduct complained of hereunder.

65.     Plaintiff's application for The Jessamine received ten (10) points for agreeing to comply with income limits based on the average AMI of total units to promote affordability, and an additional five (5) points for committing to meet green and energy efficient sustainable building requirements.

66.     Plaintiff's application for the Jessamine received 1 of 5 possible points for documented funding support from a city, county, or other local government, which was based on the total amount or value of funding support committed per low-income unit. *See* 2021 QAP, at ¶ VI.G. As a result of the $10,000.00 commitment made by Defendant Dorriety on behalf of Florence County, Plaintiff's application for the Jessamine received one (1) point in a category where it is very difficult to obtain points. Points earned because of local funding support was a critical component to the application's competitive stance as this issue was not simply "checking a box." Florence County know of the importance of this funding support to the Jessamine's chances of receiving an allocation of tax credit, as this was discussed both verbally and in

writing prior to the funding commitment being made. LIHTC awards are routinely won or lost by a single point. Only in a few larger municipalities in the state did applications receive more than one (1) point for local funding support.

67.     Plaintiff's application for the Jessamine also received five (5) points for the Concerted Community Revitalization Plan (CCRP) scoring category, which resulted from Shawn Brashear's May 11, 2021 letter detailing the measures taken by Florence County to increase the quantity of affordable housing and develop a resilient community. Upon review, the Housing Authority deemed these measures to meet the necessary components of a CCRP.

68.     Plaintiff's application for The Jessamine would not have scored high enough to receive an award of LIHTCs under the 2021 QAP without the assistance, cooperation, and support of Florence County and Florence County Council, which resulted in Plaintiff's application obtaining six (6) additional points and elevated the score of Plaintiff's application over other competing applications.

69.     When the application scoring process was completed, the Housing Authority posted its list of the 2021 LIHTC Final Point Scores, indicating the point scores of applications separated into the four set-asides detailed in the 2021 QAP, at ¶ IV.B. Among the forty-three (43) full applications submitted, three (3) applications were disqualified, and seventeen (17) applications were denied as they fell within a set-side that had exhausted its credits, reached the limit of projects that would be funded within certain counties, or the applicant/developer had already reached their limit of three (3) projects that could receive LIHTCs under the 2021 QAP cycle. A copy of the 2021 LIHTC Final Point Scores is attached as <u>Exhibit 10</u>, with the application scores of Plaintiff and its related entities highlighted for reference.

### *The Jessamine Receives Award of LIHTCs Under 2021 QAP*

70.     On September 18, 2021, the Housing Authority posted its list of twenty-three (23) applications that would be receiving 2021 LIHTC Awards.  Plaintiff's application for the Jessamine, along with two (2) other applications submitted by Plaintiff were included in this Final Award List.  A copy of the 2021 LIHTC Final Award List is attached as Exhibit 11.

71.     In a letter to Plaintiff dated October 22, 2021, the Housing Authority officially notified Plaintiff that it had qualified for a reservation of annual LIHTCs in the amount of $894,517.22, and that in order for Plaintiff to accept this tax credit reservation award a non-refundable reservation fee in the amount of $89,451.72 along with an executed Reservation Certificate must be submitted to the Housing Authority on or before November 1, 2021. Additionally, Plaintiff was required to pay $5,850.00 to cover a plan and specification review and four (4) construction inspections by an independent third-party consultant.

72.     In a letter to Plaintiff dated October 22, 2021, the Housing Authority notified Plaintiff that it had made a preliminary determination that Plaintiff's application for the Jessamine was eligible for **$8,945,172.20**[10] in South Carolina state housing tax credits ("STCs"), an amount equal to the award of LIHTCs awarded to Plaintiff.

73.     Plaintiff submitted checks dated October 27, 2021 in the amounts of $89,451.72 and $5,850.00 to the Housing Authority and accepted the tax credit reservation award of **$8,945,172.20**[11] in LIHTCs for the Jessamine.  The award of LIHTCs was tentative only in that it required that certain conditions be satisfied subsequent to the initial award.   One such requirement was that Plaintiff incur at least ten percent (10%) of the costs of development of the low-income housing project by **May 2, 2022**.  Additionally, Plaintiff is required to have

---

[10] These STCs would be funded annually in an amount of $894,517 for a period of ten (10) years.

[11] These LIHTCs would be funded annually in an amount of $894,517 for a period of ten (10) years.

completed one hundred percent (100%) of the construction and received a certificate of occupancy by **December 31, 2023**.

74.     The consequences of missing these dates are severe.  If Plaintiff does not incur the required development costs and complete construction by the applicable deadlines, Plaintiff's tentative allocation of LIHTCs for the Jessamine is forfeited.  Furthermore, Plaintiff and its members could be subject to penalties under the Housing Authority's suspension and debarment policy for failing to perform its obligations and responsibilities in developing the Jessamine and for failing utilize the LIHTCs that it was awarded and reserved.

75.     Due to the illegal conduct of Defendants, Plaintiff has requested and received an extension of the ten percent (10%) cost test/deadline to **October 31, 2022**.  However, the Housing Authority is unable to extend the one hundred percent (100%) completed and deadline of December 31, 2023.  Due to the Illegal Moratorium adopted through Ordinance 17-2021/2022, construction of the Jessamine cannot be completed within the allocated timeframe.

76.     At all times relevant to this Complaint, Plaintiff has been and remains ready, willing, and able to perform all obligations and responsibilities relating to the development of the Jessamine.  The reason that this Complaint has been filed is because Plaintiff has been prevented from doing so by the illegal, improper, and discriminatory actions of Defendants, which are depriving families with children, including a disproportionate number of minority families, of their rights under federal and state law.

### *The Need for Affordable Housing in Florence County*

*Relevant Demographics of Florence County and the Florence PMA*

77.     According to data from the United States Census Bureau, African Americans are the most common racial or ethnic group living below the poverty line in Florence County.

Specifically, African Americans account for 61.4% of the population living below the poverty line in Florence County, as shown in the first column on the chart below.[12]



78.    As noted above, the Jessamine was to be developed in Census Tract 12. Data from the 2010 Census shows that the population of Census Tract 12 was 87.5% White, and only 11.2% African American.[13] Data from the United States Census Bureau also shows that in 2019 the average household income for a white household was $83,929.00, but only $53,984.00 for an African American household in Census Tract 12.

79.    Data from the 2010 Census also demonstrates continuing housing segregation existing within the Florence PMA. The twenty-one (21) census tracts that make up the Florence PMA have a total white population of 47,285 with an average annual household income of $60,062.18, and a total African American population of 35,780 with an average annual household income of $35,107.86. Within the Florence PMA, there are eleven (11) census tracts with greater than 60% white population, which census tracts also contain ten (10) of the eleven

---

[12] Data is available at: https://datausa.io/profile/geo/florence-county-sc#economy (last visited April 13, 2022).

[13] Source U.S. Census Bureau data Available at: https://data.freep.com/census/total-population/total-population-change/census_tract_12_florence_county_south_carolina/140-45041001200/ (last visited March 25, 2022).

(11) highest average annual household incomes. Of these eleven census tracts, census tract 12 where Plaintiff plans to develop the Jessamine received the highest possible rating of "Very High," and seven census tracts received the second highest rating of "High."

80.     Conversely, there are four census tracts with greater than 78% African American population[14] within the Florence PMA, which census tracts contain the three lowest average annual household incomes. Of these four (4) census tracts, three (3) census tracts received the lowest possible POI rating of "Very Low," and one (1) census tract received the second lowest POI rating of "Low."

81.     The average white household income is higher than the average African American household income in all but two (2) of the census tracts that make up the Florence PMA.

82.     Within the Florence PMA, 47.5% of the 35,780 African American population is concentrated into four (4) majority minority Census Tracts, while fourteen (14) of the twenty-one (21) census tracts making up the Florence PMA are majority white.

83.     The Jessamine Market Study identified twenty-two (22) existing apartment properties within the Florence PMA, seven (7) of which are low-income projects that have been developed using LIHTCs. Three (3) of the seven (7) existing low-income LIHTC properties in the Florence PMA are packed into Census Tract 8 (98.3% African American population) and Census Tract 9 (96.8% African American population), and a fourth is located in Census Tract 10 which had an average annual income of only $18,625.00 for African American households in 2019. According to the POI, Census Tract 8 and 9 received the lowest possible rating of "Very Low" and Census Tract 10 received a rating of "Low." Additionally, two (2) of the existing LIHTC properties located in Census Tract 14 are adjacent to each other as well as two (2) other

---

[14] Three (3) of these four (4) Census Tracts contain greater than 92% African American population.

low-income senior multi-family projects, representing an unnecessary concentration of low-income housing units in one small area.

84.    The 2021 QAP (as well as the 2022 QAP) intentionally target census tracts that are rated as "Very High" by the POI with the specific purpose of placing additional affordable housing in desired areas and in close proximity to essential goods and services, health care, quality education, employment opportunities, public transit, and other amenities. By increasing access for low-income families and their children to these basic and necessary resources, the goal of curbing systemic poverty and racial segregation in housing are also served.  In the 2021 QAP, Census Tract 12 was the _**only**_ census tract that was scored as "Very High" in Florence County, indicating that the 2021 QAP and the LIHTC Program are intending to promote affordable housing developments within Census Tract 12.

85.    If the Jessamine were built, it would have increased access to affordable housing for the minority population of Florence County, decreased community segregation, and promoted interracial association into one of the most racially segregated and affluent areas of the Florence PMA.

### _The County Club Residents Become Aware of the Jessamine and Launch Efforts to Kill It_

86.    At 3:00 p.m. on Thursday, January 6, 2022, a meeting was held at the Florence County planning office.  Plaintiff's civil engineering consultant, Tim Harris, attended the meeting in person.  Drew Schaumber and Tres Bagwell of Schaumber Development participated virtually via "Zoom."  Also present at this meeting were Woody Powell on behalf of Florence County's Stormwater Department, Martin Fox, on behalf of City of Florence Utilities Department, and Tripp Ward, on behalf of the South Carolina Department of Transportation ("SCDOT").

87.     The purpose of this meeting was to discuss the various regulatory approvals and timelines that Plaintiff needed from each of the respective departments and agencies from different governmental entities.  Plaintiff's civil engineering consultants reviewed the site plan with everyone in attendance at this meeting and answered all questions regarding the Jessamine. During the meeting, there was not the slightest indication from any of the governmental employees present that there would be any zoning, stormwater, access, utility, or any other permitting problems.  This stands to reason, as all of these items had already been discussed with Florence County, the City of Florence, and SCDOT in the early, pre-development stage prior to submission of the full application under the 2021 QAP.

88.     Immediately after the January 6, 2022 informational meeting, Plaintiff's representatives were approached over the weekend of January 7-9, 2022 with an oral offer from a group of neighbors and/or "concerned citizens" asking them to "walk away" and abandon the Jessamine, stating they were willing to pay Plaintiff an amount equal to: (i) their development costs incurred to date; (ii) the developer fee that Plaintiff would receive by developing the Jessamine; and (iii) an amount sufficient to compensate Plaintiff for the cashflow that Plaintiff would receive from owning and managing the Jessamine in exchange for Plaintiff abandoning its plans.

89.     Plaintiff's representatives were told that money was no object to "make them whole," even after Plaintiff's representatives stated that such an offer was both unsavory and, from a practical standpoint, infeasible because the amount would be "in the millions."  This offer, as well as how such an offer could be funded, was repeated on separate occasions to Plaintiff's representatives by several unrelated parties during this same timeframe immediately after the January 6, 2022 informational meeting.

90.     Over the course of that same month, Plaintiff was advised that while the Country Club Residents were opposed to affordable housing of any kind, regardless of architectural style or quality, it would accept a home ownership development similar in style and size as Wren Creek, a ***market rate*** townhome community located approximately ¼ mile from the Property.

91.     By January 10, 2022, Plaintiff's representatives had communicated that a monetary offer could not be considered.  Plaintiff had already accepted the tentative allocation and award of $8,945,170.00 in LIHTCs for the Jessamine awarded to Plaintiff by the Housing Authority and was committed to moving forward.  Furthermore, accepting such an offer would certainly result in debarment of Plaintiff and any related entity from all housing programs administered by the Housing Authority.  Plaintiff's representatives reiterated to the offering parties that the Jessamine would be a good development for Florence County and would become a valuable part of the of the Country Club Estates and Country Club Forest neighborhoods. Plaintiff submitted several emails and offered to meet with any concerned residents and provided renderings and additional information and context regarding the Jessamine.

92.     Almost immediately after Plaintiff's representatives rejected the oral offer to accept a payoff to abandon plans to develop the Jessamine, media attention arose.  On January 14, 2022, "FITSNews" published the first of three articles focusing on the Jessamine.  This article contained the following racist quote attributed to an anonymous Florence resident, "They are putting a glorified section eight complex in the middle of a very nice part of Florence."  This same racist quote attributed to an anonymous Florence resident was published in the two subsequent FITSNews articles published on January 18, 2022 and January 20, 2022.  Copies of the three FITSNews articles are attached as Exhibit 12.

93.    On January 18, 2022, a large meeting was hosted at the Florence Country Club to facilitate the development of a plan among the Country Club Residents to kill the Jessamine.  A copy of the January 15, 2022 email from Pete Gioldasis, a representative for the Country Club Estates Home Owners Association, alerting residents in the Country Club Forest neighborhood to the meeting is attached as <u>Exhibit 13</u>.  Surprisingly, Defendant Brand was present at the January 18, 2022 meeting at the Florence Country Club.

94.    Upon information and belief, the residents who attended the January 18, 2022 meeting at Florence Country Club, including Defendant Brand, discussed and developed a plan to stop or block Plaintiff from developing the Jessamine.  The initial focus of this plan would be to interfere, delay or block approvals or permits Plaintiff would need from SCDOT, DHEC, Florence County, and/or the U.S. Army Corps of Engineers.

95.    Plaintiff received an unexpected letter dated of the same date of the meeting at the Florence Country Club (January 18, 2022) from Defendant Dorriety, in which the Chairman of Florence County Council indicated that he was rescinding his April 27, 2021 correspondence in support of the Jessamine, where Florence County had not only applauded the Jessamine but had pledged to contribute $<u>10,000.00</u> towards the installation of a new fire hydrant.

96.    In advance of the January 18, 2022 meeting at Florence Country Club, Jeffrey Payne, an attorney at the law firm of Turner Padgett Graham and Laney and a Country Club Resident, submitted a Freedom of Information Act request, dated January 14, 2022, to the Florence County Planning Commission.  The FOIA request sought all correspondence related to the development of the Property, all plans, drawings, and surveys that have been submitted to Florence County for review, all documents that discuss stormwater issues relating to the Property produced or submitted to Florence County, and all correspondence between Florence County and

the City of Florence relating to The Property.  Mr. Payne's request sought the above information for the period of January 1, 2018 up through the date of the request.  A copy of Mr. Payne's January 14, 2022 Freedom of Information request is attached as <u>Exhibit 14</u>.

97.     On January 19, 2022, Tripp Ward, the Assistant District Permit Engineer for the South Carolina Department of Transportation ("<u>SCDOT</u>"), emailed Plaintiff and stated that the District 5 District Engineer had (suddenly) asked that a Traffic Impact Study be provided to identify if there are any offsite improvements needed to accommodate the increase in pedestrian and vehicular traffic.  Notably, just five days prior, Mr. Ward emailed Plaintiff to confirm that SCDOT would ***<u>not</u>*** require a Traffic Impact Study in order to process Plaintiff's application for encroachment permits.

98.     SCDOT's Access and Roadside Management Standards Manual (the "<u>ARMS Manual</u>") states that a Traffic Impact Study will be required for large developments such as major shopping centers, large planned-unit developments, industrial complexes, and other projects that would generate 100 or more trips during the peak hour of the traffic generator or the peak hour of the adjacent street.  The ARMS Manual provides examples of land use size thresholds that might be expected to generate **<u>100</u>** peak hour trips that may be used to determine whether a study will be required, and the threshold for apartments is **<u>150</u>** units and for townhouses is **<u>190</u>** units.

99.     The Jessamine is below such thresholds, as it involves only **<u>60</u>** townhome units that were expected to generate only **<u>29</u>** new peak AM trips and only **<u>37</u>** peak PM trips.  On the basis, both the request and timing of the request are entirely suspect.

100.     Just two days after the January 18, 2022 Florence Country Club meeting, on January 20, 2022, Mr. Payne hand-delivered a revised and much more detailed Freedom of

Information request to the Florence County Administrator's office. Mr. Payne's January 20, 2022 Freedom of Information request sought the following items relating to The Property and The Jessamine from January 1, 2018 to the present:

1. All documents and communications related to the development of the Project;

2. All plans, drawings and surveys that relate to the Project that have been submitted to Florence County for review during January 1, 2018 to present.

3. All documents and communications that discuss the storm water issues that impact the Project that were produced or submitted to Florence County.

4. All correspondence between Florence County and the City of Florence that relate to the Project.

5. Phase l and or Phase 2 Environmental Reports for the Project Site.

6. All communications and documents that relate to the monitoring wells located on properties adjacent to the Project Site that are monitoring an Underground Fuel Storage Tank spill/leak.

7. All communications and documents to and from any elected official that relates to the Project.

8. All communications and documents with the Developer of the Project, or its engineer or architect.

9. All communications and documents concerning water, sewer and emergency services available for the Project.

10. All communications and documents to and from the South Carolina Department of Transportation.

11. All communications and documents regarding any required road widening to serve the Project.

12. All communications and documents regarding the wetlands located on Project site.

13. All communications and documents regarding traffic issues impacting the Project.

        14. All communications and documents regarding the Transmission Tower located on the property adjacent to the Project site.

A copy of Jeffrey Payne's January 20, 2022 Freedom of Information request is attached as <u>Exhibit 15.</u>

101.     On January 25, 2022, Jeffrey Payne was told that the estimated cost for Florence County to comply with his Freedom of Information request would be $<u>314.00</u> and that a deposit of $<u>78.50</u> or the full amount must be received for Florence County staff to begin compiling the requested data.

102.     The following day, January 26, 2022, Florence County received a check in the amount of $78.50 that was written from an account held by Turner, Padget, Graham & Laney, P.A.

### ***<u>Florence County Begins its Illegal, Targeted Campaign to Block the Jessamine</u>***

103.     In response to this flare-up of discriminatory pressure, Florence County Council held a "Special Called Meeting" at 8:00 a.m. on January 27, 2022, just two days after its Regular January Meeting.  The **only** item on the agenda for the January 27, 2022 Special Called Meeting was the introduction and first reading of Ordinance No. 17 2021/22 which was published by title only and read by the clerk as follows:

> **An Ordinance To Develop A Study Of The Characteristics Of Properties Within The County Of Florence Which Are Bounded By The Incorporated Limits Of A Municipality On At least 75% Of The Sum Of The Properties, Or Cluster Of Properties, Perimeter Boundary Lines; To Further Place A Moratorium On All Development Related Permits For Properties Bounded By The Incorporated Limits Of A Municipality Which Are Currently Designated Unzoned; To Receive Zoning Recommendations For Properties Within The County Of Florence Which Are Bounded By The Incorporated Limits Of A Municipality On At Least 75% Of The Sum Of The Properties Perimeter Boundary Lines And Other Matters Related Thereto**.

The entire Special Meeting including the Pledge of Allegiance and Prayer lasted only three minutes and fourteen seconds.[15]  A copy of the approved minutes from the January 27, 2022 Special Meeting are attached as <u>Exhibit 16</u>.

104.     Following the Clerk publishing Ordinance No. 17 2021/22 by reading the title, Defendant Dorriety, Chairman of Florence County Council, declared the ordinance has been introduced by title only, and proceeded to thank Defendant Brand for bringing this to the attention of Florence County Council. Notably, Defendant Brand resides on Fairway Drive in the Florence Country Club area, and (as noted above) attended the January 18, 2022 meeting at the Florence Country Club which was held to discuss how to block Plaintiff from developing the Jessamine. Defendant Brand did not disclose this conflict of interest in open session to Florence County Council prior to the vote.

105.     According to the approved minutes posted online by Florence County, there have been one hundred and eight (108) meetings of Florence County Council dating back to January 15, 2015, including sixteen (16) special called meetings, and five (5) emergency meetings.

106.     Of the sixteen (16) special called meetings, the January 27, 2022 Special Called Meeting was the **<u>only</u>** instance where no advanced notice of a special called meeting was published in the Florence Morning News at least one day prior to the meeting, even though, upon information and belief, Defendants knew that the January 27, 2022 Special Meeting was going to be called as early as January 21, 2022.

107.     According to the approved minutes posted online by Florence County, the only other instances from January 15, 2015 through the present where advanced notice of a county

---

[15] A video of the three minute and fourteen second January 27, 2022 County Council meeting can be accessed at <u>https://s3.us-east-1.amazonaws.com/media.florenceco.org/videos/council/2022/council-012722.mp4</u>

council meeting was not published in the Florence Morning News, were the five Emergency

Meetings, which were called with no notice for the following reasons:

a) <u>October 4, 2015</u>: Emergency telephonic meeting was called for the purpose of declaring a State of Emergency, due to **excessive flooding** in Florence County;

b) <u>October 8, 2016</u>: Emergency telephonic meeting was called for the purpose of declaring a State of Emergency in Florence County, due to **Hurricane Matthew**;

c) <u>September 8, 2017</u>: Emergency telephonic meeting was called for the purpose of declaring a State of Emergency in Florence County, due to **Hurricane Irma**;

d) <u>September 11, 2018</u>: Emergency telephonic meeting was called for the purpose of considering a change in time and location of the upcoming September 13, 2018 Regular Meeting, due to **Hurricane Florence**; and

e) <u>June 2, 2020</u>: Emergency telephonic meeting was called for the purpose of declaring a State of Emergency in Florence County, due to the **potential loss of property and personal injury from demonstrations** involving the death of George Floyd.

In other words, Plaintiff is unaware of any other recent instance where the ordinary permitting

and construction of a residential development has risen to the level of a County "emergency,"

other than the concerted and collusive effort to stop the Jessamine by way of the Illegal

Moratorium.

108.    The introduction of an ordinance for first reading at a special called meeting

violates the Florence County Code of Ordinances, which only allow for the introduction of

ordinances for first reading at any **regular meeting** of Florence County Council.  *See* Florence

County Code of Ordinances, Chapter 2 Article VI § 2-248(5)(a) (emphasis added).   The

introduction of Ordinance No. 17 2021/22 at a Special Called Meeting with no notice to the

public was a violation of Florence County's own ordinances.

109.    Notably, on February 3, 2022, Jeffrey Payne alerted Florence County that he would like to place a hold on his Freedom of Information request, as he might not need the materials. Although it was not explicitly stated, implicit in this communication is the acknowledgment that Florence County would pass the Illegal Moratorium, which was conceived for the specific purpose of blocking the Jessamine.

110.    Florence County Council held its next regularly scheduled meeting on February 17, 2022 and posted on the agenda was the second reading of Ordinance No. 17 2021/22 as well as a public hearing for this ordinance. The agenda was revised two days prior to the meeting and the text of the title of Ordinance No. 17 2021/22 was revised from what was introduced at the improper and unlawful first reading.

111.    The revisions changed the properties, or clusters of properties, to which Ordinance No. 17 2021/22 would apply. Initially, the ordinance and Illegal Moratorium would apply to properties or clusters of properties bounded by the incorporated limits of a municipality (such as the City of Florence) on at least 75% of the sum of the boundary lines of the properties, or clusters of properties. The revision upon second reading was to limit application of the crafted ordinance and Illegal Moratorium to those properties or clusters of properties that were completely surrounded by the incorporated limits of a municipality, otherwise known as "donut holes."

112.    Upon information and belief, this revision was made so that the efforts of Defendants to rush the adoption of an unlawful ordinance would have only the intended purpose of targeting and blocking the Jessamine. As it was initially written, the ordinance would have, upon information and belief, precluded another unrelated project (that did not involve LIHTC credits or affordable housing) within the county from obtaining permits. The ordinance was

abruptly revised to only impact the Jessamine.  The revisions in Ordinance No. 17 2021/22 are shown below:

2.  **ORDINANCE NO. 17-2021/22** *(Public Hearing)*
An Ordinance To Develop A Study Of The Characteristics Of Properties Within The County Of Florence Which Are Completely Bounded By The Incorporated Limits Of A Municipality On At least 75% Of The Sum Of The Properties, Or Cluster Of Properties, Perimeter Boundary Lines; To Further Place A Moratorium On All Development Related Permits For Properties Bounded By The Incorporated Limits Of A Municipality Which Are Currently Designated Unzoned; To Receive Zoning Recommendations For Properties Within The County Of Florence Which Are Completely Bounded By The Incorporated Limits Of A Municipality On At Least 75% Of The Sum Of The Properties Perimeter Boundary Lines And Other Matters Related Thereto.

Defendants published the full revised text of Ordinance No. 17 2021/22 for the first time in the agenda for the February 17, 2022 Florence County Council meeting.  A copy of Ordinance No. 17 2021/22 as published in the agenda for the February 17, 2022 Florence County Council meeting is attached as Exhibit 17.  One of Defendants' justifications for enacting Ordinance No. 17 2021/22 that appears in the body of the ordinance is that Defendants have been "contacted by various individuals concerning the anomaly of the County properties being unzoned surrounded by Municipal properties that are zoned."  The relevant portion is shown below:

**WHEREAS:**

1.  There are various and sundry parcels of property located in the County which are completely surrounded by the Municipalities; and,

2.  The properties in the Municipalities are zoned and the properties in the County of Florence are unzoned; and,

3.  The County has been contacted by various individuals concerning the anomaly of the County properties being unzoned surrounded by Municipal properties which are zoned.

113.     David Douglas, one of the members of DHD Jessamine, LLC, spoke at the public hearing portion of the February 17, 2022 Florence County Council meeting in opposition to Ordinance No. 17 2021/22.  Mr. Douglas attempted to inform Florence County Council that Plaintiff has already spent a significant amount of money, and that if Florence County proceeded with enacting Ordinance No. 17 2021/22 and its development moratorium that Florence County would be blocking a development with an estimated value in excess of $12,000,000 that would provide quality workforce housing to its residents and that the LIHTCs that had been awarded to the Jessamine would be lost, with no ability to allocate them elsewhere in the State under the 2021 QAP due to the time at which they would be forfeited back to The Authority.  Mr. Douglas challenged the Defendants to answer the question as to, other than the Jessamine, what other "donut hole" had Florence County Council been contacted about at all and whether anyone ever called to express any such concerns about any other "donut hole" than where the Jessamine would be located.  Predictably, not a single Defendant responded to this inquiry.

114.     Following the public comments made by David Douglas, Florence County Councilman Kent Caudle told Defendant Dorriety that he needed to be recused from the issue of Ordinance No. 17 2021/22 that was before Florence County Council, because his firm, Palmetto Commercial Real Estate, was representing the owner of the property in the pending sale to Plaintiff.  This abstention by Mr. Caudle, on the basis of his business affiliation with the Property being sold to Plaintiff is further evidence that Ordinance No. 17 2021/22 was designed to single out, target, and block the Jessamine, rather than to address a supposed, legitimate countywide concern of Defendants.

115.     Walker Wilcox, an attorney with the law firm of Willcox, Buyck, & Williams in Florence, who referred to himself as "one of the country club neighbors," spoke in support of

Ordinance No. 17 2021/22 at the February 17, 2022 Florence County Council. Mr. Wilcox spoke in length as to his opinions and concerns that he had specific to the Jessamine, and stated that this development is a "bad deal for Florence County." Mr. Willcox also made several false statements as to an alleged burden that the Jessamine would put on the surrounding infrastructure, which he described as "crumbling," and stated that "he could not imagine a worse place to put this multifamily development." In his public comments, Mr. Wilcox repeatedly stated that Plaintiff "was trying to take advantage of an anomaly," again parroting the wording used in the revised version of the ordinance.[16]

116. At the February 17, 2022 regular meeting, following second reading, Florence County Council voted in favor of a motion to approve second reading of Ordinance No. 17 2021/22 by a vote of 8-0. Notably, there was **zero discussion or debate** regarding Ordinance No. 17 2021/22 and its potential ramifications, with Councilman Kent Caudle abstaining from making any comments regarding the Ordinance or participating in any vote related to the ordinance.

117. Drew Schaumber submitted written comments via email, as is permitted by Florence County, to be read aloud at the February 17, 2022 meeting. However, these comments were not read at the meeting, according to Connie Haselden, Clerk to Florence County Council, because (despite being submitted prior to the deadline to do so) they were not received by her in time. She advised they would be distributed accordingly and added to Council's package for the March 17, 2022 meeting.

118. Mr. Schaumber's email included the following question which still has not been answered by Florence County Council: "*The ordinance references calls of concern about*

---

[16] A video of the February 17, 2022 County Council meeting can be accessed at https://s3.us-east-1.amazonaws.com/media.florenceco.org/videos/council/2022/FCC%20February%202022.mp4. The public hearing portion of this meeting begins at the 6:50 mark and concludes at the 18:15 mark.

*unzoned parcels in the county. I would ask the county to specifically identify what other parcels and projects they have received calls on…"*

119. On February 24, 2022, Jeffrey Payne alerted Florence County that he would like to cancel his Freedom of Information request, as it was already clear that the discriminatory actions of Defendants would have the effect that he was seeking, *i.e.*, to kill the Jessamine.

### *Florence County Unlawfully Imposes the Illegal Moratorium Prior to Third Reading*

120. During this process, Plaintiff continued to pursue the next steps in the process to obtain building permits. However, on February 25, 2022, Shawn Brashear, Florence County's Director of Planning and Building, indicated in an email to Plaintiff's mechanical electrical and plumbing engineer that the Jessamine was one of several thousand properties that are under a development moratorium, that a multifamily housing project would not be approved under this moratorium, and that it was uncertain when the moratorium would be lifted. A copy of Shawn Brashear's February 25, 2022 email is attached as Exhibit 18.

121. On March 3, 2022, Plaintiff's civil engineering consultant called Woody Powell with the Florence County Stormwater department to ask about some specific details regarding the preferred method for submitting Plaintiff's stormwater package. Woody Powell asked what project the submittal was regarding, and upon learning it was the Jessamine, stated that the site was under a moratorium.

122. Plaintiff's civil engineering consultant informed Woody Powell that the moratorium ordinance had not yet been adopted, and Woody Powell said he would check with his supervisor and follow up with an answer. Woody Powell called Plaintiff's civil engineering consultant back within five (5) minutes and informed him that the development moratorium was

a "done deal" and that the third reading of the ordinance was just a "formality," and that there was no use in submitting anything because Florence County would not accept it.

123.    On March 4, 2022, Plaintiff attempted to submit an application for a certificate of zoning compliance along with all of the required supporting documentation and application fee to Derrick Singletary, a senior planner/zoning administrator for Florence County.  Plaintiff's submission was in strict compliance with the form provided on Florence County's and the application requirements as stated in Florence Code of Ordinances, Chapter 30 Article VIII § 30-267(c).

124.    When Plaintiff's representative attempted to make this submission, Mr. Singletary stated that he could not accept the application because The Property was in the study area that the development moratorium governed, and that his office has been told not to issue any permits for properties in the study area.  Derrick Singletary refused to provide any explanation in writing as to why he refused to accept Plaintiff's application for a certificate of zoning compliance, and only offered to provide his business card.  Derrick Singletary's refusal to even accept Plaintiff's application for a certificate of zoning compliance was unlawful and a violation of Florence County's code of ordinances.

125.    The Florence County Zoning Ordinances does not grant any discretion to the zoning administrator to refuse to even accept an application for a certificate of zoning compliance. Rather, the Florence County Zoning Ordinances provides **only two non-discretionary options** available to the zoning administrator when an application for a certificate of zoning compliance is submitted:

   b)  Processing procedures:

      1.  When the zoning administrator receives an application for a certificate of zoning compliance whose proposed improvement and

use described and illustrated conforms to all requirements of this chapter, **he shall issue a certificate of zoning compliance and return a signed copy to the applicant within ten days of receipt of the application**.

2. **When** he zoning administrator receives an application for a certificate of zoning compliance whose proposed improvement and use described and illustrated does not conform to this chapter, **he shall deny the issuance of a certificate of zoning compliance, and so advise the applicant within ten days, citing the particular sections of this chapter with which the application does not comply**.

3. Each application for a certificate of zoning compliance shall be filed with the zoning administrator on a form provided therefore, which form may be combined with the application for a building permit required under the building code. The application must be signed by the owner or his authorized agent or attorney.

*See* Florence Code of Ordinances, Chapter 30, Article VIII § 30-267(b) (emphasis added).

126.    On March 14, 2022, Plaintiff sent a letter to Defendants in an attempt to ensure that Defendants were cognizant of the fact that if they proceeded with the Illegal Moratorium, this would have a disparate impact that will disproportionately affect low-income families and minorities and would reinforce and perpetuate residential housing segregation in Florence County. Plaintiff also took the opportunity to remind Florence County of its support of the Jessamine, which Plaintiff relied upon in making the decision to proceed.

127.    Although the writing was on the wall, Plaintiff wanted to make sure that before Florence County Council adopted the Illegal Moratorium, the consequences were understood, hoping that Defendants might change course before it was too late.

128.    Plaintiff also advised in this letter that its comments submitted for the February 17, 2022 meeting did not appear to have been added to the approved meeting notes or agenda

package, and requested again that confirmation these comments were shared and added to the public record. A copy of Plaintiff's March 14, 2022 letter is attached as <u>Exhibit 19</u>.[17]

129.   It was not until Drew Schaumber's third request on March 16, 2022 for confirmation that his submitted February 17, 2022 public comments were added to the public record and circulated to Council, that his submitted comments were finally included in the meeting minutes.

130.   Florence County Council held its next regularly scheduled meeting on March 17, 2022. Included in the agenda was third reading of Ordinance No. 17 2021/22. Although the public hearing was already conducted, based on a request for public participation, Defendants Yarborough and Bradley moved to recognize William Tallavast, the owner of the Property, to be able to speak during the meeting. Mr. Tallavast spoke in opposition of Ordinance No. 17 2021/22, stating that he believed the ordinance had specifically targeted his property and providing reasons why the Jessamine was needed in Florence County to provide workforce housing to low-income households and families who provide essential services to employers and to Florence County as a whole.

131.   Pierce Campbell, who identified himself as the Chief Executive Officer of the law firm of Turner Padgett Graham and Laney, P.A., spoke in support of Ordinance No. 17 2021/22 at the March 17, 2022 meeting. Mr. Campbell stated he lives right beside the Property, although there are actually several parcels (including two commercial businesses) between his residence and the Property.

132.   Mr. Campbell spoke at length as to his opinions and concerns that he had, all of which were specific to the Jessamine. He stated his opinion that the Property does not work for a

---

[17] Plaintiff's March 14, 2022 letter was sent via FedEx and was received by Florence County and Florence County Council by March 16, 2022. Plaintiff also sent a copy of this letter to the Florence County and Florence County Council via email on March 16, 2022.

multifamily project such as the Jessamine, proceeding to make multiple false statements regarding the site plan and statements regarding flooding and stormwater that demonstrates his lack of understanding of both current conditions and the effect that the Jessamine would have. Mr. Campbell told Florence County Council that they also needed to think about Lake City and Timmonsville and other areas where donut holes exist, recognizing that it would be apparent to even the most casual observer that the entire effort to impose the Illegal Moratorium was undeniably targeted towards the Jessamine.[18]  Notably, there are actually **zero** donut holes or surrounded, unzoned Florence County parcels in either Timmonsville or Lake City that would be subject to the Undefined Zoning Study or the Illegal Moratorium, according to the Florence County GIS map.[19]  A part of the campaign to block the Jessamine consisted of misinformation intended to create a false impression that the effort was something other or something broader than what it was.

133.    With regard to municipalities in Florence County generally, it is only the City of Florence that contains donut holes or unzoned Florence County parcels that would be subject to the study and moratorium created by Ordinance No. 17 2021/22.  A review of publicly available resources maps confirms that there are **zero** such donut holes or surrounded, unzoned Florence County parcels that would be subject to the Undefined Zoning Study or the Illegal Moratorium in the following municipalities: (i) the Town of Quimby; (ii) the Town of Coward; (iii) the Town of Olanta; (iv) the Town of Scranton; (v) the Town of Pamplico; or (vi) the City of Johnsonville.

---

[18] A video of the March 17, 2022 County Council meeting can be accessed at https://s3.us-east-1.amazonaws.com/media.florenceco.org/videos/council/2022/March%2017%20FCC%202022.mp4.   The relevant portion of the public hearing this meeting begins at the 30:50 mark and concludes at the 41:15 mark.

[19] The GIS Maps used to confirm this analysis can be located online as follows: *See* https://flocogis.maps.arcgis.com/apps/webappviewer/index.html?id=9a5174c030744528979330963bdbb5f9 (Last visited March 25, 2022).

134.    At the March 17, 2022 regular meeting, following third reading, Florence County Council voted in favor of Ordinance No. 17 2021/22 by a vote of 8-0 after again having **zero discussion or debate** regarding Ordinance No. 17 2021/22 and its potential ramifications, with Councilman Kent Caudle abstaining from making any comments regarding the Ordinance or participating in any vote related to the ordinance.

### *Florence County Council Failed to Enact an Ordinance of "Equal Dignity" Before Suspending Its Zoning Code and Land Use Regulations*

135.    The South Carolina Code grants local governing bodies, like Florence County Council, the authority to amend, supplement, and repeal ordinances. However, when an ordinance like Ordinance No. 17 2021/22 establishes a moratorium that effectively suspends the valid operation of part of the existing Florence County Zoning Ordinance, the ordinance must be enacted in the same manner and in full compliance with the procedural requirements that are required and were required when enacting the Florence County Zoning Ordinance itself.

136.    This concept is recognized as the doctrine of "equal dignity."  In *Simpkins v. City of Gaffney*, 315 S.C. 26, 431 S.E.2d 592 (1993), the South Carolina Court of Appeals recognized that municipal corporations have the authority to regulate buildings and structures through zoning ordinances but held in order to suspend operation of an existing zoning ordinance, the ordinance must be either repealed or succeeded by another ordinance or instrument of equal dignity.  Otherwise, the enactment is illegal and void.

137.    The Illegal Moratorium on all development related permits purports to suspend ordinances and existing, allowed land uses in place under the current Florence County Zoning Ordinance, and thus temporarily changed, in part, the operation of the Florence County Zoning Ordinance.  Ordinance No. 17 2021/22 enacted by Florence County Council is not of equal dignity to the Florence County Zoning Ordinance and was improperly given the full force and

effect of enacted law after a tainted first reading through the invalid and unlawful conduct of Defendants.

138.    Accordingly, under *Simpkins*, for any moratorium on all development related permits and permitting activities for a set of properties to be potentially valid, Florence County Council must pass an ordinance of equal dignity in accordance with the applicable law and procedural requirements as discussed above.  Because Florence County Council has not enacted a valid ordinance of equal dignity, Ordinance No. 17 2021/22 is null and void and does not have the force of law.

### *Ordinance No. 17-2021/22 Specifically Targeted the Jessamine and Serves No Legitimate Legislative Purpose*

139.    When reading the title and fourteen (14) paragraphs of Ordinance No. 17-2021/22 in harmony, and applying to the clear and plain meaning of the language therein, the Undefined Zoning Study and Illegal Moratorium on all development related permits created by the ordinance will apply to areas of the County that are: (i) unzoned; (ii) surrounded in whole by properties located within a Town or City that themselves are zoned ("Zoned Municipal Properties"); and (iii) are either single properties or clusters of properties.

140.    By its terms, the Illegal Moratorium does not apply to permits or certificates of zoning compliance which may be required for the maintenance of existing structures, nor does it apply to any new building permits for single family and accessory structures in existing, established and approved single family residential subdivisions and subdivisions that have prior sketch plan approval by the Planning Commission.

141.    Pursuant to the clear and plain meaning of the text of Ordinance No. 17-2021/22 there are thirty-two (32) clusters of Florence County parcels that are currently unzoned and entirely surrounded by Zoned Municipal Properties.  These thirty-two (32) clusters contain a

total of one hundred and sixty-four (164) individual parcels.  Additionally, there are forty-seven (47) individual Florence County parcels that are currently unzoned and surrounded in whole by Zoned Municipal Properties.  Together, this amounts to two hundred eleven (211) parcels that would be affected by the Illegal Moratorium, as opposed to "several thousand."  Furthermore, the vast majority of the parcels are already developed under an active use, such that there is no need or purpose for them to be "studied."

142.    Of the two hundred eleven (211) parcels that would be affected by the Illegal Moratorium: (i) one hundred thirty-eight (138) parcels already have an existing single-family residence on them, the majority of which are located within established and approved residential subdivisions; (ii) twenty-five (25) parcels already have one or more existing commercial buildings on them; (iii) one (1) parcel already has an existing multi-family development on it; (iv) one parcel is a cemetery with no access; and (v) one (1) parcel is a paved roadway leading to another unzoned county parcel containing multiple medical offices.  In other words, one hundred sixty-five (165) parcels are developed and being actively used, which accounts for seventy-eight percent (78%) of the parcels that are subject to the Illegal Moratorium.

143.    Among the remaining parcels or clusters of parcels that are undeveloped, only fourteen (14) are parcels or clusters of parcels are under the same ownership and exceed 2.5 acres and most of these are undevelopable, such that they do not need to be "studied" either.  Specifically, of these fourteen (14) parcels or clusters of parcels, one (1) parcel is entirely wetlands and undevelopable, one (1) parcel is on the National Historic Register and undevelopable, one (1) parcel contains a power substation owned by Carolina Power and Light Company, three (3) parcels have existing commercial buildings that take up the majority of the

parcel, and two (2) parcels would have to be subdivided in order to access the undeveloped wooded acreage is adjacent to a factory and warehouse located are on those parcels.

144.    In total, among the total of two hundred eleven (211) parcels covered by the Illegal Moratorium, there are only six (6) parcels or clusters of parcels, including the Property, which are under the same ownership and could hypothetically support a multifamily affordable housing development such as the Jessamine, most of which are already developed or are undevelopable.  Below is a summary of these six (6) parcels and clusters of parcels, starting with the subject Property:

1.  **The Property - 5.93 acres**
    - TMS 90018-03-006 2.39 acres
    - TMS 90018-03-007 1.03 acres
    - TMS 90018-03-008 2.51 acres
    - Plaintiff has this Property under Contract, has qualified for an award of LIHTCs, has received an award for LIHTCs, and was proceeding with the development of the Jessamine until blocked by the illegal and discriminatory actions of Defendants.

2.  **TMS 00176-01-024 - 15.61 acres**
    - The property already contains four (4) single family residences and consists of woodlands

3.  **TMS 00176-01-007 - 17.52 acres**
    - This parcel is entirely woodlands and is bisected by a powerline easement

4.  **Cluster of Parcels Owned by Maxwell Baptist Church - 26.54 acres**
    - TMS 00176-01-006 5.59 acres
    - TMS 00176-01-004 0.78 acres
    - TMS 00176-01-005 0.33 acres
    - TMS 00176-01-002 19.84 acres
    - Cluster is entirely undeveloped woodlands

5.  **TMS 00175-01-153 - 6.09 acres**
    ▪ Parcel is entirely undeveloped woodlands

6.  **TMS 00175-01-035 - 19.79 acres**
    ▪ Parcel is entirely farmland

145.    Prior to the January 27, 2022 Special Called Meeting, when Florence County Council illegally and improperly introduced Ordinance No. 17 2021/22 for first reading and began their pattern of refusing to follow the clear and plain meaning of the Florence County Code of Ordinances, Plaintiff had already incurred significant costs and expenses in application, review, design, engineering, due diligence, and other development related costs as part of its year-long process to develop the Jessamine.  These development related costs and expenses were incurred solely based on Plaintiff's good faith efforts and belief that Defendants would not completely reverse support, decisions and positions they had maintained, including but not limited to certifying that the location of the Jessamine represented the "ideal location" for an affordable community and that Florence County supported the addition of new affordable housing in the specific area of The Jessamine.

146.    There was an extended course of dealing, which led to knowledge and good faith belief on the part of Plaintiff that Defendants would not act in an unlawful and racially discriminatory manner.  Specifically, Plaintiff relied upon assurances and written representations that the Jessamine, as planned, was permissible under the Florence County's zoning ordinances that were in place at the time and remain in place as of the date of this action, but have been unlawfully suspended through the enactment of Ordinance No. 17-2021/22 and the Illegal Moratorium that was implemented before it was even was adopted.

147.    Additionally, due to Plaintiff's reasonable reliance and the ultimate timing of Defendants' unlawful conduct, members of Plaintiff were prevented from proceeding with developing "The Savoy at Market Common," (the "Savoy") an 88-unit low-income multifamily apartment development that also received a final award of LIHTCs under the 2021 QAP.  Due to the limit of three (3) LIHTC awards under the 2021 QAP that any single developer or member can receive, Plaintiff could not proceed with each of the projects that had qualified.

148.    During the 2021 QAP cycle, members of Plaintiff and their related entities received awards on three (3) of their applications separate from the Savoy, which were: (i) Swansgate 3, a 64-unit rehabilitation development in Myrtle Beach; (ii) **the Jessamine**; and (iii) Riley at Overbrook, an 88-unit new construction multifamily development in Greenville.

149.    If, at any time during the process, Florence County or Florence County Council had raised any issue with the Jessamine prior to the date when Plaintiff's' was required to accept or forego the LIHTC reservation for the Jessamine, Plaintiff could have notified the Housing Authority of its intent to withdraw the application for the Jessamine and accepted the reservation for the Savoy.    However, the timing of the illegal conduct on the part of all Defendants prevented this, which has caused additional damages due to the loss of the opportunity to pursue the Savoy.

150.    Plaintiff's inability to develop the Jessamine denies low-income individuals and families from Florence County and neighboring areas from having the opportunity to live in high-quality rental housing in one of the most affluent and desirable areas of Florence County. This disproportionately harms African American families and families with children, who are in the greatest need of this housing in Florence County, and also perpetuates the racial segregation that continues to exist in the area.  In addition to the damages that Plaintiff has suffered and will

continue to suffer, the actions of Defendants have the purpose and effect of limiting housing opportunities for racial minorities and families with children who would live at the Jessamine.

151.    On this basis, the actions of Defendants constitute unlawful interference with housing opportunities on the basis of race and familial status.

152.    Through their actions described above, Defendants have acted negligently, intentionally, maliciously, and with willful, malicious, wanton, and reckless disregard for federal and state fair housing and non-discrimination laws.

153.    Defendants' actions resulting in the successful targeting of the Jessamine were unethical, illegal, arbitrary, capricious, and racially discriminatory. Defendants' illegal introduction and enactment of Ordinance No. 17 2021/22 and the Illegal Moratorium, which were specifically engineered to block The Jessamine, as well as Defendants' failure to follow local ordinances, state law, federal law, the South Carolina Constitution, and the United States Constitution have caused Plaintiff to incur actual, consequential, special and other damages in amounts that will be proven at trial.

154.    Defendants crafted Ordinance No. 17-2021/22 and the Illegal Moratorium on the false pretense that there was countywide concern over the "anomaly" of supposed unzoned parcels throughout Florence County, when the actual concern was from the Country Club Residents motivated by an intention to deny low-income families the opportunity to have affordable housing in a desirable, yet racially segregated area of Florence County with plentiful amenities and employment opportunities.[20]

---

[20] As noted above, the Jessamine was awarded LIHTCs in part due to the fact that more than 5,000 jobs exist within a 2-mile radius of the site that earn annual incomes high enough for the Jessamine to qualify under the scoring criteria of the 2021 QAP. According to 2019 US Census data (http://onthemaps.ces.census.gov/) used for the 2021 QAP, there were 8,098 jobs within a 2-mile radius of 421 Cashua Drive paying between $1,251 - $3,333 per month.

## FOR A FIRST CAUSE OF ACTION

### *(Violation of Fair Housing Act of 1968, 42 U.S.C. § 3604)*

155.    Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

156.    Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3604(a), which makes it unlawful "[t]o sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, **otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status**, **or national origin**." (emphasis added).

157.    Defendants are further liable under 42 U.S.C. § 3604(b), which makes it unlawful to "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

158.    Defendants' actions also impose disproportionate harm upon African Americans and families with children by making affordable housing in one of the most desirable, affluent and racially segregated areas of Florence County unavailable to them, with the effect of impeding racial desegregation in Florence County.

159.    To violate the FHA, it is *not* necessary for a government body to *intentionally* exclude minorities from housing opportunities, or to be motivated by racial *animus* in its land use and zoning decisions.  In 2015, the United States Supreme Court affirmed that "[t]hese unlawful practices include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods ***without any sufficient justification***." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 135 S. Ct. 2507

(2015) (emphasis added). Pursuant to the FHA, local government entities may not use their land use and zoning authority in a manner that has either a discriminatory intent or a discriminatory effect against minorities, familial status, or those protected parties under the FHA.

160. Plaintiff has been injured by Defendants' discriminatory conduct and has suffered actual, consequential, and special damages as a result, all in amounts to be proven at trial, plus attorney's fees, costs, and prejudgment interest.

161. Defendants' conduct was intentional, willful, malicious, and made in reckless indifference and callous disregard of the known rights of others, justifying an award of punitive damages. It must be noted that malice or reckless indifference for this purpose pertain to the knowledge of a defendant that it *may* be acting in violation of federal law, rather than actual awareness that it is engaging in discrimination.

## FOR A SECOND CAUSE OF ACTION
### *(Violation of Fair Housing Act of 1968, 42 U.S.C. § 3617)*

162. Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

163. Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under the federal Fair Housing Act, 42 U.S.C. § 3617, under which "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."

164. Defendants' actions have interfered with Plaintiff's efforts to build and operate an affordable housing development that would disproportionately benefit African Americans and

families with children, thereby constituting unlawful retaliation against Plaintiff for proposing a development project that would serve these groups.

165.     Even a land use or zoning practice that is seemingly or facially neutral violates the FHA if enacted with discriminatory intent.  In that instance, the analysis of whether there is intentional discrimination will be based on a variety of factors, not all of which must be met in order for liability to attach.  The applicable factors include, but are not limited to:

(i)     the "impact" of the municipal practice, such as whether an ordinance disproportionately impacts minority residents compared to white residents or whether the practice perpetuates segregation in a neighborhood or particular geographic area;

(ii)     the "historical background" of the action, such as whether there is a history of segregation or discriminatory conduct by the municipality;

(iii)     the "specific sequence of events," such as whether the city adopted an ordinance or took action only after significant, racially-motivated community opposition to a housing development or changed course after learning that a development would include non-white residents;

(iv)     departures from the "normal procedural sequence," such as whether a municipality deviated from normal application or zoning requirements;

(v)     "substantive departures," such as whether the factors usually considered important suggest that a state or local government should have reached a different result; and

(vi)     the "legislative or administrative history," such as any statements by members of the state or local decision-making body.

See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265–68 (1977).

166.     **When enacting or applying zoning or land use laws, state and local governments may not act because of the fears, prejudices, stereotypes, or unsubstantiated assumptions that community members may have about current or prospective residents because of the residents' protected characteristics. Doing so violates the Act, even if the officials themselves do not personally share such bias.**

167.    For example, a city may not deny zoning approval for a low-income housing development that meets all zoning and land use requirements because the development may house residents of a particular protected class or classes whose presence, the community fears, will increase crime and lower property values in the surrounding neighborhood.

168.    The actions of Defendants to obstruct, delay, and interfere with the Jessamine are and have been based on discriminatory motives related to the race and familial status of the likely tenants of the Jessamine, specifically the likelihood that the tenants will include minorities and minority families with children.

169.    These same actions also impose disproportionate harms on African Americans and families with children by making affordable housing in Florence County unavailable to those groups, with the effect of impeding racial desegregation in Florence County.

170.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered actual, consequential, and special damages as a result, all in amounts to be proven at trial, plus attorney's fees, costs, and prejudgment interest.

171.    Defendants' conduct was intentional, willful, malicious, and made in reckless indifference and callous disregard of the known rights of others, justifying an award of punitive damages.

## FOR A THIRD CAUSE OF ACTION

### (Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.)

172.    Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

173.    Defendants, through their actions and the actions of their agents described above, are liable for the violation of Plaintiff's rights under Title VI of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000d et seq., under which, "[n]o person in the United States shall, on the ground of

race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

174.    The discrimination directed toward Plaintiff and the Jessamine directly and adversely impacts the right of the intended beneficiaries of the Jessamine, which will disproportionately include African Americans and other racial minorities.  Minorities, and those seeking to create affordable housing opportunities for them, are specifically protected from such discrimination by Title VI of the Civil Rights Act of 1964.

175.    Plaintiff has been injured by Defendants' discriminatory conduct and has suffered actual, consequential, and special damages as a result, all in amounts to be proven at trial, plus attorney's fees, costs, and prejudgment interest.

176.    Defendants' conduct was intentional, willful, malicious, and made in reckless indifference and callous disregard of the known rights of others, justifying an award of punitive damages.

## FOR A FOURTH CAUSE OF ACTION

### (*Violation of Substantive Due Process under the South Carolina and United States Constitutions – Violation of 42 U.S.C. § 1983*)

177.    Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

178.    Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 provides that every person who, under color of any statute, ordinance regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

179.    Article I, Section I of the South Carolina Constitution provides that no person "shall be deprived of life, liberty, or property without due process of law, nor shall a person be denied the equal protection of the laws."

180.    Section 1983 alone creates no substantive rights; rather, it provides a remedy for deprivations of rights established elsewhere in the Constitution.

181.    To recover in an action under Section 1983, a plaintiff must show: (1) that they suffered a deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States; and (2) that the act or omission causing the deprivation was committed by a person acting under the color of law.

182.    Defendants are not entitled to sovereign immunity in Section 1983 actions. *See Howlett v. Rose*, 496 U.S. 356, 375, 378, 380-381 (1990).  Furthermore, local governments and municipalities are "persons" within the meaning of Section 1983 and are subject to suit in federal civil rights actions. *See Owen v. City of Independence*, 445 U.S. 622, 647-48 (1980).

183.    Where a local government either: (a) adopts or promulgates a policy; (b) engages in a custom or practice that is not written or formally adopted; (c) fails to supervise its employees and otherwise ensure that its employees follow applicable law; or (d) allows a policymaker to make a decision or undertake an act, and the result of any of the foregoing is a deprivation of protected rights, privileges and immunities occurring under color of law, liability exists under Section 1983.

184.    Despite the great deference accorded local officials in zoning and land use matters, their decisions and official actions are not exempt from the constitutional command to be free of racial discrimination:

> Racially discriminatory local land use decisions of various kinds have long been struck down or found actionable under the Equal Protection Clause. *See, e.g., Progress Development Corp. v. Mitchell,* 286 F.2d 222 (7 Cir.1961) (**discriminatory condemnation to prevent integrated housing development**); *Kennedy Park Homes Association v. City of Lackawanna,* 436 F.2d 108 (2 Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971) (**rezoning undertaken upon learning of plans for low-income housing project**).

*See Scott v. Greenville Cty.*, 716 F.2d 1409, 1416 (4th Cir. 1983) (emphasis added) (reversing the lower court's judgment in favor of municipal defendants who adopted a moratorium in response to community pressure to block a low-income housing development and remanding for further proceedings on developer's claims for damages).

185.    The starting point for our inquiry is to determine whether state or local law afforded Plaintiff a "protectible property interest in the permit" sufficient to trigger federal due process guarantees. *United Land Corp. of America v. Clarke,* 613 F.2d 497, 501 (4 Cir.1980). Under South Carolina law, Plaintiff enjoyed an entitlement to the issuance of certificate of zoning compliance upon presentation of an application and plans showing a use expressly permitted under the then-current zoning ordinance. *Niggel v. City of Columbia,* 254 S.C. 19, 173 S.E.2d 136, 137–38 (1970); *Pure Oil Division v. City of Columbia,* 254 S.C. 28, 173 S.E.2d 140, 142 (1970). This entitlement extended to Plaintiff even though it held only an option to purchase the property or similar interest, rather than actual legal title. *See, e.g., Abbeville Arms v. City of Abbeville,* 273 S.C. 491, 257 S.E.2d 716 (1979). *Id,* at 1418.

186.    Under South Carolina law, even the publicly announced intention of Florence County Council to reconsider the zoning of the area in which Plaintiff proposed to build could not undermine his entitlement to a certificate of zoning compliance, as "vested rights acquired under a zoning ordinance in effect at the time of the application will be protected against a change in the zoning ordinance." *See Pure Oil, supra,* 173 S.E.2d at 142. Plaintiff therefore held

a cognizable property interest, rooted in state law, to which federal due process protection extended. *Id* at 1418–19.

187.    Although federal courts are reluctant to act as a "zoning board of appeals" when presented with claims which, although couched in constitutional language, at bottom amount only to "the run of the mill dispute between a developer and a town planning agency," this legal principle is entirely inapplicable to disputes involving discrimination and violation of federally protected rights, such as exists here.  It "has been recognized that zoning action which is 'tainted with fundamental procedural irregularity, racial animus, or the like' does amount to an actionable denial of due process. *See Scott,* 716 F.2d at 1419 (4th Cir. 1983).

188.    Individuals acting under the color of law are subject to Section 1983 unless they are immune.  Qualified immunity protects public officers in their *individual* capacities from civil liability if the individual defendants establish that they were acting within the scope of their discretionary authority when the allegedly wrongful acts occurred.  The members of Florence County Council who enacted Ordinance No. 17-2021/22 and the Illegal Moratorium are being sued in their official capacities.

189.    Absolute legislative immunity protects public officers in their individual capacities from civil liability when they perform certain functions, whether or not they acted with malicious intent.  In distinguishing between legislative and administrative acts, courts look to the facts and the impact of the action.  If the action involves general policy, it is legislative. On the other hand, **if it applies general policy to specific individuals, it is administrative**. *See Crymes v. DeKalb County*, 923 F.2d 1482, 1485-86 (1991)(emphasis Added).  Thus, the legal and proper adoption of ordinances and budgeting decisions are legislative in nature, but the improper and illegal adoption of Ordinance No. 17 2021/22 that was specifically designed to

target Plaintiff and the Jessamine was administrative. Furthermore, the refusal to accept and process Plaintiff's application for a certificate of zoning compliance was a constructive denial of a development permit and was administrative in nature.

190.    Because Florence County Council's members assumed non-legislative roles in dealing with Plaintiff's development and development related permit applications (by targeting the Jessamine as opposed to adopting general prospective rules), legislative immunity does not extend to them. *See Scott v. Greenville Cty.*, 716 F.2d 1409, 1423 (4th Cir. 1983), *citing Altaire Builders, Inc. v. Village of Horseheads,* 551 F.Supp. 1066, 1072–75 (M.D.N.Y. 1982); *Riccobono v. Whitpain Tp.,* 497 F.Supp. 1364, 1376 (E.D. Penn. 1980); and *Kinderhill Farm Breeding Associates v. Appel,* 450 F.Supp. 134, 136 (S.D.N.Y. 1978).

191.    The actions of Defendants were purely administrative in nature and were not within the scope of their discretionary authority and therefore no qualified or absolute immunity exists. Also, Defendants acted under the color of law and are subject to Section 1983 liability.

192.    Plaintiff is entitled to judgment against Florence County, each member of Florence County Council, and John Does 1-15 for their violation of Section 1983 of the Civil Rights Act of 1971, 42 U.S.C. § 1983 and Article I, Section I of the South Carolina Constitution in an amount to be proven at trial, plus attorney's fees, costs, and prejudgment interest.

### **FOR A FIFTH CAUSE OF ACTION**
#### *(Conspiracy to Interfere with Civil Rights – 42 U.S.C. § 1985)*

193.    Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

194.    "If two or more persons ... conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

privileges and immunities under the laws ... whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators." See 42 U.S.C. § 1985(3).

195.     To state a claim under 42 U.S.C. § 1985(3) a plaintiff must establish: (1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

196.     Defendants along with John Does 1-15 (to be identified residents living in the Florence Country Club neighborhoods) conspired for the express purpose of stopping and/or blocking Plaintiff from developing the Jessamine, and were motivated by discriminatory animus against the prospective tenants of a low-income apartment development against low-income.

197.     Plaintiff has been injured by Defendants' discriminatory conduct and has suffered actual, consequential, and special damages as a result, all in amounts to be proven at trial, plus attorney's fees, costs, and prejudgment interest.

198.     Defendants' conduct was intentional, willful, malicious, and made in reckless indifference and callous disregard of the known rights of others, justifying an award of punitive damages.

### FOR A SIXTH CAUSE OF ACTION
#### *(Promissory Estoppel)*

199.     Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

200.     Promissory estoppel is a doctrine that holds an estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice.

201.     Where promissory estoppel is available as a remedy, it is a substitute for consideration.  A promise binding under principles of promissory estoppel is a contract.

202.     The elements of promissory estoppel are: (a) the presence of a promise unambiguous in its terms; (b) reasonable reliance on the promise by the party to whom the promise is made; (c) the reliance is expected and foreseeable by the party who made the promise; and (d) the party to whom the promise is made must sustain injury in reliance on the promise.

203.     It was expected and foreseeable by Defendants that Plaintiff would rely on the unambiguous commendation and financial support for the Jessamine that was provided or pledged over a year long course of dealing when Plaintiff and Defendants were in constant contact regarding the Jessamine.  As such, it was expected and foreseeable by Defendants that Plaintiff would rely on the established course of dealing, the agreement to commit $10,000.00 of financial support towards the installation of a fire hydrant, and the assurances from multiple members of Florence County's planning and zoning departments that the Property was an "ideal location" for the Jessamine that no issues would affect Plaintiff's ability to successfully develop the Jessamine.

204.     Plaintiff has clearly sustained injuries and damages by relying, to its detriment, on Defendants' assurances relating to the Property and the Jessamine.  Plaintiff has also sustained injuries by mistakenly trusting the commitment made by Defendant Dorriety on behalf of Florence County and Florence County Council.

205.   On the basis of promissory estoppel, Plaintiff is entitled to judgment against Defendants for the significant losses and damages that it has suffered as a result of its detrimental reliance Defendants' written and verbal promises in an amount to be proven at trial.

## FOR A SEVENTH CAUSE OF ACTION
### *(Negligence/Gross Negligence)*

206.   Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

207.   Defendant Florence County owed Plaintiff duties of care to:

   a.   Properly supervise its employees and representatives to ensure that they did not make incorrect representations to plaintiffs of City ordinances, policies, and procedures.

   b.   Properly train its employees and representatives to understand and be able to correctly interpret City ordinances, policies, procedures, and intentions and communicate them correctly to Plaintiff; and

   c.   Affirmatively further fair housing and protected rights of all Florence County citizens and particularly minorities, as required by 42. U.S.C. §3608, 42 U.S.C. §5304(b), 24 C.F.R. §91.425(a)(1)(i).

208.   As above-alleged, Defendant Florence County failed to act reasonably and carefully in any of the duties above-stated, instead taking actions that are entirely inconsistent with those that would be expected from a municipality and its elected officials to promote the well-being of its citizens, rather than engage and permit intentional violations of their civil rights.

209.   These failures to act reasonably and carefully were breaches of said duties of care, which were the proximate cause of damages to Plaintiffs as alleged above.

210.   Plaintiff has been injured by Defendants' negligence and gross negligence and has suffered actual, consequential, and special damages as a result, all in amounts to be proven at

trial, plus attorney's fees, costs, and prejudgment interest. Furthermore, the gross negligence of Florence County eliminates any protections of the South Carolina Tort Claims Act.

211.     Defendants' conduct was intentional, willful, malicious, and made in reckless indifference and callous disregard of the known rights of others, justifying an award of punitive damages.

## FOR AN EIGHTH CAUSE OF ACTION
### *(Declaratory Judgment – Illegality of Ordinance No. 17-2021/22)*

212.     Plaintiff reasserts and realleges each and every allegation above as if fully repeated verbatim herein.

213.     In the two reported cases where attempts by municipalities to adopt immediate moratoriums have been reviewed, courts have invalidated the moratoriums in both instances. *See Simpkins v. City of Gaffney*, 315 S.C. 26, 431 S.E.2d 592 (1993) (rejected attempted moratorium that was imposed after a single reading of a resolution); *see also Scott v. Greenville Cty.,* 716 F.2d 1409, 1419, n. 10 (4th Cir. 1983) (rejecting applicability of the Pending Ordinance Doctrine because a "particular scheme of rezoning" was not under consideration and the municipality had not advertised to the public its intention to hold public hearings on any particular scheme of rezoning.)

214.     Absent a particular scheme of rezoning (such as one that, for example, would prohibit multifamily as a use for the Property), it is impossible to know whether an application for certificate of zoning compliance, development related permit applications, or proposed development is going to be "repugnant" to the pending, but not yet enacted ordinance.

215.     Plaintiff seeks a declaratory judgment that the introduction of Ordinance No. 17 2021/22 at the January 27, 2022 Special Called Meeting was illegal and improper, as it violated the Florence County's own Code of Ordinances, which **only allow for the introduction of**

**ordinances to take place at regularly scheduled meetings**, and that as a result Ordinance No. 17 2021/22 is null and void. As such, Defendants were required to comply with the applicable provisions and procedural requirements of the South Carolina Code and Florence County Code of Ordinances before Ordinance No. 17-2021/22 was enacted following third reading.

216.    Plaintiff also seeks a declaratory judgment that the imposition of the moratorium on all development related permits by multiple authorized employees of Florence County, resulting in their refusal to even accept Plaintiff's application for a certificate of zoning compliance prior to the third reading of Ordinance No. 17 2021/22, were improper and a violation of the Florence County Code of Ordinances and state law.

217.    In connection with the issuance of the declaratory adjudications, Plaintiff also requests an award of costs in the amount that the Court determines to be equitable and just. Specifically, Plaintiff is entitled to an award of attorney's fees and costs under S.C. Code § 15-77-300, as the actions of Defendants were without substantial justification.

218.    WHEREFORE, having stated its Complaint against Defendants Florence County, Frank J. Brand, Jason Springs; Roger M. Poston; Alphonso Bradley; Jerry W. Yarborough; Stoney C. Moore; Waymon Mumford; and Willard Dorriety, Jr., as elected members of Florence County Council, and John Does 1-15, Plaintiff DHD Jessamine, LLC respectfully requests that the Court:

    i.    Award actual, compensatory and special damages in an amount to be determined by the jury that would fully compensate Plaintiffs for the loss that has been caused by the conduct of Defendants alleged herein;

    ii.    Award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein;

iii.       Award Plaintiff their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1983, 1985, 1988, and 3613(c)(2);

iv.       Enter a declaratory judgment that the actions of Defendants are in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.*; Title VI of the Civil Rights Act of 1964, the Civil Rights Act of 1871, and 42 U.S.C. § 1983;

v.       Grant declaratory judgment that the introduction of Ordinance No. 17 2021/22 at the January 27, 2022 Special Called Meeting was a violation of South Carolina law, the Florence County Code of Ordinances, and was otherwise illegal and improper;

vi.       Grant declaratory judgment that that the imposition of the Illegal Moratorium on all development related permits by Florence County and its refusal to even accept Plaintiff's application for a certificate of zoning compliance prior to the third reading of Ordinance No. 17 2021/22 was improper and a violation of the Florence County Code of Ordinances as well as state law; and

vii.       For such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff DHD Jessamine, LLC demands a trial by jury of all issues in this case.

Respectfully submitted,

By:  *s/ J. Taylor Powell*
Ellis R. Lesemann (Fed. ID No. 7168)
E-mail: erl@lalawsc.com
J. Taylor Powell (Fed. ID No. 12265)
E-mail: jtp@lalawsc.com
LESEMANN & ASSOCIATES LLC
418 King Street, Suite 301
Charleston, SC 29403
Phone: (843) 724-5155
Fax: (843) 720-2312

***ATTORNEYS FOR PLAINTIFF***
***DHD JESSAMINE, LLC***

April 15, 2022
Charleston, South Carolina