# Exhibit A

**Appraisal Report**

Of

**Tallevast Tract - 5.83 +/- Acres**
**South Cashua Drive & West Palmetto Street**
**Florence, South Carolina 29501**
**TMS: 90018-03-006, (-007), (-008)**
**Appraiser File # M23-1031**

Prepared For
**Mr. Ross Appel**
**McCullough, Khan, Appel**
**2036 Ewall Street**
**Mount Pleasant, SC 29464**

As of
**August 15, 2022**

Prepared By
**Edward F. Hucks, MAI, SRA**
**E. F. Hucks & Associates, Inc.**
**3320 Highway 17 South**
**Murrells Inlet, SC 29576**

**Copyright © 2023**
**E.F. Hucks & Associates, Inc.**
**All rights reserved. No part of this document may be reproduced in any form or by any means, electronic or**
**mechanical, including photocopying and recording, or by any information storage and retrieval system**
**without permission in writing from E.F. Hucks & Associates, Inc.**

E. F. HUCKS & ASSOCIATES, INC.



**E. F. HUCKS**
& ASSOCIATES, INC.

Real Estate Appraisers & Consultants

E.F. "BUDDY" HUCKS, MAI, SRA
President

September 12, 2023

Ross Appel
McCullough, Khan, Appel
2036 Ewall Street
Mount Pleasant, SC 29464


RE:   Tallevast Tract - 5.83 +/- Acres
      South Cashua Drive & West Palmetto Street
      Florence, South Carolina 29501
      TMS: 90018-03-006, (-007), (-008)
      Appraiser File # M23-1031


Dear Mr. Appel:

At your request, we have inspected and appraised the above-referenced property.  The subject property is three contiguous parcels, totaling 5.83+/- acres on South Cashua Drive and West Palmetto Street in Florence, South Carolina. The parcels identified as Florence County TMS 90018-03-006, 90018-03-007, and 90018-03-008.

The purpose of this appraisal is to estimate the current **market value** of the **fee simple interest** in the subject property based on **"As Is"** condition and subject to the existing zoning. We have utilized the Sales Comparison the value the property on a "per Acre" basis. This is typically the most reliable method for valuing vacant land; therefore, the Cost Approach and the Income Approach were not developed; however, the Income Approach was utilized as a test of reasonableness.

The subject property is improved with various older structures; however, due to the scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property.

This assignment is being reported as an Appraisal Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2 of the *Uniform Standards of Professional Appraisal Practice* (USPAP) for an Appraisal Report. As such, it represents summary descriptions and discussions of the subject property as well as the data, reasoning, and analyses that were used in the appraisal process to develop the opinion of value. The appraisers are not responsible for unauthorized use of this report.

Based on the foregoing analysis, it is our conclusion that the **market value** of the **fee simple** interest in the entire subject property, based on **"As Is"** condition as of August 15, 2023, is:

**Three Hundred Fifty Thousand Dollars**
**($350,000)**

**MURRELLS INLET**
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

**MYRTLE BEACH**
Founder's Centre
2411 North Oak Street
Suite 201
Myrtle Beach, SC 29577

Phone (843) 443-3159
Fax (843) 448-1925
website: efhucks.com



# E. F. HUCKS
## & ASSOCIATES, INC.

Real Estate Appraisers & Consultants

E.F. "BUDDY" HUCKS, MAI, SRA
President

The reliance of this report is limited to the client/intended users; everyone else is considered an unintended user. All information contained within this submitted report is strictly for the sole use of the client/intended users and may not be used for any purpose by another party without the written consent of the appraisers.

If we can be of any further assistance, please do not hesitate to contact us.

Respectfully submitted,

Edward F. Hucks, MAI, SRA
SC State Certified General
Real Estate Appraiser #CG138

**MURRELLS INLET**
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

**MYRTLE BEACH**
Founder's Centre
2411 North Oak Street
Suite 201
Myrtle Beach, SC 29577

Phone (843) 443-3159
Fax (843) 448-1925
website: efhucks.com

## Table of Contents

MISSION STATEMENT .................................................................................... 5

CERTIFICATION – E. F. "BUDDY" HUCKS, MAI, SRA ......................... 6

SUMMARY OF SALIENT FACTS AND CONCLUSIONS .......................... 7

SUBJECT PROPERTY PHOTOGRAPHS .................................................. 9

ASSUMPTIONS AND LIMITING CONDITIONS .................................... 16

APPRAISAL DEVELOPMENT AND REPORTING OPTION ................. 19

SCOPE OF WORK ....................................................................................... 20

IDENTIFICATION OF THE SUBJECT PROPERTY ............................. 22

REGIONAL, COUNTY, AND NEIGHBORHOOD DATA ....................... 25

SITE DATA .................................................................................................. 27

HIGHEST & BEST USE ............................................................................. 31

VALUATION PROCESS ............................................................................. 35

TECHNIQUE OF THE APPROACH ......................................................... 36

APPRAISER QUALIFICATIONS ............................................................. 44

GLOSSARY OF TERMS AND DEFINITIONS ........................................ 49

ADDENDA .................................................................................................... 55



E. F. HUCKS
& ASSOCIATES, INC.                                   Real Estate Appraisers & Consultants

---

**Mission Statement**

---

     **E. F. Hucks & Associates, Inc. is committed to providing our clients with realistic, reliable residential and commercial appraisal services and development consulting services that will enable our clients to make informed decisions that are vital to their success in the accomplishment of their goals.**

     **We will provide our services to owners, lenders, investors, and developers in a professional manner for fees that are both reasonable and profitable.**

## Certification – E. F. "Buddy" Hucks, MAI, SRA

I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

- I have **no** present or prospective interest in the property that is the subject of this report and **no** personal interest with respect to the parties involved.

- I have performed **no** services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

- My analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the *Uniform Standards of Professional Practice*.

- I **have** made a personal inspection of the property that is the subject of this report.

- No one provided significant real property appraisal assistance to the person signing this certification.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I have completed the continuing education program for Designated Members of the Appraisal Institute.

_____
Edward F. Hucks, MAI, SRA
Certified General R.E. Appraiser #CG138

7

## Summary of Salient Facts and Conclusions



*geothinQ*

| | |
|---|---|
| **Property Location:** | West Palmetto Street & S. Cashua Drive, Florence, SC |
| **Property Description:** | The subject property is three contiguous parcels totaling 5.83+/- acres on South Cashua Drive and West Palmetto Street in Florence, South Carolina. The subject property is improved with various structures; however, due to the scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property. |
| **Florence County PIN:** | 90018-03-008, 90018-03-007, 90018-03-006 |
| **Owner of Record:** | William D. V. Tallevast |
| **Date of Appraisal Report:** | September 12, 2023 (Date Report Signed) |
| **Effective Date of Appraisal:** | August 15, 2023 |
| **Purpose:** | Estimate the current *market value* of the *fee simple interest* in the subject property based on *"as is"* condition. |
| **Total Land Area:** | 5.83 +/- Acres |
| **Zoning:** | R-1 – Single-Family Residential, Large Lots – Florence County |

| | |
|---|---|
| **Present Use:** | Land with Older Improvements |
| **Highest and Best Use:** | Low Density Single-Family Residential Development |

**Valuation:** Consideration was given to all three techniques, and it was determined that only the Sales Comparison Approach to value is applicable in valuing the subject property. The Sales Comparison Approach to value is applicable in valuing the subject property based on "As Is" condition. This is the most reliable method for valuing vacant land, therefore, the Cost Approach and the Income Approach were not developed; however, the Income Approach was utilized as a test of reasonableness.

**Fee Simple Values:**

| | |
|---|---|
| Sales Comparison Approach | $350,000 |
| **Reconciled Market Value "As Is"** | **$350,000** |

**Reporting Type:**                     **Appraisal Report**

## Subject Property Photographs



*View of Property – Cashua Drive*



*Street View of Property – Cashua Drive*



*View of Property – Cashua Drive*



*View of Property – Cashua Drive*



*View of Property – Cashua Drive*



*View of Property – Cashua Drive*



*View of Property – N. Palmetto Street*



*Street View of Property – N. Palmetto Street*



*View of Property from Behind McAlister's*



*View of Property from Behind Tobacco Market*



*View of Property from Behind Harris Teeter*



*View of Property from Behind Harris Teeter*

## Subject Location Map



## Assumptions and Limiting Conditions

This *Appraisal Report* has been made with the following general assumptions:

1.      No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

2.      The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

3.      Responsible ownership and competent property management are assumed.

4.      The information furnished by others is believed to be reliable; however, no warranty is given for its accuracy.

5.      All engineering is assumed to be correct. The plot plans and illustrative material in this report are included only to assist the reader in visualizing the property.

6.      It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more, or less, valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

7.      It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

8.      It is assumed that all applicable zoning and use regulations and restrictions have been complied with unless a non-conformity has been stated, defined, and considered in the appraisal report.

9.      It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

10.     It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

This *Appraisal Report* has been made with the following general limiting conditions:

1.      The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.

2.      Possession of this report, or a copy thereof, does not carry with it the right to publication.

3.      The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

C21-0128                                                            17

4.    Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraiser, or the firm with which the appraiser is connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraisers.

5.    The appraiser has personally inspected the subject property and finds no obvious evidence of structural deficiencies except as stated in this report; however, no responsibility for hidden defects or conformity to specific governmental requirements such as fire, building and safety, earthquake, or occupancy codes can be assumed without provision of specific professional or governmental inspections.

> **Appraiser Comment:** "The primary reason for inspection of a property is to gather information about the characteristics of the property that are relevant to its value."[1] While there are other ways to gather such information, in many cases the personal observations of the appraiser are the primary source of information regarding the property. An inspection conducted by the appraiser(s) is not the equivalent of an inspection by an inspection professional (e.g., a structural engineer, a licensed home inspector, a Renaissance art expert, and environmental engineer). This statement is made for the understanding of the reader.

6.    No termite inspection report was available, and the appraiser assumed the improvements to be free of infestation or damage caused by termites or other wood boring insects.

7.    Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyls, petroleum leakage, or agricultural chemicals which may or may not be present on the property or other environmental conditions were not called to the attention of nor did the appraiser become aware of such during the appraisers' inspection. The appraiser has no knowledge of the existence of such materials on or in the properties unless otherwise stated. The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions may affect the value of the properties, the value estimated is predicated on the assumption that there is no such condition on or in the properties or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions or for any expertise or engineering knowledge required to discover them.

8.    The Americans with Disabilities Act ("ADA") became effective January 26, 1992. A specific compliance survey and analysis of this property was not made to determine whether it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more of the requirements of the Act. If so, this fact could have a negative effect upon the value of the properties. Since no direct evidence relating to this issue was obtained, the possibility of non-compliance with the requirements of the ADA in estimating the value of the properties was not considered.

---

[1] Advisory Opinion 2 (AO-2) USPAP 2014-2015 Edition

**E. F. HUCKS & ASSOCIATES, INC.**

9.      Wetland legislation is ever changing, and interpretations of their whereabouts are beyond the appraiser's expertise. If wetlands exist and their impact on the value of the subject properties are not discussed in this report, the value estimate for the subject will need to be reconsidered by the appraiser and the value conclusions contained herein are not applicable.

10.     It has been noted in this appraisal report that any significant adverse conditions (such as needed repairs, depreciation, the presence of hazardous wastes, toxic substances, etc.) discovered during the data collection process in performing the appraisal. Unless otherwise stated in this appraisal report, there is no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, mold existence, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable and it is assumed that there are no such conditions and make no guarantees or warranties, expressed or implied. The appraisers will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraisers are not experts in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property. The obtained information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable public and/or private sources are believed to be true and correct.

## Extraordinary Assumptions

**There are no extraordinary assumptions for this appraisal.**

## Hypothetical Conditions

**The subject property is improved with various structures; however, due to the scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property.**

C21-0128                                    19

## Appraisal Development and Reporting Option

**Appraisal Report:** This is the most detailed and complete reporting option. The length and descriptive detail in such a report should be based on the scope of work set forth by the appraisal problem which the client requested. This reporting type replaces two types of reporting (Summary and Self-Contained) that were replaced in the USPAP 2014–2015 Edition and continued through the current 2020–2021 Edition.

**Restricted Appraisal Report:** Should contain a brief statement of information significant to the solution of the appraisal problem. Only the client intends it for use and everyone else is considered an unintended user. The opinions and conclusions set forth in the report may not be understood properly without additional information in the appraiser's work file.

**Development Level and Reporting Option Used**

This report is intended to be an **Appraisal Report.**

## Appraisal Procedure, Format, and Use Restriction

The Sales Comparison Approach to value is applicable in valuing the subject property based on "As Is" condition. This is the most reliable method for valuing vacant land, therefore, the Cost Approach and the Income Approach were not developed; however, the Income Approach was utilized as a test of reasonableness. This assignment is being reported as an Appraisal Report, which is intended to meet the minimal requirements of such, as specified under Standards Rule 2.2 of USPAP 2020–2021 Edition (effective January 1, 2020, and extended through December 31, 2023).

## Competency Statement

The *Uniform Standards of Professional Appraisal Practice* (USPAP) contains a provision relative to the ability of the appraiser to perform the appraisal assignment in a competent manner. This provision requires that, prior to accepting an appraisal assignment, the appraiser must thoroughly and properly identify the appraisal problem and possess the knowledge and experience to adequately and competently complete the appraisal assignment. In the event the appraiser does not possess adequate background and knowledge with which to appropriately address the appraisal assignment, he/she may draw upon or associate with another appraiser or consultant who does possess the necessary background and experience. In those instances where association with another individual was utilized, the name(s) of the individual and the extent of the association is identified herein. Therefore, with respect to the preparation of this report, the provisions of the competency requirement have been adequately met.

## Scope of Work

Scope of work is the amount and type of information researched and the analysis applied in the assignment. Scope of work includes, but is not limited to, the following:

- The degree to which the property was inspected or identified;
- The extent of research into physical or economic factors that could affect the property;
- The extent of data research; and
- The type and extent of analysis applied to arrive at opinions or conclusions.

**_Inspection of Property:_** The subject property was last personally inspected by Edward F. Hucks, MAI, SRA on September 9, 2023. The subject photographs presented herein were also taken in August 2023. Due to the age and condition of the existing improvements, only exterior inspections were made of the improvements to the parcel.

> **Appraiser Comment:** "The primary reason for inspection of a property is to gather information about the characteristics of the property that are relevant to its value."[2]  While there are other ways to gather such information, in many cases the personal observations of the appraiser are the primary source of information regarding the property. An inspection conducted by the appraiser(s) is not the equivalent of an inspection by an inspection professional (e.g., a structural engineer, a licensed home inspector, a Renaissance art expert, and environmental engineer). This statement is made for the understanding of the reader.

**_Research of Market Data:_** Appropriate market data for utilization in the valuation for the subject was investigated. Our investigations included research of public records through the use of commercial sources of data such as printed comparable data services, computerized databases, etc. Search parameters such as dates of sales, locations, sizes, types of properties and distances from the subject started with relatively narrow constraints and have been expanded until we retrieved sufficient data to estimate market value, or until we reasonably exhausted the available pool of data. We viewed the researched sales and, if deemed appropriate, verified the data with people directly involved in the transactions such as buyer, seller, or agent. We may have used some data that we were unable to verify but, in our opinion, appeared to be correct. We also considered any appropriate listings of properties that we found during our data collection process. We reported on the data that we deemed to be pertinent to the valuation problem.

**_Research of Easements or Restrictions:_** Pertinent easements or restrictions on the subject property were investigated and analyzed. A title report was not available to review; therefore, a visual inspection was relied upon to identify any readily apparent easements or restrictions.

**_Analysis of Data:_** The researched data was analyzed, and a conclusion regarding the market value, as defined in the report, of the subject property as of the date of value was determined using the appropriate valuation approaches identified on the previous page.

**_Compliance with Appraisal Standards:_** The appraisal report was completed in compliance with the appraiser's interpretation of the _Uniform Standards of Professional Appraisal Practice_ as promulgated by The Appraisal Foundation and the Code of Professional Ethics and Certification Standard of the Appraisal Institute.

---

[2]  Advisory Opinion 2 (AO-2) USPAP 2014-2015 Edition

**_Responsibility for Contamination:_** The appraisers were not responsible for ascertaining the existence of any toxic waste or other contamination present on or off the site. Any indications of toxic waste or contaminants that may affect value were reported if they were readily apparent to during investigations. The user of the report is cautioned that the appraisers are not experts in such matters and may have overlooked contamination that might have been readily apparent to others.

**_Preparation of Appraisal Report:_** We prepared a report, including photographs of the subject property, a description of the subject neighborhood, the site, and zoning, a highest and best use analysis, a summary of the most important sales used in our land valuation, reconciliation, and conclusion, as well as other data that we deemed relevant to the report. Pertinent data and analyses not included in the report are retained in our files.

**_Intended Use and Intended User:_** The intended user of this report is Ross Appel and McCullough, Khan, Appel Law Firm. This appraisal has been prepared for the sole use for a legal dispute between the owner of the property and Florence County. No other party should use or rely on the appraisal or any content in this report for any purpose.

**_Property Interest Appraised_**: The interest being appraised is the **_market value_** of the **_fee simple_** interest in the subject property based on **_"as is"_** condition. As stated previously, the subject property is improved with various structures; however, due to the age and condition of these improvements and the limited scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property.

**_Effective Date_**: The effective date of this appraisal is August 15, 2023, as it relates to the **_as is_** value, which is also the date the subject property was personally inspected by the appraiser.

**_Definitions_**:
**Market Value**[3]
_"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and sellers, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:_

A.     _Buyer and seller are typically motivated;_
B.     _Both parties are well informed or well advised, and acting in what they consider their best interests;_
C.     _A reasonable time is allowed for exposure in the open market;_
D.     _Payment is made in terms of cash in U.S. Dollars or in terms of financial arrangements comparable thereto; and,_
E.     _The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale."_

**Fee Simple Estate** [4]
_"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat."_

**As Is Market Value**[5]
_"The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date."_

---

[3] As defined by _The Federal Register_, vol. 55. no. 163, August 22, 1990, pages 34228 and 34229,  and found in _The Appraisal of Real Estate, Fourteenth Edition._
[4] Appraisal Institute, _The Dictionary of Real Estate Appraisal_, 6th ed. (Chicago: Appraisal Institute, 2015).
[5] Appraisal Institute, _The Dictionary of Real Estate Appraisal_, 6th ed. (Chicago: Appraisal Institute, 2015).

## Identification of the Subject Property



*Florence County qPublic*

The subject property is three contiguous parcels totaling 5.83+/- acres on South Cashua Drive and West Palmetto Street in Florence, South Carolina. The subject property is improved with various structures; however, due to the scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property. The parcels identified as Florence County TMS 90018-03-006, 90018-03-007, and 90018-03-008.

**History and Ownership of the Subject Property**

The *Uniform Standards of Professional Appraisal Practice* requires a three-year sales history for the subject property. The subject parcels are currently owned by TALLEVAST WILLIAM D V. There was an interrelated transfer of the subject parcels on May 20, 2023; however, there has been no market transaction of the subject parcels in the three years preceding the effective date of this report. The subject was contracted for sale on February 8, 2020, for a consideration of $1,150,000. The contract was terminated on July 29, 2022.

**Legal Description**

The full and complete legal description for the parcel of subject property 90018-03-006 can be found in Florence County deed book 1051, page 361, and is shown on the following page:

C21-0128                                    23

**Also**:  All that parcel or lot of land in Florence County, South Carolina fronting on the public highway leading from Florence to Timmonsville, and which said acre of land is fully described on a plat of two (2) acres of land made by Adams & Ervin, C.E.'s for Tallevast and Williams.  The lot of land herein conveyed is bounded as follows, to-wit:   On the Southeast by the road leading from Florence to Timmonsville; on the Southwest by lands formerly of Frost and Revell; on the Northwest by lands formerly of Revell; and on the North by an acre of ground formerly of Revell but later of Ella J. Williams.  Reference being further directed to a plat of said land duly recorded in the Clerk of Court's office and hereinabove referred to for a more accurate description.

TMS No.:  90018-03-006

The full and complete legal description for the parcel of subject property 90018-03-007 can be found in Florence County deed book A932, page 473, and is shown below:

**TMS#90018-03-007**

All that certain piece, parcel or lot of land situate in the County of Florence, State of South Carolina, and fronting on the west side of the Old Timmonsville Road and being designated as Tracts A and B on plat made by Ervin Engineering Company, dated September 16, 1960.  The said tract is bounded as follows: On the North, South and West by lands now or formerly of the Grantor herein; and on the East by Old Timmonsville Highway.

This being the same property conveyed to the Grantor herein by deed of William D. Tallevast, Jr. recorded July 22, 1983 in Book A196 at Page 315 in the office of the Clerk of Court for Florence County.

The full and complete legal description for the parcel of subject property 90018-03-008 can be found in Florence County deed book 1051, page 361, and is shown below:

**Parcel 1 of 4**:  All that parcel or tract of land situate in Florence County, South Carolina containing 4.3 acres, more or less, and being known as a part of the Revell Estate lands; butting and bounding North on the paved highway leading from Florence to Timmonsville; on the East by lands now or formerly of T.H. Revell; on the South by old Florence-Timmonsville Highway; and on the West by lands now or formerly of Williams and Revell.

TMS Nos.:  90018-03-021, 90018-03-022 and 90018-03-008

C21-0128
24

**Assessments and Taxes**

The total fair market value for the subject property, according to the Florence County assessor, is $534,594. The total annual real estate taxes for 2022 were $11,605.08. The breakdown between each of the parcels and the dates on which the taxes were paid can be seen in the table below.

| Parcel ID | 2022 Taxable Value | 2022 Taxes | Date Paid |
|---|---|---|---|
| 90018-03-006 | $256,230 | $5,369.50 | 2/3/2023 |
| 90018-03-007 | $87,745 | $1,922.21 | 1/15/2023 |
| 90018-03-008 | $186,619 | $4,313.37 | 3/10/2023 |
| **Totals** | **$530,594** | **$11,605.08** | |

## Regional, County, and Neighborhood Data

The City of Florence is the county seat of Florence County, located in the Pee Dee Region of South Carolina the junction of I-95 and I-20. Being located at the junction of these two major interstates is the major encominc driver for the area, making the City of Florence the trade, medical, transportation, cultural, financial and educational center for the Pee Dee region. According to the Greater Florence Chamber of Commerce, "Florence County and the Pee Dee Region manufacture pharmaceuticals, ATVs, state-of-the-art medical equipment, building systems, plastics, food products, industrial mechanized cutting systems, steel fabricating for large projects, heavy commercial and industrial construction and much, much more." Some notable top employers for Florence County include Honda, Assuarnt Group, City o florence, Francis Marion University, HopeHealth Inc., McLeod Health, Medical University of SC, Otis Elvaator Company, and QVC, Inc. The Chamer of Commerce further states that "this growing infrastructure supports our immense drivers and growing industrial and commercial base. Community leaders, the Florence Economic Development Partnership and the Greater Florence Chamber of Commerce strive to make this area a location of choice. Florence County is world class, with one of the best business climates in the southeast. It has recently been named among America's top 50 cities for business relocation and expansion by Expansion Management Magazine. The business climate of our area has brought more than $1 billion in capital investments in the commercial, industrial, institutional arts sectors in the past eight years alone." The most notable of these capital investments include Automotive Energy Supply Corporation that announced an $810 million dollar plant to "produce a variety of batteries to support AESC's partnership with the BMW group" that will span 900 acres and be powered by renewable resources. AESC broke ground on this project in June of 2023 and will bring 1,170 new jobs to Florence County. Florence County's economy is forward moving and expanding with ample opportunities in employment and education and the longrange forecast for the area is positive.



The appraised property is located on South Cashua Dirve and West Palmetto Street near the Five Points intersection in Florence. The Five Points Intersection is the interseciton of W. Palmetto Street, South Cashua Drive, Cherokee Road, Hoffmeyer Road, and N. Cashua Drive. West Palmetto Street, also known as I-76, is a east-west traffic route that runs from I-95 through the heart of Florence. The average daily traffic count of West Palmetto Street at the subject property is 21,528. Build up along West Palmetto Street is primarily commerical, as it is the major throughoutfare through the city of Florence. South Cashua Drive is a two lane road, that runs south from the Five Points Intersection, and intersects 2nd Loop Road in a distance of 1 mile, and ending back at W. Palmetto Street in a distance of 3.7 miles. The average daily traffic count of S. Cashua Lane at the subject property is 5,988, and 12,505 on S. Cashua Drive at the intersection of 2nd Loop Road. Build up along South Cashua Drive consists of predominantly various older single-family residential dwelling from the Five Points Intersection to 2nd Loop Road. To the west of South Cashua Drive the Country Club Forest residenital neighborhood and to the east of South Cashua Drive is the highly desirable Florence County Country Club residential neighborhod. The subject property is located on the west side of South Cashua Drive. There is limited commerical uses along South Cashua Drive from the Five Points Intersection to 2nd Loop Road. These commerical uses include older office professional uses, a dry cleaner, carpet store, and dog grooming salon. At the intersection ofSouth Cashua Dirve and 2nd Loop Road, there is a CVS, convience store, Walgreens, and Walmart Neighborhood Market. Heading south on South Cashua Drive after 2nd Loop Road, the road has recently been widened to a four lane road and build out is predominately commerical uses. Cashua Drive serves as a popular connecting road from Palmetto Street to 2nd Loop Road and the south and west sides of the City of Florence that has most of the residential growth.

C21-0128

27

## Site Data



*Florence County qPublic*

**Size and Shape:** The subject property is three contiguous parcels totaling 5.83+/- acres on South Cashua Drive and West Palmetto Street in Florence, South Carolina. The subject property has 613.37' of frontage along South Cashua Drive and 56.82' of frontage along West Palmetto Street. The subject property's shape can be described as irregular.

**Easements and Encroachments:** No adverse easements or encroachments that would impact the subject property in a negative manner were obvious or made apparent to the appraiser. Utility easements are typical. Again, the appraiser is not a surveyor or engineer, so this position is not guaranteed.

**Improvements:** As of the date of inspection, and seen in the image above, the subject property has various improvements on site. According to the Florence County Records, these improvements include a 2,892 square foot single-family home that was built in 1950, a 1,603 square foot single family home that was built in 1953, and a 2,261 square foot retail building that was built in 1940. Furthermore, there is a billboard located on the subject property that fronts West Palmetto Street (Highway 76). Due to the scope of this appraisal, per the request of the client, the subject's improvements were not to be considered in the valuation of the property.

C21-0128
28

**Topography:** The subject property is generally level to the grade of the surrounding roads, with some upward sloping into the center of the property. The topography, as well as the existing structures, can be seen on the graphic below, which was provided by ASI Engineering, Inc. Soils, according to the available United States Department of Agriculture (USDA), are typical of the area and have supported residential development in the past. Again, the client is advised that the appraiser is not a surveyor or engineer and makes no guarantees regarding the suitability of the soil to support development.



**Wetlands:** The subject property does not appear to have any wetlands on site.

**Utilities:** It appears the subject property has access to all the utilities typically found in this area including public water, public sewer, as well as electric, cable TV, telephone, and internet service.

**Location and Access:** The subject property is located along South Cashua Drive and West Palmetto Street in Florence, South Carolina. The property has access from both streets. The location of the subject is further discussed in the Neighborhood Analysis portion of this report. The map below shows the subject property in relation to the surrounding development, which includes Harris Teeter, Cashua Dry Cleaners, McAlister's, Tobacco Market, Clean Eatz, Missy's Café, and residential uses.



The subject is located between The Five Points Intersection and Second Loop Road. The map below shows the subject location in relation to major roadways, such as I-95 and I-20, as well as Downtown Florence, McLeod Regional Hospital, Florence Regional Airport, and Magnolia Mall.



C21-0128                                  30

**Flood Plain:** According to the Federal Emergency Management Agency (FEMA) Flood Hazard Maps #45041C0133E and #45041C0141E dated December 16, 2014, the site appears to be located entirely in a Zone X, which are "areas determined to be outside the 0.2% annual chance floodplain."

**Zoning:** The subject property has recently been rezoned to Single-Family, large lots (R-1) by Florence County. "Aside from differences in lot sizes and densities, these [residential] districts are intended to foster, sustain, and protect areas in which the principal use of land is for single-family dwellings and related support uses." The minimum allowable lot size for the (R-1) district is 15,000 square feet, with a minimum lot width of 100'. The setback from the property lines includes a 25' front setback, 10' side setbacks, and 25' rear setback.



## Highest & Best Use

The theory of highest and best use is one of the fundamentals that affect the value of all real property. According to the 14th Edition of *The Appraisal of Real Estate*, highest and best use is defined as "the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value."

To value a property at its highest and best use, it is analyzed on its legal, physical, and economic aspects. The highest and best use of a property, both as vacant and as improved, must meet four criteria. The highest and best use must be legally permissible, physically possible, financially feasible, and maximally productive.

**Highest and Best Use-*As Vacant***

**Physically Possible:** In determining what physical uses are possible for the subject property, factors considered included the subject's location, adjoining and neighboring properties, and other relative physical characteristics that were discussed under the Description of the Subject Property section earlier in the report. The subject property is three contiguous parcels totaling 5.83+/- acres in Florence, SC. South Cashua Drive is a two-lane road that connects W. Palmetto Street to 2nd Loop Road and has an AADT of 5,988 in front of the subject property. The subject property is in a "transition area" between commercial uses along W. Palmetto Street and primarily residential uses along South Cashua Drive. The surrounding development adjacent to the subject property includes Harris Teeter, McAlister's, Tobacco Market, Clean Eatz, Missy's Café, and Cashua Dry Cleaners. The back side of these businesses abuts the subject property. The subject property is irregularly shaped with 613.37' of frontage along South Cashua Drive and 56.82' of frontage along West Palmetto Street. The frontage along West Palmetto Street is wide enough for an access point to the subject property; however, most of the land area and frontage is along South Cashua Drive. Overall, the subject is in a transition area between major commercial uses and established residential neighborhoods. The site does not have adequate frontage along W. Palmetto Street to be utilized for commercial use; however, the frontage would allow for a secondary access to the site and could benefit the tract for high density residential uses, which is a typical use for similar properties located in these "transition areas." Other than size and configuration, there are few physical constraints in developing the subject site.

**Legally Permissible:** The subject property has recently been rezoned Single-Family, large lots (R-1) by Florence County. "Aside from differences in lot sizes and densities, these [residential] districts are intended to foster, sustain, and protect areas in which the principal use of land is for single-family dwellings and related support uses." The minimum allowable lot size for the (R-1) district is 15,000 square feet, with a minimum lot width of 100'. The setback from the property lines includes a 25' front setback, 10' side setbacks, and 25' rear setback. Based on these requirements, we have been supplied with preliminary plans from a local engineering firm that indicate the maximum number of lots that could be developed on the property is nine lots, which would require install significant infrastructure including streets, water, and sewer extensions to the site.

**Financially Feasible:** To developers of the overall subject site, financial feasibility is weighed against potential profitability and risk associated with the development of the assembled site. Sites similar to the subject in "transition areas" between commercial and residential uses are typically developed with "transitional" uses, such as high-density residential uses; however, this is not a legally permissible use of the site, as single-family residential uses are the only allowable uses. Nonetheless, due to being in this "transition area" upscale residential homes constructed on the subject site there could be external obsolescence to these

improvements. This external obsolescence would be derived from the surrounding development of the site. Developing the site with residential uses would create residential lots that back up the existing surrounding commercial development. Having residential lots that abut loading docks, dumpster areas, and rear parking lots of commercial buildings is an undesirable characteristic and could significantly impact the marketability of the residential lots and the homes built on these lots. However, this is the only legally permissible use. Therefore, with the assistance of ASI Engineers, Inc., we have studied the potential residential uses of the site and due to the size, shape, and location of the subject property, there are two "likely" development options for the subject property, which include:

1. A "major development" to install infrastructure to maximize the number of allowable lots to nine residential lots. This option creates nine residential lots, averaging 23,038 square feet, with four lots abutting the surrounding commercial uses.



2. A minor subdivision to subdivide the subject parcel along its road frontage, to minimize the infrastructure costs. This option creates six residential lots, averaging 38,735 square feet, with only two of lots abutting the surrounding commercial uses. The two lots abutting the commercial uses are the largest lots, measuring at 1.45 acres and 1.85 acres, which provides these lots with significant buffer area.

C21-0128
33



To determine the feasibility of these two options, the appraiser studied and analyzed estimated costs and values for each option, as well as discussions with market participants, including engineers, appraisers, brokers, and developers. The appraiser also studied comparable residential land tracts in the area and their intended use. Based on this analysis, it is our conclusion that it is not feasible to install significant infrastructure for the "major subdivision" of nine lots. This is because this development option has the most cash outlay, unknown timing with development, and maximizes the external obsolescence of the surrounding development, as four of the nine lots would back up to the commercial development, which would significantly impact the marketability of these lots. Furthermore, due to current infrastructure costs, holding costs, and costs of sale to complete this development option, and lot sales prices would have to be priced above the "typical" contributory value of surrounding residential homes and unsupportable. Therefore, it is unlikely that a developer would take on such a high-risk development because of the risk vs. reward.

As such, it is our opinion that the development option of the minor subdivision to subdivide the subject parcel along its road frontage, to minimize the infrastructure costs, is a feasible and likely option. As seen to the right, single family building permits are near all-time high for Florence County. This development option has less cash outlay, less time, due to the minimal infrastructure to be completed, and is the best balance of risk vs. reward. Furthermore, this development option minimizes the external obsolescence created by the surrounding development, as only two



residential lots would abut the existing commercial development, compared to four in the 9-lot development option. Additionally, the two lots abutting the commercial uses are the largest lots, measuring at 1.45 acres and 1.85 acres, which provides these lots with significant buffer area. This development option appears to be the most feasible option for local developers, as is how two of comparables sales utilized in the valuation were also developed by local developers. It is our opinion that this option is the best balance between risk and reward and is the most likely use of the subject site.

C21-0128
34

**Maximally Productive:** The study of financial feasibility illustrates that a major subdivision of the subject property, that includes installing significant infrastructure to maximize the number of lots, is not the maximally productive use of the parcel and that a minor subdivision of the subject parcel along South Cashua Drive into larger single family lots would likely bring a higher return to the land, making it the most maximally productive use of the site.

**Analysis and Conclusion:** Based on the size, shape, location, current zoning, and development patterns in this area it is our opinion that the highest and best use for the subject property is for low density single family residential development that minimizes infrastructure expenditures. The most likely buyer for the subject property would be a local homebuilder or investor/developer.

## Valuation Process

There are three commonly accepted approaches used in valuing real estate: The Cost Approach, the Sales Comparison Approach, and the Income Approach. The sixth edition of *The Dictionary of Real Estate Appraisal* describes these methods as follows:

## Cost Approach

A set of procedures through which a value indication is derived for the fee simple interest in a property by estimating the current cost to construct a reproduction of, or replacement for, the existing structure; deducting accrued depreciation from the reproduction or replacement cost; and adding the estimated land value plus an entrepreneurial profit. Adjustments may then be made to the indicated fee simple value of the subject property to reflect the value of the property interest being appraised.

## Sales Comparison Approach

A set of procedures in which a value indication is derived by comparing the property being appraised to similar properties that have been sold recently, applying appropriate units of comparison, and making adjustments to the sale process of the comparables based on the elements of comparison. The sales comparison approach may be used to value improved properties, vacant land, or land being considered as though vacant; it is the most common and preferred method of land valuation when comparable sales data are available.

## Income Approach

A set of procedures through which an appraiser derives a value indication for an income-producing property by converting its anticipated benefits (cash flows and reversion) into property value. This conversion can be accomplished in two ways. One year's income expectancy can be capitalized at a market-derived capitalization rate or at a capitalization rate that reflects a specified income pattern, return on investment, and change in the value of the investment. Alternatively, the annual cash flows for the holding period and the reversion can be discounted at a specified yield rate.

## Valuation Conclusion

Consideration was given to all three techniques, and it was determined that only the Sales Comparison Approach to value are applicable in valuing the subject property. The Sales Comparison Approach to value is applicable in valuing the subject property based on "As Is" condition. This is the most reliable method for valuing vacant land, therefore, the Cost Approach and the Income Approach were not developed; however, the Income Approach was utilized as a test of reasonableness.

## Sales Comparison Approach

### Technique of the Approach

The Sales Comparison Approach will be used to estimate the "as is" value for the subject property through the comparison to sales of similar entitled residential land tracts. This approach is based on the principle of substitution and assumes that no prudent purchaser will pay more for a particular property than a similar substitute property. When using the Sales Comparison Approach, a sufficient number of sales are needed in order to establish a market pattern. When this pattern is established, the subject property can be analyzed to determine how the subject relates to this pattern. The typically the most reliable unit of comparison for land tracts is the "sales price per acre."

### Data Search

To locate sales of entitled residential land tracts we researched private information sources such as the local MLS, CoStar, the public records of Florence County, and our own appraisal files. The sales used are detailed on the following pages and summarized in the market grid. A location map and an explanation of the adjustments is also provided.

### Sales Summary

| Sale # | Location | Sales Date | Size (Acres) | Adjusted Sale Price | $/Acre |
|--------|----------|------------|--------------|---------------------|--------|
| 1 | Left Bank Drive, Florence, SC | Sep-22 | 7.49 Acres | $385,000 | $51,436 |
| 2 | Clark Branch Road, Florence, SC | May-22 | 2.31 Acres | $215,000 | $93,275 |
| 3 | S. Cashua Drive, Florence, SC | Aug-21 | 4.48 Acres | $350,000 | $78,090 |
| 4 | 2nd Loop Road, Florence, SC | Sep-21 | 2.90 Acres | $275,000 | $94,828 |



*Comparables Location Map*

C21-0128
37

### Sale Comparable 1



| | |
|---|---|
| Location: | Left Bank Drive, Florence, SC |
| TMS: | 00521-07-011 |
| Grantor: | Claussen Developers, LLC |
| Grantee: | Dowling Investments, LLC |
| Property rights: | Fee simple |
| Sale price: | $385,000 |
| Sale date: | September 19, 2022 |
| Deed book/page: | 1013/1699 |
| Zoning: | R-1 |
| Size (Gross Acres): | 7.485 +/- Acres |
| ***Unit price:*** | ***$51,426 per acre*** |

***Summary:***          This sale was of 7.485 acres of land that had 2,453' +/- of frontage along Left Bank Road and South Peninsula Road in Florence, SC. This parcel has since been subdivided into 18 SF lots.

**Sale Comparable 2**



| Location: | Clark Branch Road, Florence, SC |
|---|---|
| TMS: | 00098-01-002 |
| Grantor: | Melinda R. Fowler Trustee |
| Grantee: | KDK Development, LLC |
| Property rights: | Fee simple |
| Adjusted Sale price: | $215,000 |
| Sale date: | May 10, 2022 |
| Deed book/page: | 992/1025 |
| Zoning: | NC-6.1 (Single-family detached with 6,000 sf min lot area and 60 ft min lot width) |

| Size (Eff. Acres): | 2.31 +/- Acres |
|---|---|
| ***Effective Unit price:*** | ***$93,275 per acre*** |

***Summary:***   This sale was of 3.005 acres of land on Clark Branch Road in Florence, SC. The transaction price was $450,000; however, this included a 1,668 SF house. This existing house was subdivided into a 0.70-acre parcel and sold for $235,000 on January 26, 2023. The remaining 2.31 acres is being developed into single family residential lots. As such, the effective sales price for the land is $215,000 and the effective size is 2.31 acres. The remaining 2.31+/- acres has 760' +/- of frontage along Clark Branch Road and is to be subdivided into 12 SF lots. The purchaser of the land has developed and sold 3 of the planned 12 lots, on June 9, 2023, to a homebuilder for $135,000, or $45,000 per lot. The builder is expected to be building 2,000+/-SF homes to be sold for around $175 PSF, or $350,000 for the home lot packages.

## Sale Comparable 3



| | |
|---|---|
| Location: | South Cashua Drive, Florence, SC |
| TMS: | 00101-01-758 |
| Grantor: | Houck Family Trust |
| Grantee: | Odell, Barnett Edward |
| Property rights: | Fee simple |
| Sale price: | $325,000 |
| Sale date: | August 03, 2021 |
| Deed book/page: | 952/1678 |
| Zoning: | Unzoned |
| Size (Gross Acres): | 4.482 +/- Acres |
| ***Unit price:*** | ***$78,090 per acre*** |

***Summary:***    This sale was of 4.482 acres of land on the corner of South Knollwood Road and South Cashua Drive in Florence, SC. The tract had 1,270' of road frontage and was purchased by the adjoining landowner for assemblage purposes.

## **Sale Comparable 4**



| | |
|---|---|
| Location: | 2nd Loop Road, Florence, SC |
| TMS: | 90040-08-001+ |
| Grantor: | Anne D. Davis Estate |
| Grantee: | South Florence Developers, |
| Property rights: | Fee simple |
| Sale price: | $275,000 |
| Sale date: | September 16, 2021 |
| Deed book/page: | 948/1506 |
| Zoning: | NC-15 (Single-Family Detached with 15,000 sf. min lot area and 100 ft min lot width) CR (Commercial Re-use) |
| Size (Gross Acres): | 2.90 +/- Acres |
| *Unit price:* | *$94,828 per acre* |

*Summary:*

This sale was of 2.90 acres of land on 2nd Loop Road in Florence, SC. The tract had existing improvement on site at the time of the sale that had minimal if any contributory value to the site for redevelopment. The property has 190' +/- of road frontage. 0.99 acres of the parcel that fronts 2nd Loop Road is zoned commercial, while the remaining backland is zoned for residential uses.

C21-0128
41



# Market Grid - Vacant Land Tracts
### 5.83 +/- Acres - S. Cashua Drive, Florence, SC

| | | Subject | Sale 1 | Sale 2 | Sale 3 | Sale 4 |
|---|---|---|---|---|---|---|
| **Property Elements** | Street | S. Cashua Drive | Left Bank Drive | Clark Branch Rd. | S. Cashua Drive | 2nd Loop Road |
| | City | Florence | Florence | Florence | Florence | Florence |
| | PIN | 90018-03-007 | 00521-07-011 | 00098-01-002 | 00101-01-758 | 90040-08-001 |
| | Current/Planned Use | Residential | Residential | Residential | Vacant Land | Vacant Land |
| | Price | | $385,000 | $450,000 | $350,000 | $275,000 |
| | Adjustments | | $0 | -$235,000 | $0 | $0 |
| | Adjusted Price | | $385,000 | $215,000 | $350,000 | $275,000 |
| | Date | | Sep-22 | May-22 | Aug-21 | Sep-21 |
| | Deed Book/Page | | 1013/1699 | 992/1025 | 952/1678 | 948/1506 |
| | Gross Acres | **5.83 Acres** | **7.49 Acres** | **2.31 Acres** | **4.48 Acres** | **2.90 Acres** |
| | Development Front Footage | 670' +/- | 2,453' +/- | 760' +/- | 1,270' +/- | 190' +/- |
| | Front Footage/Acre | 115 F.F./Acre | 328 F.F./Acre | 330 F.F./Acre | 283 F.F./Acre | 66 F.F./Acre |
| | Zoning | R-1 | R-1 | NC-6.1 | Unzoned | NC-15 & CR |
| | **Sale Price/Acre** | | **$51,436** | **$93,275** | **$78,090** | **$94,828** |
| **Transactional Elements** | Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | Conditions of Sale | Arm's Length | Arm's Length | Arm's Length | Arm's Length | Arm's Length |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | After Sale Expenditures | None | None | None | None | None |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | Market Conditions | Jul-23 | Sep-22 | May-22 | Aug-21 | Sep-21 |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | **Adjusted Price/Acre** | | **$51,436** | **$93,275** | **$78,090** | **$94,828** |
| **Adjustments** | Location | S. Cashua Drive | Left Bank Drive | Clark Branch Rd. | S. Cashua Drive | 2nd Loop Road |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | Size | 5.83 Acres | 7.49 Acres | 2.31 Acres | 4.48 Acres | 2.90 Acres |
| | *Adjustment* | | 0% | 0% | 0% | 0% |
| | Shape/Configuration | 115 F.F./Acre | 328 F.F./Acre | 330 F.F./Acre | 283 F.F./Acre | 66 F.F./Acre |
| | *Adjustment* | | -30% | -30% | -25% | 10% |
| | Zoning | R-1 | R-1 | NC-6.1 | Unzoned | NC-15 & CR |
| | *Adjustment* | | 0% | -10% | 0% | -30% |
| | **Net Adjustments** | | **-30%** | **-40%** | **-25%** | **-20%** |
| | **Indicated Value/Acre** | | **$36,005** | **$55,965** | **$58,568** | **$75,862** |

| Value Indication | | | |
|---|---|---|---|
| Low Range Per Acre | $36,005 | Indicated Value Per Acre | $60,000 |
| Mean Per Acre | $56,600 | Indicated Value | $349,800 |
| High Range Per Acre | $75,862 | **Rounded** | **$350,000** |

## Explanation of Adjustments

<u>Property Rights:</u>  All the comparable sales were sold on a fee simple basis. No property rights adjustments were needed.

<u>Financing and Condition of Sale:</u> All the comparable sales conveyed in terms equivalent to cash to the seller. No financing and/or conditions of sale adjustments were needed.

<u>After Sale Expenditures:</u> No after-sale expenditures adjustments were needed.

<u>Market Conditions:</u> "Market conditions" is an adjustment required when analyzing the sales dates of the comparables to the date of the subject appraisal. All the comparable sales are within the past 24 months, so no adjustments are applied.

<u>Location:</u>  No adjustments were applied for location.

<u>Size:</u> It is usually common for larger properties to sell for less, than smaller properties, and vice versa, due to economies of scale. No adjustments are applied, as the comparable sales are within a range which would not materially affect the sales price.

<u>Shape/Configuration:</u>  As discussed in the highest and best use and supported by comparable sales, the most likely purchaser is a local investor/developer to subdivide the parcel along the roadway, for single family lots. The subject has a development front footage per acre ratio of 115:1. A higher ratio of development front footage per acre is favorable, as it lowers development cost and risk, allowing maximum utilization of a site. All sales were adjusted accordingly.

<u>Zoning:</u> The subject property is zoned R-1, which requires 15,000 SF minimum lot area and 100' minimum lot width. Sale comparable two is adjusted downward for superior zoning, as NC-6.1 has 6,000 SF minimum lot area and 60' minimum lot width, allowing for higher density. Sale comparable four is adjusted downward as 0.99 acres of the 2.90 acres that fronts 2nd Loop Road is zoned commercial, while the remaining backland is zoned for residential uses.

<u>Analysis:</u> The final adjusted unit prices range from $36,005 to $75,862 per acre and produce a mean of $56,600. Based on this analysis and the size, location, and configuration of the subject property, we conclude that the subject property value is well-supported at $60,000 per acre. As such:

| | |
|---|---|
| Indicated Value Per Acre | $60,000 |
| Indicated Value | $349,800 |
| **Rounded** | **$350,000** |

Based on the foregoing analysis, it is our conclusion that the ***market value*** of the ***fee simple*** interest in the subject property based on ***"As Is"*** condition as of August 15, 2023, via the **Sales Comparison Approach** is estimated to be:

**Three Hundred Fifty Thousand Dollars**
**($350,000)**

C21-0128

## Reconciliation and Final Conclusion

We used the Sales Comparison Approach to estimate the current market value of the subject property. The sales in the grid are the most similar, verifiable sales available and bracket the subject in all line items. This is typically the most reliable method for valuing vacant land, therefore, the Cost Approach and the Income Approach were not developed; however, the Income Approach was utilized as a test of reasonableness and further supports the indicated value of this report.

After gathering and analyzing all the pertinent facts and data, and applying the methods and techniques prescribed by the Appraisal Institute, it is our conclusion that the ***market value*** of the ***fee simple*** interest in the subject property, based on ***"as is"*** condition as of August 15, 2023, is:

**Three Hundred Fifty Thousand Dollars**
**($350,000)**

## Marketing Time and Exposure Time

Upon review of the overall real estate market in Florence County generally and the subject neighborhood specifically, and considering how the subject property is positioned therein, it is our opinion that if available and properly exposed, the subject property would sell at or very near the appraised value within twelve (12) months. The typical buyer for the subject property would be a local homebuilder or investor/developer.

## Appraiser Qualifications

## REAL ESTATE QUALIFICATIONS AND EDUCATION
## EDWARD F. HUCKS, MAI, SRA



**APPRAISAL CERTIFICATION**:
Certified General Real Estate Appraiser - #A394 (North Carolina)
Certified General Real Estate Appraiser - #CG138 (South Carolina)

**PROFESSIONAL EDUCATION**:
Graduate, Francis Marion College, Florence, S. C. - 1981
    B. S. in Business Administration

**APPRAISAL COURSES COMPLETED**:  Appraisal Institute
Courses:
8-1: Appraisal Principles - l983
8-2: Residential Valuation - l982
SPP: Standards of Professional Practice - l983
1BA: Capitalization - Theory & Techniques A - 1988
1BB: Capitalization - Theory & Techniques B - 1988
2-1: Case Studies in R. E. Valuation - 1989
1A2: Basic Valuation Procedures - 1988
2-2: Report Writing and Valuation Analysis - 1989
SPP: Standards of Professional Practice - Parts A & B - 1996
Standards of Professional Practice - Part C - 2000
Business Practices and Ethics – Course 420 – 2006, 2008 & 2013
The National USPAP Update, Course 400 – 2006, 2008 , 2010, 2012 & 2014
Appraisal Curriculum Overview (2-Day General) – 2011
Fundamentals of Separating Real Property, Personal Property & Valuing Intangible Assets – 2012

Seminars:
Review Appraisal Seminar - 1986
Computer Assisted Sales Comparison - 1986
Subdivision Analysis - 1987
Capitalization Overview - 1987
Rates, Ratios & Reasonableness - 1989
Valuation of Lease Interests - 1989
Discounted Cash Flow Analysis - 1990
Environmental Considerations for Real Property - 1990
Rate Extraction - 1990
Standards of Professional Practice Update - 1990
Easement Valuation – 1990
Real Estate Risk Analysis - 1991
Appraising Troubled Properties - 1991
Highest and Best Use - Non-Residential Properties - 1992
Hotel/Motel Valuation - 1992
Valuation Considerations: Appraising Nonprofit Properties - 1992
Under The Microscope: The Cost Approach - 1992
Power Line Easements & Electro Magnetic Fields-Effect on People & Value - 1993
Appraisal Regulations of the Federal Banking Agencies From the Lenders' Perspective - 1994
Fair Lending and the Appraiser - 1996
The Internet and Appraising - 1996
The High-Tech Appraisal Office - 1996
Special Purpose Properties: The Challenges of Real Estate Appraising in Limited Markets - 1996
Appraising High-Value and Historic Homes - 1998
New Technologies for the Real Estate Appraiser - 1998
USPAP in Cross Examination - 1999
Cost Approach Applications - 2000
Valuation of Detrimental Conditions in Real Estate - 2000
Keeping Up-An Updated and Review for South Carolina Appraisers - 2000
Supporting Sales Comparison Grid Adjustments for Residential Properties - 2001

Seminars (continued):
State of the Valuation Profession - 2001
Appraisal Review - General – 2001
Eminent Domain and Condemnation Appraising - 2001
Appraisers and the Gramm-Leach-Bliley Act – 2002
Introduction to Appraising and Analysis of Proposed Subdivisions and Condominiums – 2002
Analyzing Distressed Real Estate – 2002
Supporting Capitalization Rates – 2003
Establishing the Worth of an Appraisal to Your Clients and the Community – 2003
Appraisal Consulting: A Solutions Approach for Professionals – 2003
Scope of Work – 2004
National USPAP Update Equivalent - 2005
How to Increase Profits Using Your Appraisal Skill - 2005
What Clients Would Like Their Appraisers to Know – 2006
Loss Prevention – 2006
Litigation Skills for the Appraiser: An Overview – 2006
Subdivision Valuation: A Comprehensive Guide to Valuing Improved Subdivisions – 2006
Inverse Condemnation - 2007
New Technologies for the Real Estate Appraiser: Cool  Tools - 2007
Analytics with the Site to do Business - 2007
Introduction to Valuation for Financial Reporting - 2009
Fannie Mae 2009 Selling Guide Updates – 2009
Valuing High Performance Residential Properties - 2009
Managing and Procuring Commercial Appraisal Reports - 2009
Spotlight on USPAP: Agreement for Services – 2010
A Debate on the Allocation of Hotel Total Assets - 2010
Appraising Distressed Commercial Real Estate – 2010
Appraisal Review: Income Capitalization Approach - 2010
The Appraiser and the Site to Do Business: Location, Timing and Demographics - 2010
Land, Condos & Subdivisions – Solutions to Hard Value Assets – 2010
Commercial Appraisal Engagement and Review – 2010
Understanding and Testing DCF Valuation Models – Pt. 1 – 2010
The Lending World in Crisis: What Clients Need Their Appraisers to Know – 2011
New Interagency Appraisal and Evaluation Guidelines: A Primer for  Commercial Lenders and Appraisers – 2011
Advanced Spreadsheet Modeling for Valuation Applications – 2011
Appraising the Appraisal: Appraisal Review General – 2012
Real Estate Finance, Value, and Investment Performance – 2012
Marketability Studies: Advanced Considerations and Applications – 2013
Marketability Studies: The Six Step Process and Basic Applications ⁼ 2014
Liability Issues for Appraisers Performing Litigation and Other Non-Lending Work:  Staying Out of the Courtroom Unless You're Being Paid to be There – 2014
Forest Valuation for Non-Foresters – 2014
Review of Court Decisions on Valuations – Lessons Learned – 2014
The Discounted Cash Flow Model: Concepts, Issues, and Applications – 2015
The 50% FEMA Rule – 2015
Improving Appraisal Reports Used for Financing Institutions - Strategies from Reviewers – 2015
Evaluating the Evaluation - 2015
Analyzing Tenant Credit Risk and Commercial Lease Analysis – 2016
2016-17 USPAP Update – 2016
Spotlight on USPAP: Confidentiality – 2017
Spotlight on USPAP: Reappraising, Readdressing, Reassigning – 2017
Spotlight on USPAP: Appraisal Review – 2017
Hot Topics and Myths in Appraiser Liability – 2017
Parking and its Impact on Value on  South Carolina Properties – 2017
Another View of the Tough One: Mixed Use Properties – 2018
Advancing the Appraisal Profession – 2018
7-Hour USPAP Update Course – 2018
State of South Carolina Economic Summit – 2018
Examining Property Rights and Implications on Valuation – 2018
Fundamentals of Commercial Real Estate for Appraisers-2019
Artificial Intelligence, AVMs, and Blockchain: Implications for Valuation –2019
What's Up in Technology for Real Estate Appraisers –2020
State of South Carolina Economic Summit – 2020
7- Hour USPAP 2020-2021 Update Course – 2020
7- Hour USPAP 2022-2023 Update Course – 2022

C21-0128
46

Seminars (continued):
Impact of Short-Term Rentals for Real Estate Appraisers – 2023
15 Takeaways from Colleagues' Legal Misfortunes – 2023
State of SC Economic Summit-Part 1 – 2023
Current Issues and Misconceptions in Appraisal – 2023
CLE International - Eminent Domain Conference – 2003 & 2005
Fortune Academy of Real Estate – CE004035: Core Update – 2005; Top Ten Ways to be Disciplined - 2010
The Center for American and International Law (Institute for Local Government Studies) –  Planning, Zoning and Eminent Domain – 2003
American Society of Real Estate Appraisers - Income Producing Properties Seminar - l985;  "R-41-C" Seminar - l987;
BV201: Introduction to Business Valuation, Part 1 – 2001
American Society of Farm Managers and Rural Appraisers -
Advanced Rural Appraisal - 1981; Report Writing - 1984: Eminent Domain/Condemnation – l986
The Whitmer Company - Comprehensive Exam Workshop – 1991;  South Carolina Home Builder's Exam Preparation Course

## PROFESSIONAL EXPERIENCE:

• Licensed Real Estate Broker and Appraiser in South Carolina - since l980
• Partner in Real Estate Brokerage Firm  - 1981 - 1984
• 30± years' experience in sales and appraising all types of properties including commercial, single family, multi-family, condos, office buildings, restaurants, mobile home parks, golf course developments, manufacturing facilities, hotels, motels, subdivisions, farms and other special purpose properties.
• Vice-President/Branch Manager - Bay State Appraisal Corporation - Myrtle Beach, S. C. - 1986 - 1991
• President - E. F. Hucks & Associates, Inc. - Myrtle Beach, S. C.

## PROFESSIONAL ORGANIZATIONS:

South Carolina Real Estate Appraisers Board – 2001-2004
Greater Horry County Board of Realtors
South Carolina Association of Realtors
National Association of Realtors
SC Chapter 47 - Appraisal Institute
       Candidates Guidance Chairman - SRA's - 1991
       Board of Directors - 1991-1992
       Regional Representative - 1993-1994

## SERVICES OFFERED:

• Independent fee appraisals and review appraisal services
• Consulting and counseling
• Testimony as expert witness in family courts of Lee and Horry Counties plus testimony in Horry County Master in Equity Court and Federal Bankruptcy Court - Columbia, SC

## PROPERTIES APPRAISED:

| | | |
|---|---|---|
| Apartment Complexes | Golf Courses | Assisted Living Facilities |
| Marina Facilities | Churches and Funeral Homes | Banks |
| Motels | Condominium Projects | Convenience Stores |
| Office Complexes | Farms and Timberlands | Mini Warehouses |
| Restaurants | Retail & Shopping Centers | Mobile Home Parks |
| Warehouse and Industrial Properties | Residential Subdivisions | |
| Miniature Golf Courses and Amusement Parks | Health Clubs | |

## APPRAISAL CLIENTS SERVED:

US Army Corps of Engineers
Horry County
Georgetown County
Santee Cooper
General Services Administration (GSA)
SC Coastal Council
SC Dept. of Highways & Public Transportation
Municipalities-Conway, Surfside Beach, Bishopville & Lee Counties
Resolution Trust Corporation
Various Banks, Savings & Loans, and other Thrifts throughout South Carolina and other parts of the U.S.

E. F. HUCKS & ASSOCIATES, INC.

C21-0128
47

**ADDRESSES**:

E. F. HUCKS & ASSOCIATES, INC.
Inlet Crossing (Main)
3320 S. Hwy. 17
Murrells Inlet, SC 29576

Founders Centre
2411 N. Oak Street, Suite 201
Myrtle Beach, S. C.  29577

Telephone:        (843) 443-3159
Fax:              (843) 448-1925
website:          efhucks.com
email:            efhucks@efhucksinc.com

## REAL ESTATE QUALIFICATIONS AND EDUCATION
## BENJAMIN J. WOOLCOCK

**APPRAISAL CERTIFICATION**:
Apprentice Real Estate Appraiser - #8292 (South Carolina)

**PROFESSIONAL EDUCATION**:
Graduate, Coastal Carolina University, Conway, S.C. - 2021
    B. S. in Finance (Concentration in Banking & Minor in Commercial & Investment Real Estate)

**PROFESSIONAL TOOLS EXPERIENCE**:
Microsoft Office: Word, Excel, PowerPoint
Trimble Sketchup

**APPRAISAL COURSES COMPLETED**:

| Date | Course | Provider |
|---|---|---|
| *December - 2021* | Supervisory Appraiser/Trainee Appraiser Course | The Appraisal Institute |
| *November - 2021* | 15-Hour Equivalent USPAP Course | The Appraisal Institute |
| *November - 2021* | Basic Appraisal Procedures | The Appraisal Institute |
| *November - 2021* | Basic Appraisal Principles | The Appraisal Institute |
| June – 2022 | Subdivision Valuation | The Appraisal Institute |
| June – 2022 | 2022-2023 7-Hour USPAP Update Course | The Appraisal Institute |
| July – 2022 | General Appraiser Income Approach Part 1 | The Appraisal Institute |

**PROFESSIONAL EXPERIENCE:**

***07/2021-Current   Apprentice Appraiser – EF Hucks and Associates***

    Hired in July 2021 as an assistant; acquired apprentice license in December 2021

    *Apprentice Appraiser* – aspects of commercial real estate appraising including property inspection, obtaining data from the courthouse and other governmental agencies, locating comparative sales/income or lease data, analyzing subject and relative data obtained, and writing the narrative report.

**TYPES OF PROPERTY APPRAISED:**
- Office – Medical and Professional Office
- Industrial – Flex
- Land; Commercial & Residential
- Mini-Storage Complexes
- Mobile Home Parks
- Single Family Residential Homes
- Miniature Golf Courses
- Retail Buildings
- Restaurants
- Convenience Stores
- Boat Slips
- Plantations
- Residential Subdivisions

## Glossary of Terms and Definitions

The following definitions of pertinent terms are taken from *The Dictionary of Real Estate Appraisal*, Sixth Edition (2015), published by the Appraisal Institute, Chicago, IL, as well as other sources.

**ABSORPTION**
1. Broadly, the process whereby vacant space in a property, a group of properties, or a market becomes occupied, either by leasing or by sales to owner- users.
2. In subdivision analysis, the process whereby lots or units in a subdivision are sold off.
3. In market analysis, short-term capture.

**ABSORPTION PERIOD**
The actual or expected period required from the time a property, group of properties, or commodity is initially offered for lease, purchase, or use by its eventual users until all portions have been sold or stabilized occupancy has been achieved.

**ABSORPTION RATE**
1. Broadly, the rate at which vacant space in a property or group of properties for sale or lease has been or is expected to be successfully sold or leased over a specified period of time. See also *capture rate.*
2. In subdivision analysis, the rate of sales of lots or units in a subdivision.

**ACCRUED DEPRECIATION**
1. In appraisal, a loss in property value from any cause; the difference between the reproduction or replacement cost of an improvement on the effective date of the appraisal and the market value of the improvement on the same date.
2. In regard to improvements, depreciation encompasses both deterioration and obsolescence.
3. In accounting, an allocation of the original cost of an asset, amortizing the cost over the asset's life; calculated using a variety of standard techniques.

**AS IS MARKET VALUE**
The value of a specific ownership rights to an identified parcel of real estate as of the effective date of the appraisal. It relates to what physically exists and is legally permissible and excludes all assumptions concerning hypothetical market conditions or possible rezoning.

**BAND OF INVESTMENT ANALYSIS**
A technique in which the capitalization rates attributable to components of capital investment are weighted and combined to derive a weighted average rate attributable to the total investment.

**BULK VALUE**
The value of multiple units, subdivided plots, or properties in a portfolio as though sold together in a single transaction.

**CAPTURE RATE**
The percentage of total market demand a specific property or group of properties is expected to capture, which is derived by comparing the competitive attributes of the specific property to the attributes of all the competitive properties in the area; also called *market share.*

**CASH EQUIVALENCY ANALYSIS**
An analytical process in which the sale price of a transaction with nonmarket financing or financing with unusual conditions or incentives is converted into a price expressed in terms of cash or its equivalent.

**DEVELOPER'S FEE**

Typically, a payment by a property owner to a third party for overseeing the development of a project from inception to completion, included among the direct and indirect costs of development. Sometimes, the term is used to describe the time, energy, and experience a developer invests in a project as well as a reward for the risk undertaken.

**DEVELOPER'S PROFIT**

The profit earned by the developer of a real estate project.

**DEVELOPMENT**

The transformation of formerly raw land into improved property through the application of labor, capital, and entrepreneurship. Development may also include the marketing of the real estate product.

**DEVELOPMENT COST**

The cost to create a property, including land costs, and bring it to an efficient operating state, as distinguished from the cost to construct the improvements.

**ELLWOOD FORMULA**

A yield capitalization method that provides a formulaic solution for developing a capitalization rate for various combinations of equity yields and mortgage terms. The formula is applicable only to properties with stable or stabilized income streams, or properties with income streams expected to change according to the J- or K-factor pattern.

**ENTITLEMENT**

In the context of ownership, use, or development of real estate, governmental approval for annexation, zoning, utility extensions, number of lots, total floor area, construction permits, and occupancy or use permits.

**ENTREPRENEUR**

One who innovates or assumes the risks of a business or enterprise in exchange for possible gains; a promoter who initiates development.

**ENTREPRENEURIAL INCENTIVE**

The amount an entrepreneur expects to receive for his or her contribution to a project. Entrepreneurial incentive may be distinguished from entrepreneurial profit (often called developer's profit) in that it is the expectation of future profit as opposed to the profit actually earned on a development or improvement. The amount of entrepreneurial incentive required for a project represents the economic reward sufficient to motivate an entrepreneur to accept the risk of the project and to invest the time and money necessary in seeing the project through to completion.

**ENTREPRENEURIAL PROFIT**

1. A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of a property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with development. An entrepreneur is motivated by the prospect of future value enhancement (i.e., the entrepreneurial incentive). An entrepreneur who successfully creates value through new development, expansion, renovation, or an innovative change of use is rewarded by entrepreneurial profit. Entrepreneurs may also fail and suffer losses.

2. In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, and capital; also called *entrepreneurial return* or *entrepreneurial reward*.

**EXPOSURE TIME**

The estimated length of time the property being appraised would have been offered on the market prior to the hypothetical consummation of a sale at the market value on the effective date of the appraisal. Exposure time is presumed to precede the effective date of the appraisal.

The reasonable exposure period is a function of price, time and use. It is not an isolated opinion of time alone. Exposure time is different for various types of property and under various market conditions. It is a retrospective opinion based on an analysis of past events, assuming a competitive and open market. It assumes not only adequate, sufficient and reasonable time, but adequate, sufficient and a reasonable marketing effort. Exposure time and conclusion of value are therefore interrelated.

**EXTRAORDINARY ASSUMPTIONS**

An assumption, directly related to a specific assignment, as of the effective date of the assignment results, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

**FEE SIMPLE ESTATE**

Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat.

**GOING CONCERN**

An established and operating business having an indefinite future life.

**GROSS PROCEEDS**

In subdivision discounted cash flow analysis, the gross receipts generated from lot or unit sales over the absorption period. This can consider income from ancillary sources and is representative of total income generated from unit or lot sales over time.

**GROSS SELLOUT VALUE**

The sum of the separate and distinct market value opinions for each of the units in a condominium, subdivision development, or portfolio of properties, as of the date of valuation. The aggregate of retail values does not represent the value of all the units as though sold together in a single transaction; it is simply the total of the individual market value conclusions.

**HOLDING AND SALES COSTS**

Costs associated with a holding period needed to achieve permitting, project approvals, or the absorption of unit inventory over time. Include items such as real estate taxes, insurance, broker's commissions, administrative costs, and marketing and promotional expenses as well as other expenses depending upon the individual development and/or property.

**HYPOTHETICAL CONDITIONS**

A condition, directly related to a specific assignment, which is contrary to what is known by the appraiser to exist on the effective date of the assignment results but is used for the purpose of analysis. Hypothetical conditions are contrary to known facts about physical, legal, or economic characteristics of the subject property; or about conditions external to the property, such as market conditions or trends; or about the integrity of data used in an analysis.

M23-1031

**INSURABLE REPLACEMENT COST**
1. The estimated cost, at current prices as of the effective date of valuation, of a substitute for the building being valued, using modern materials and current standards, design, and layout for insurance coverage purposes guaranteeing that damaged property is replaced with new property (i.e., depreciation is not deducted).
2. Value Used by insurance companies as the basis for insurance. Often considered to be replacement or reproduction cost plus allowances for debris removal or demolition less deterioration and non-insurable items. Sometimes cash value or market value, but often entirely a cost concept. (Marshall & Swift LP)

**LEASED FEE INTEREST**
The ownership interest held by the lessor, which includes the right to receive the contract rent specified in the lease plus the reversionary right when the lease expires.

**LEASEHOLD INTEREST**
The right held by the lessee to use and occupy real estate for a stated term and under the conditions specified in the lease.

**LINE-ITEM PROFIT**
In subdivision valuation analysis, a deduction for profit as an expense in the discounted cash flow analysis, a deduction for profit as an expense in the discounted cash flow analysis over the absorption period. Line-item profit is estimated in conjunction with the selection of the discount rate used to calculate the present value of the net proceeds.

**LIQUIDATION VALUE**
The most probable price that a specified interest in property should bring under the following conditions:
1. Consummation of a sale within a short time period.
2. The property is subjected to market conditions prevailing as of the date of valuation.
3. Both the buyer and seller are acting prudently and knowledgeably.
4. The seller is under extreme compulsion to sell.
5. The buyer is typically motivated.
6. Both parties are acting in what they consider to be their best interests.
7. A normal marketing effort is not possible due to the brief exposure time.
8. Payment will be made in cash in US dollars (or the local currency) or in terms of financial arrangements comparable thereto.
9. The price represents the normal consideration for the property sold, unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

**MARKET RENT**
The most probable rent that a property should bring in a competitive and open market reflecting the conditions and restrictions of a specified lease agreement, including the rental adjustment and revaluation, permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options, and tenant improvements (TIs).

## MARKET VALUE

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeable, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

· Lessee and lessor are typically motivated.
· Both parties are well informed or well advised and acting in what they consider their best interests.
· A reasonable time is allowed for exposure in the open market.
· Payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and
· The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale. *(12 C.F.R. Part 34.42(g) Federal Register 34696, August 24, 1990, as amended at 57 Federal Register 12202, April 9, 1992; 59 Federal Register 29499, June 7, 1994)*

## MARKETING TIME

An opinion of the amount of time it might take to sell a real or personal property interest at the concluded market value level during the period immediately after the effective date of an appraisal. Marketing time differs from exposure time, which is always presumed to precede the effective date of an appraisal. *(Advisory Opinion 7 of the Appraisal Standards Board of The Appraisal Foundation and Statement on Appraisal Standards No. 6, "Reasonable Exposure Time in Real Property and Personal Property Market Value Opinions" address the determination of reasonable exposure and marketing time.)*

## MORTGAGE-EQUITY ANALYSIS

Capitalization and investment analysis procedures that recognize how mortgage terms and equity requirements affect the value of income-producing property.

## NET PROCEEDS

In subdivision discounted cash flow analysis, gross proceeds less holding, and sales costs and any line-item profit associated with a subdivision project.

## PROFIT

1. The amount by which the proceeds of a transaction exceed its cost.
2. In theoretical economics, the residual share of the product of an enterprise that accrues to the entrepreneur after paying interest for capital, rent for land, and wages for labor and management. See also *entrepreneurial profit*.
3. In accounting, an increase in wealth that results from the operation of an enterprise. Gross profit usually is the selling price minus cost; items such as selling and operating expenses are deducted from gross profit to indicate net profit.

## PROFIT MOTIVE

The desire to earn a favorable financial return on a business venture.

**PROSPECTIVE VALUE OPINION**

A prospective market value may be appropriate for the valuation of a property interest related to a credit decision for a proposed development or renovation project. According to USPAP, an appraisal with a prospective market value reflects an effective date that is subsequent to the date of the appraisal report. Prospective value opinions are intended to reflect the current expectations and perceptions of market participants, based on available data. Two prospective value opinions may be required to reflect the time frame during which development, construction, and occupancy will occur. The prospective market value—as completed— reflects the property's market value as of the time that development is expected to be completed. The prospective market value—as stabilized— reflects the property's market value as of the time the property is projected to achieve stabilized occupancy. For an income-producing property, stabilized occupancy is the occupancy level that a property is expected to achieve after the property is exposed to the market for lease over a reasonable period of time and at comparable terms and conditions to other similar properties.

**SUBDIVISION**

A tract of land that has been divided into lots or blocks with streets, roadways, open areas, and other facilities to its development as residential, commercial, or industrial sites.

**SUBDIVISION DEVELOPMENT METHOD**

A method of estimating land value when subdivision and development are the highest and best use of the parcel of land being appraised. When all direct and indirect costs and entrepreneurial incentive are deducted from an estimate of the anticipated gross sales price of the finished lots, the resultant net sales proceeds are then discounted to present value at a market-derived rate over the development and absorption period to indicate the value of the land.

# Addenda

## Additional Photographs

 

*View of Existing Structures*

 



*View of Commercial Property Abutting Subject*



*Typical View of Site*

Will Tallevast
31 Cornus Dr
Savannah, GA  31406
August 14th, 2023


Mandy Barnhill
E.F. Hucks and Associates
3320 South Highway 17
Murrells Inlet, SC  29576


Dear Mandy:

Please proceed with Consulting Services concerning the Tallevast Tract in Florence, SC as described in proposal dated 8/2/23 to Ross Appel with McCullough, Khan, and Appel.   Requests for Services will be directed and work through by Ross Appel.

I have enclosed the $3000.00 retainer.  I look forward to the work performed

Sincerely,


Will Tallevast
Tally's Properties
912-658-5265


CC: Ross Appel via Email



E.F. "BUDDY" HUCKS, MAI, SRA
Manager

August 2, 2023

Ross Appel
Attorney
McCullough, Khan, Appel
2036 Ewall Street
Mount Pleasant, SC 29464

Dear Mr. Appel:

Thank you for choosing E.F. Hucks Consulting, LLC, for your real estate consulting needs. I am confident that you will be very satisfied with the services that we offer.

Enclosed please find our Appraisal Consultant/Potential Expert Witness Designation Services Agreement. If this Agreement is acceptable to you, please sign and return to our office via email to mandyb@efhucksinc.com or fax it to (843) 448-1925. Once we receive the signed Agreement from you, we will process your request.

If you have questions, please don't hesitate to contact us.

Sincerely,

Edward F. Hucks, MAI, SRA
Manager, E.F. Hucks Consulting, LLC
SC State Certified General Real Estate Appraiser #CG138

**MURRELLS INLET**
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

**MYRTLE BEACH**
Founder's Centre
2411 North Oak Street
Suite 201
Myrtle Beach, SC 29577

Phone (843) 443-3159
Fax (843) 448-1925
website: efhucks.com



# E. F. HUCKS
## CONSULTING, LLC

<u>**Appraisal Consultant/Potential Expert Witness Designation**</u>

August 2, 2023

Ross Appel
McCullough, Khan, Appel
2036 Ewall Street
Mount Pleasant, SC 29464

Re:

       William D. Tallevast, V Tract
       Florence, SC 29501
       Consulting Services

Dear Mr. Appel:

We are pleased to be retained by you as consulting experts in connection with your representation of Tallevast in the above matter. We also understand that we may be asked to provide expert witness services and testimony in the matter should it become necessary.

This engagement letter sets forth the terms of our services. If these arrangements are acceptable, please sign the enclosed copy of this letter, have your client sign it as well, and return it to us at your earliest opportunity along with the $3,000 retainer mentioned below.

**Independent Nature of Services.** Our services will be delivered in a manner that is independent, impartial, and objective. We do not warrant the outcome of this matter, and neither the amount nor payment of our fees is contingent on any result.

**Services Provided.** The services provided will be delivered in the following phases as needed:

- **Phase I:** Research the property, locate and analyze market sales for comparable data for the subject property as well as obtain from client or other sources development cost estimates to complete the development of the proposed subdivision.
  (Estimated Time: 15–20 hours)
- **Phase II:** Phone call or meeting to discuss the findings in Phase I.
  (Estimated Time: 1–2 hours)

**MURRELLS INLET**
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

**MYRTLE BEACH**
Founder's Centre
2411 North Oak Street, Suite 201
Myrtle Beach, SC 29577

**CONTACT**
Phone: (843) 443-3159
Fax: (843) 448-1925
Website: efhucks.com



# E. F. HUCKS
## CONSULTING, LLC

- **Phase III:** Compile information gathered in Phase I into a narrative appraisal report to be completed by E.F. Hucks & Associates, Inc. A separate engagement letter will be provided during this phase that will detail the scope and purpose of the appraisal. (Estimated Time: 10–12 hours)
- **Phase IV:** Court appearance to provide expert witness services and/or testimony. (Estimated Time: As needed)

**Fees and Expenses.** Our fees will be based on the actual hours expended at our standard rates.

Current hourly rates are:
**$295.00 per hour**

Our rates are subject to change periodically. We will provide detailed invoicing of the time devoted to the assignment (i.e., the respected phase with actions taken, dates, hours, travel, etc.) to you for delivery to and payment by your client after the appraisal is complete. Invoiced amounts are due and payable within 10 business days of receipt of the invoice. Any invoices which are past due 30 days or more are subject to a service charge of fifteen percent (15%) per annum.

**Responsibility for Payment.** We understand you are retaining our services in connection with the representation of your client. While we will be issuing our invoices directly to you for delivery to your client, your client shall be responsible for payment in accordance with the terms stated in this letter and has acknowledged that responsibility by signing below. However, in the event that your client fails to pay for our fees and expenses on a timely basis, your firm agrees to pay the balance owed.

**Retainer.** It is our policy to collect a retainer and receive the fully executed engagement letter before we begin providing services. The retainer for this matter shall be $3,000. This retainer will be applied to our final invoice for time and expenses, with any unused amount refunded to the party who paid the retainer unless that party directs, in writing, that the refund be paid to a different party.

**Right to Withhold Services and/or Withdraw.** Without liability on our part and without regard to the stage of litigation, we shall have the right to withhold providing services (including delivering any report or providing testimony) or withdraw completely, at our sole option, if any of our invoices are not timely paid or if we determine that an irreconcilable conflict has arisen.

**MURRELLS INLET**
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

**MYRTLE BEACH**
Founder's Centre
2411 North Oak Street, Suite 201
Myrtle Beach, SC 29577

**CONTACT**
Phone: (843) 443-3159
Fax: (843) 448-1925
Website: efhucks.com



**E. F. HUCKS**
**CONSULTING, LLC**

**Reliance on Expert Reports:** In the event that we prepare any expert reports as part of this engagement, the use of any such expert reports shall be limited to litigation of the above referenced matter. The expert reports may not be used or relied on, in whole or in part, for any other purposes.

**Valuation Dates:** If the development of any appraisal opinions is needed in this engagement, your firm shall have responsibility for determining and advising us of the date(s) of value that are legally pertinent to the matter.

**Confidentiality and Recordkeeping.** We will maintain the confidentiality of all information and documentation received during our work and will abide by all court orders and applicable professional appraisal standards regarding the disclosure of information relating to this matter.

**Other Clients and Matters.** The value of our services to you and your client is based, in part, on our reputation for independent professionalism and integrity. It is possible that we may be engaged by other law firms representing parties adverse to you or your client in other matters in the future. Your engagement of our services is expressly conditioned on your agreement not to use the fact of our current or previous engagement by other counsel in other matters as a means to enhance or diminish the credibility of our opinions or testimony in this matter or in any other matter.

**Subpoenas and Testimony.** In the event that our firm or any of its owners, appraisers, or employees is required by subpoena or other legal process to provide testimony or produce documents relating to our services or work product in connection with this engagement, whether as an expert or percipient witness, and whether in court, deposition, arbitration, or in any other proceeding, and regardless of the identity of the party requiring such testimony or production of documents, your client agrees to compensate our firm for the time incurred in connection with preparation for and provision of such testimony and/or documents at our regular hourly rates in effect at that time for expert/testimonial services and to reimburse our reasonable actual expenses. The foregoing shall not apply to the extent that a third party pays our fees or expenses.

**Hold Harmless and Limitation of Liability.** To assure that our services in this matter can be rendered freely and independently, your client agrees to indemnify, defend, and hold harmless our firm, its owners, appraisers, and employees from and against any and all liabilities, losses, costs, and expenses relating to our consulting or testimonial services under this engagement. The foregoing shall not apply to any matter resulting from our gross negligence or willful misconduct. In any case, however, the total collective liability of our firm, its owners, appraisers, and employees for all claims of any kind arising out of, relating to, or connected with this engagement shall be limited to the total fees paid to us under this engagement.

MURRELLS INLET
Inlet Crossing
3320 Highway 17 South
Murrells Inlet, SC 29576

MYRTLE BEACH
Founder's Centre
2411 North Oak Street, Suite 201
Myrtle Beach, SC 29577

CONTACT
Phone: (843) 443-3159
Fax: (843) 448-1925
Website: efhucks.com

# E. F. HUCKS
## CONSULTING, LLC

Sincerely,

Edward F. Hucks, MAI, SRA
Manager, E.F. Hucks Consulting, LLC
SC State Certified General Real Estate Appraiser #CG138

Approved as to engagement:

By: _Ross Appel_____
Ross Appel
McCullough, Khan, Appel

Date: 8-8-23_____

Approved as to engagement terms and
fees by William D. Tallevast, V:

By: _____

Name: _____

Title: _____

Company: _____

Date: _____

Page 4 of 8

| MURRELLS INLET | MYRTLE BEACH | CONTACT |
|---|---|---|
| Inlet Crossing | Founder's Centre | Phone: (843) 443-3159 |
| 3320 Highway 17 South | 2411 North Oak Street, Suite 201 | Fax: (843) 448-1925 |
| Murrells Inlet, SC 29576 | Myrtle Beach, SC 29577 | Website: efhucks.com |

BCD 1435431

State of South Carolina
Department of Labor, Licensing and Regulation
Real Estate Appraisers Board

**BENJAMIN JAMES WOOLCOCK**

Is hereby entitled in practice as a:

**Apprentice Appraiser**

License Number: **8292**

Expiration Date:  06/30/2024
OFFICE COPY

*Laura L. Smith*

Administrator

State of South Carolina
Department of Labor, Licensing and Regulation
Real Estate Appraisers Board

**EDWARD FRANK HUCKS**

Is hereby entitled in practice as a:

**Certified General Appraiser**

License Number: **138**

BCD 1471592

Expiration Date: 06/30/2024
**OFFICE COPY**

_Laura L. Smith_
**Administrator**