| | |
|---|---|
| DHD JESSAMINE, LLC, ) | Civil Action No.: 4:22-cv-01235-JD |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | **DHD JESSAMINE, LLC'S DAUBERT** |
| WILLIAM D. TALLEVAST, V, ) | **MOTION TO EXCLUDE REPORT AND** |
| ) | **ANY TESTIMONY OF DEFENDANTS'** |
| Intervenor-Plaintiff, ) | **EXPERT WITNESS PHIL LINDLER** |
| ) | |
| ) | |
| vs. ) | |
| ) | |
| FLORENCE COUNTY, SOUTH CAROLINA; ) | |
| FRANK J. BRAND; JASON SPRINGS; ) | |
| ROGER M. POSTON; ALPHONSO ) | |
| BRADLEY; JERRY W. YARBOROUGH; ) | |
| STONEY C. MOORE; WAYMON MUMFORD; ) | |
| and WILLARD DORRIETY, JR., as the elected ) | |
| members of ) | |
| the FLORENCE COUNTY COUNCIL; and ) | |
| JOHN DOES 1-15, ) | |
| ) | |
| Defendants. ) | |
| ) | |

Plaintiff DHD Jessamine, LLC ("Plaintiff") files this Daubert Motion and hereby moves

the Court for an Order excluding the report and barring certain "expert" testimony of Phil Lindler

("Lindler").[1]  Defendants have identified Lindler as an expert witness in the field of Governmental

Planning and Zoning.  He has been identified as expected to testify in accordance with his report,

a copy of which is attached as Exhibit 1.  In his report, Lindler stated:

> "I conclude that Florence County's adoption of and implementation of the pending
> ordinance doctrine were customary actions as related to other local governments
> within South Carolina and such actions **met guidelines for related procedures as
> found in caselaw** and recommended practices.  Furthermore, actions to approve R-

---

[1] This Motion sets forth the specific grounds for Plaintiff's request, including legal authorities that
support the relief being sought.  For this reason, in accordance with D.S.C. Local Civil Rule 7.04,
Plaintiff has incorporated all necessary items and arguments within this Motion and has not filed a
separate Memorandum.

1 zoning and deny PD zoning as proposed were consistent with the Future Land Use Map of the 2017 Florence County Comprehensive Plan." (Emphasis Added).

*See* Exhibit 1 at Pg. 15-16.

Plaintiff moves to exclude the opinions, testimony, and report of Lindler as an improper effort by Defendants to introduce expert testimony on the law, which is not admissible in federal court. Furthermore, even if qualified to testify, Lindler's opinions contained in his October 3, 2023, report above do not have a scientific basis and therefore, fail the reliability requirements of Rule 702 of the Federal Rules of Evidence and *Daubert* such that his opinions will not assist the trier of fact to understand the evidence or to determine a fact in issue.

## LEGAL STANDARD

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), *citing* 3 Weinstein & Berger, Weinstein's Evid. ¶ 702[02]. Therefore, expert evidence must be reliable. "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001). For these reasons, under Federal Rule of Evidence 702, trial judges act as gatekeepers to ensure that any and all scientific testimony is not only relevant, but reliable. Specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) of the Federal Rules of Evidence, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier or fact to

understand or determine a fact in issue. *Daubert,* 509 U.S. at 592. In *Daubert,* the Supreme Court

further distilled the trial court's analysis as follows:

1) Whether a theory or technique can be or has been tested;
2) Whether it has been subjected to peer review and publication
3) The quality control procedures used to ensure reliability; and
4) Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Daubert,* 509 U.S. at 592-594.  The proponent of expert testimony must prove "by a preponderance

of the evidence that the testimony is reliable." *Moore v. Ashland Chemical, Inc.,* 151 F. 3d 269,

276 (5th Cir. 1998), *cert. denied,* 526 U.S. 1064 (1999) (excluding expert opinion proffered in

chemical exposure case as unreliable).

Furthermore, additional factors have been incorporated since *Daubert* was initially decided

by the United States Supreme Court: whether the technique or theory has been developed solely

for purposes of litigation, *Daubert,* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert* on remand);

whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded

conclusion, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); whether the expert has

accounted for obvious alternative explanations, *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-503

(9th Cir. 1994); whether the expert is "being as careful as he would be in his regular professional

work outside his paid litigation consulting," *Sheehan v. Daily Racing Forms, Inc.*, 104 F.3d 940,

942 (7th Cir. 1997), *following Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999), for the

proposition that *Daubert* requires the trial court to assure itself that the expert "employs in the

courtroom the same level of intellectual rigor that characterizes the practice of an expert in the

relevant field"; and, whether the field of expertise claimed by the expert is known to reach reliable

results for the type of opinion the expert would give, *Kumho Tire*, 526 U.S. at 1175.

In evaluating the admissibility of expert testimony, the Court acts as a "gate-keeper" whose primary task is to assess the reliability and relevance of the proffered evidence. *Moore* at 1174. The Court's inquiry as gatekeeper is a "flexible one" focusing on the principles and methodology used by the expert. *Daubert,* 509 U.S. at 594-95. The Court has broad latitude to consider whatever factors it deems useful in evaluating the reliability of proffered testimony. The factors evaluated by the Court obviously depend upon the type of expert testimony involved. The *Daubert* factors apply to all experts regardless of field. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149-50 (1999).

Even if otherwise admissible under Rule 702, expert testimony may still be properly excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury." *United States v. Dorsey,* 45 F.3d 809, 815 (1995). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert*, 113 S.Ct. 2786, 509 U.S. 579 (citation omitted). "Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403… exercises more control over experts than lay witnesses." *Id.* at 595.

## ARGUMENT

### A. RULE 702 DOES NOT PERMIT EXPERT TESTIMONY ON THE LAW

While Federal Rule of Evidence 702 allows testimony by experts, it allows such testimony only "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. Fed. R. Evid. 702 (emphasis added). The explicit language of Rule 702 does not contemplate the admissibility of expert testimony for any purpose other than to aid in the understanding of evidence or to determine a fact in issue. Clearly, these specifically stated purposes are not broad enough to include expert assistance on legal

questions.  This should end the inquiry, under the plain-meaning standard of interpretating the Rule without regard to legislative history, policy, or practical considerations.[2]  The majority rule is that expert testimony on the law is **NOT** admissible in federal court.  Several leading decisions illustrate this rule.

In 1986, the Fourth Circuit addressed the admissibility of expert testimony on the law in *Adalman v. Baker, Watts & CO*., 807 F.2d 359 (4th Cir. 1986).  *Adalman* was disapproved on other grounds in *Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988).  In *Adalman*, the controversy surrounded a tax-sheltered investment.  The tax investment was organized as a partnership, and investors were solicited.  Subsequently, the partnership went into receivership, and investors filed this suit alleging securities law-violations.  The defendant proffered an expert witness to testify to his conclusion that the applicable securities law did not require the disclosure of the omitted material and the district court ruled the testimony inadmissible.  *Id*. at 365.  The *Adalman* court held that "[u]nder circumstances involving domestic law, this court can conceive of no circumstances which would shift this burden [of determining the applicable law] from the court to the jury."  *Id*. at 366.  The court added that Federal Rule of Evidence 704(a) does not permit the expert witness to "usurp the province of the judge."  *Id*. at 368.

In 1987, the Second Circuit decided *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987).  *Krear* involved a conflict over the control of employee benefit plan funds.  The plaintiff contracted with the trustees to provide administrative services for the fund and sued for payment under the contract.  The trustees proffered a lawyer as a witness to testify that the contract between the parties was unenforceable because essential terms were missing from

---

[2] The Supreme Court has imposed a plain-meaning standard of interpretation on the Federal Rules of Evidence. See, e.g., *United States v. Zolin*, 491 U.S. 554, 566 (1989); *United States v. Owens*, 484 U.S. 554, 561-62 (1988). See generally Randolph N. Jonakait, The Supreme Court, Plain Meaning, and the Changed Rules of Evidence, 68 Tex. L. Rev. 745 (1990).

the document.  *Id*. at 1256.  The Second Circuit upheld the district court's exclusion of the proffered expert testimony and concluded that "[i]t is not for witnesses to instruct the jury as to the applicable principles of law, but for the judge."  *Id*. at 1258.  In deciding *Krear*, the Court invoked an earlier decision from the Second Circuit, *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508 (2d Cir.), cert. denied, 434 U.S. 861 (1977), which held that the trial court had erred in permitting expert testimony regarding the parties' legal obligations.

In 1977, the Fifth Circuit addressed a case involving a bookmaking organization.  The court stated in *United States v. Milton* that the judiciary must "remain vigilant against the admission of legal conclusions, and an expert witness may not substitute for the court in charging the jury regarding the applicable law."  *United States v. Milton*, 555 F.2d 1198, 1203 (5th Cir. 1977).  In 1983, the Fifth Circuit decided *Owen v. Kerr-McGee Corp*., 698 F.2d 236 (5th Cir. 1983).  In *Owen*, the plaintiff alleged that the defendant negligently installed and operated an underground gas pipeline.  At trial, the defendant sought to introduce testimony by an expert who would have given his opinion on the legal conclusions to be drawn from the evidence.  *Id*. at 239-40.  In affirming the trial court's refusal to admit the evidence, the Fifth Circuit panel stated that the Federal Rules of Evidence generally do not allow a witness to "give legal conclusions," and that allowing the expert to give his opinion on the legal conclusions to be drawn from the evidence would both invade the trial court's province and be irrelevant.  *Id*. at 240.

The Sixth Circuit addressed the issue of expert legal testimony in *United States v. Zipkin*, decided in 1984.  729 F.2d 384 (6th Cir. 1984).  The district court permitted the plaintiff's expert witnesses to testify about bankruptcy law and the law's application in the case with regard to interim compensation for receivers.  Additionally, the district court allowed the bankruptcy judge presiding over the estate's bankruptcy proceedings to testify regarding the proper interpretation of

an order he had made concerning the payment of fees to the receiver.  The Sixth Circuit held that this testimony was inadmissible and that the error in admitting it was reversible because only the judge can properly instruct the jury on the applicable principles of law.  *Id*. at 387.  The court of appeals further noted that expert testimony on the law is properly excluded because a trial judge does not need the assistance of witnesses to determine the applicable law.  *Id*.

In *Harbor Insurance Co. v. Continental Bank Corp.*, the Seventh Circuit held that a lawyer could not testify as an expert on the meaning of "indemnity" in the defendant-bank's charter.  922 F.2d 357 at 366 (7th Cir. 1990).  Although the court acknowledged that a lawyer was a proper witness to provide an opinion regarding the meaning of the charter, the lawyer-witness in this case had gone further at trial and based his opinion on judicial opinions.  *Id*. at 366.  By allowing the lawyer to testify on the conclusions of his legal research, the district judge improperly "allowed the jury to infer that it could look to that witness for legal guidance."  *Id*.  In effect, this amounted to the judge vouching for one side's theory of the case. According to the appellate court, "by doing this the judge impermissibly tilted the balance of power between the parties" thus, the Seventh Circuit concluded that the district court was incorrect in allowing the lawyer to testify on the legal meaning of indemnification.  *Id*.

In *Farmland Industries v. Frazier-Parrott Commodities*, the Eighth Circuit recently held that an expert witness cannot testify regarding the requirements of the law.  871 F.2d 1402, 1409 (8th Cir. 1989).  In *Farmland*, the plaintiff claimed that the defendants conspired to defraud the plaintiff by trading in oil futures contracts without authorization.  *Id*. at 1404.  The district court refused to allow the plaintiff's expert witness to testify regarding the federal agency's rules pertaining to the defendant's conduct.  The Eight Circuit approved the trial court's refusal and stated that the special legal knowledge of the judge rendered the witness's testimony superfluous.

*Id*. The panel further explained that, "[t]he admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case." *Id*. (quoting *Marx & Co. v. Diner's Club, Inc*., 550 F.2d 50S, 510 (2d Cir.), cert. denied, 434 U.S. 861 (1977)).

In 1974, the Ninth Circuit decided *Cooley v. United States*. 501 F.2d 1249 (9th Cir. 1974), cert. denied, 419 U.S. 1123 (1975). The defendant in *Cooley* was convicted for willfully and knowingly failing to file a tax return. In upholding the trial court's ruling that copies of case decisions were inadmissible, the Ninth Circuit pointedly noted that the law is given to the jury by the court and is not introduced into evidence. *Id*. at 1253. The *Cooley* court held that "It is the function of the jury to determine the facts from the evidence and apply the law as given by the court to the facts." *Id*.

The Tenth Circuit, sitting en banc, addressed the admissibility of expert legal testimony in *Specht v. Jensen*, decided in 1988. 853 F.2d 805 (10th Cir. 1988), cert. denied, 488 U.S. 1008 (1989). The Tenth Circuit panel directly addressed the issue of whether Federal Rule of Evidence 702 permits an attorney who is called as an expert witness to state his views on the law that governs the verdict. The Specht Court considered whether "the expert encroached upon the trial court's [function and] authority to instruct the jury upon the applicable law" and held that "it would be a waste of time if witnesses or counsel should duplicate the judge's statement of the law, and it would intolerably confound the jury to have it stated differently." *Id*. at 807. The court concluded, in no uncertain terms, that "[i]n no instance can a witness be permitted to define the law of the case." *Id*. at 810.

The Eleventh Circuit held that an expert witness is not allowed to testify regarding the legal interpretation of a contract. In *Montgomery v. Aetna Casualty & Surety Co.*, the Court reversed the trial court's decision to admit expert testimony regarding the legal duty of an insurer under a

policy. 898 F.2d 1537, 1538 (11th Cir. 1990). The *Montgomery* Court held that "[a]n expert may not ... merely tell the jury what result to reach," and "also may not testify to the legal implications of conduct; the court must be the jury's only source of law." *Id*. at 1541. Rather, "the court must be the jury's only source of law," and questions of law are not subject to expert testimony." *Id*.

Expert legal testimony does not meet the requirement of Federal Rule of Evidence 702 because the evidence is not helpful in assisting the jury in the determination of issues of fact. The judge is the sole authority on the law and its interpretation. The jury's function is to evaluate the facts in the light of the applicable law which, in turn, is determined by the judge. Expert legal testimony should also be excluded under an analysis of Federal Rule of Evidence 403.

### B.  PHIL LINDLER'S FINDINGS AND CONCLUSIONS ARE OPINIONS ON THE LAW AND MUST BE EXCLUDED

Lindler, in his report, offers conclusions and findings which should be excluded under both Rule 702 and Rule 403 of the Federal Rules of Evidence. In Section One of his report, Lindler opined:

> I have found that Florence County acted within the requirements of South Carolina State Law in enacting a moratorium for individual unzoned parcels in the unincorporated county.

*See* Lindler Report at pg. 3. Lindler's conclusion states:

> I conclude that Florence County's adoption of a moratorium and implementation of the pending ordinance doctrine were customary actions as related to other local governments within South Carolina and such actions met guidelines for related procedures as found in caselaw and recommended practices.

*Id*. at pg. 16. The finding and conclusion of Lindler are exactly the type of expert opinions regarding the law which have been properly excluded by the Fourth Circuit, along with an overwhelming majority of the other federal circuit courts of appeals.

A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Expert opinion that is nothing more than the expert's untestable say-so is inadmissible as matter of law. *Joiner*, 522 U.S. at 146; *Weisgran v. Manley Co.*, 528 U.S. 440, 453 (2000) (contributes "nothing to a 'legally sufficient evidentiary basis'"); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d at 321 (3rd Ci. 2003) ("'must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'").

Lindler's report should be excluded, and his testimony should be barred because he is not even remotely familiar with the South Carolina statutory provisions and caselaw which he is improperly attempting to provide expert testimony about. In his report, Lindler stated:

> "The Pending Ordinance Doctrine was upheld in 1979 by the South Carolina Supreme Court in the case of Sherman v. Reavis 273 S.C. 542, 257 S.E.2d 735 in which the City of Charleston utilized the pending ordinance doctrine to refuse building permits for a proposed use of the property that was contrary to the terms of an ordinance pending enactment."

*See* <u>Exhibit 1</u> at pg. 7.

When he was deposed, Lindler was unable to accurately state the factors that must be met for a governmental body to properly invoke the Pending Ordinance Doctrine pursuant to *Sherman v. Reavis*. Furthermore, Lindler opined that many jurisdictions in South Carolina go through the pending ordinance doctrine or establish the Pending Ordinance Doctrine differently which demonstrates his total lack of knowledge that the Pending Ordinance Doctrine is a judicially created common law principle that is controlling South Carolina common law. Lindler presented no evidence to support his deposition testimony that some jurisdictions have codified the Pending Ordinance Doctrine, because no such evidence exists in South Carolina.

21          Can you tell me what your understanding is of

22     the required elements that have to be met before a

23     governmental body can properly invoke the pending

24     ordinance doctrine?

25  A    Typically, there has to be a -- a ordinance that's

1      advertised and issued in order for that to be

2      enacted.  Many jurisdictions go through the pending

3      ordinance doctrine or establish the pending

4      ordinance doctrine differently.

5          Some actually state that within the ordinance.

6      Some don't state that and it's implied that

7      whenever there is a change or proposed change on a

8      property that that is already invoked, because it's

9      basically in limbo.

10          Because when it's going through that change,

11     there are a number of things that could be approved

12     or not approved on that property based on what

13     would be the final outcome of the decision.

14          So, therefore, everything is basically stayed,

15     and there's no -- no review or action taken on that

16     until, in this case, the council makes a final

17     determination on what they want that property to

18     be.

19          And if we're talking zoning in particular, to

20     what particular zoning category that they wanted to

21     have this on the property.

15  A    No.  And I -- everything I've stated is related to

16     South Carolina.

*See* the deposition transcript of Phil Lindler attached as <u>Exhibit 2</u>, at Pg. 19:20 – 20:21, 21:15-16.

Furthermore, Lindler testified that he was not aware of any limitation as to the type of ordinance that the pending ordinance doctrine could be applied to.

```
20   Q   Do you have any understanding as to whether or not
21       the pending ordinance doctrine can be invoked for
22       any type of ordinance?  Or is there a limitation on
23       the types of ordinances that it can be used for?
24   A   I'm not aware of any limitation to that.  My
25       knowledge is based on more land use decisions,
```

```
1        whether they be a zoning matter, whether they be a
2        particular land use that can be placed on a
3        property or area.  That could be -- have a
4        moratorium on it for whatever reason.
5    Q   Are you aware of any limitation on the type of
6        property that the pending ordinance doctrine could
7        be invoked or utilized in relation to?
8    A   No.
```

*See* Exhibit 2, at Pg. 21:20 – 22:8.  This testimony is directly refuted by the black letter law of *Sherman v. Reavis*.  Under South Carolina's pending ordinance doctrine, a city may properly refuse a permit for a land use "when such use is repugnant to a pending and later enacted **zoning ordinance**." *Sherman v. Reavis,* 273 S.C. 542, 257 S.E.2d 735, 737 (1979) (emphasis added).

Therefore, considering the factors under *Daubert* and its progeny, Lindler should be precluded from testifying regarding whether or not Florence County's actions were consistent with the law, or to discuss any caselaw which governs the subjects in his expert report.  Lindler's opinions fail to meet any of the criteria for reliability, and are totally devoid of any scientific, technical, or other specialized knowledge and contain absolutely no methodology that Lindler relied upon to reach his conclusion(s).  For these reasons, Lindler's opinions are inherently

unreliable and cannot serve as the foundation for his expert opinion under Federal Rule of Evidence 702.

### C. PHIL LINDLER'S FINDINGS AND CONCLUSIONS SHOULD BE EXCLUDED DUE TO RELIANCE ON FALSE INFORMATION, INCORRECT DATA, AND UNACCPETED PREMISES

Lindler's opinions should be excluded because they lack reliable principals and methods. Lindler's conclusions must be excluded as they are based on incorrect information about the language of the moratorium ordinance, incorrect information about the number and types of properties affected by the moratorium ordinance, a lack of knowledge as to Florence County's comprehensive plan, and a lack of knowledge of the law as it relates to zoning and the pending ordinance doctrine. Lindler does not cite to a single peer reviewed study or methodology that he bases his conclusions on. Specifically, Lindler's methodology is inadequate for: (1) lack of personal examination; (2) insufficient underlying data; (3) the absence of literature in his field supporting his theory." *See, e.g., Adams v. Pro Transportation, Inc.,* 2002 WL 801911, at 7 (D.Neb. Jan. 9, 2002), citing *Jaurequi v. Carter Mfg. Co., Inc.,* 173 F.3d 1076, 1082 (8ᵗʰ Cir. 1999) (discussing *Daubert*, 509 U.S. at 593-594).

When, deposed, Lindler conceded that his lack of personal examination, insufficient underlying data, and absence of literature in his field to support his opinions:

```
16   Q     Other than things that you were provided by the
17         defense attorneys who hired you and the items that
18         are the things that you cited to as sources in your
19         report, are there any other outside or third-party
20         sources or entities or individuals you consulted
21         with or worked with in forming your opinions in
22         this case?
23   A     No.
```

*See* Lindler Deposition, attached as <u>Exhibit 2</u>, at Pg. 9:16-23.

```
24              Is there any specific methodology you used in
25          forming your opinions that are contained in your

 1          report?
 2    A     Just based on my education and knowledge in that
 3          profession for the -- those number of years.  That
 4          is what I'm basing my information on.
 5    Q     Okay.  Have you consulted with or spoken with any
 6          of the staff members of the Florence County
 7          planning or building department in forming your
 8          opinions?
 9    A     No.
10    Q     Have you consulted with any members of the Florence
11          County Council in forming your opinions?
12    A     No.
```

*Id*. at 12:24-13:12.

In his report, Lindler stated:

"Even though the South Carolina Supreme Court has not ruled directly on a case involving a zoning or land development moratoria, the United States Supreme Court has upheld moratoria in Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency (00-1167) 535 U.S. 302 (2002) where development was paused for 32 months while a comprehensive land use plan was developed for the area."

*See* <u>Exhibit 1</u> at pg. 4.  Lindler's report blatantly misrepresents the caselaw in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* that he is improperly attempting to provide expert testimony on.  There was no challenge to the legality of any moratoria that was present to the United States Supreme Court in this action, rather the entire case was about whether or not a temporary moratoria amounted to a taking that was compensable under the constitution.

Justice Stevens delivered the opinion of the court and stated, "The question presented is whether a moratorium on development imposed during the process of devising a comprehensive land-use plan constitutes a *per se* taking of property requiring compensation under the Takings Clause of the United States Constitution." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 306, 122 S. Ct. 1465, 1470, 152 L. Ed. 2d 517 (2002). This case cited by Lindler in an effort to support his impermissible opinions on the law has no application on Plaintiff's claims, as Plaintiff has not alleged a taking in this matter.

When asked whether or not he was aware of the South Carolina Court of Appeals ruling directly on any case involving a zoning or land development moratoria, Lindler testified as follows:

```
 9        paragraph under the moratorium section, you wrote,
10        "Even though the South Carolina Supreme Court has
11        not ruled directly on a case involving a zoning or
12        land development moratoria, the United States
13        Supreme Court has upheld moratoria in Tahoe-Sierra
14        Preservation Council v. Tahoe Regional Planning
15        Agency."
16            Do you have any understanding or idea as to
17        whether or not the South Carolina Court of Appeals
18        has ruled directly on cases involving zoning or
19        land development moratoria?
20    A   No.
21    Q   Okay.  Did you seek to find that out or do any
22        research on that or no?
23    A   No, I did not.
```

*See* Exhibit 2, at Pg. 26:9-23. The South Carolina Court of Appeals, in *Simpkins v. City of Gaffney*, has ruled directly on a case involving a zoning and land use moratoria, and stated, "We hold the

moratorium passed by the city council on the issuance of permits under the existing ordinance is invalid. First, the city council did not possess the power to suspend the ordinance temporarily. Second, **to suspend operation of the existing zoning ordinance regulating the construction of duplexes and multi-family dwellings, the ordinance must be either repealed or succeeded by another ordinance or an instrument of equal dignity**. *Simpkins v. City of Gaffney*, 315 S.C. 26, 29, 431 S.E.2d 592, 594 (Ct. App. 1993) (emphasis added).

Lindler testified that he was not familiar with the terms "equal dignity" or the "time of application rule" in his capacity as someone who has worked in city and county planning and zoning departments for his entire career.

```
24   Q    In your career as a -- in various planning
25        departments, have you ever become familiar with or

 1        been educated on a term called the equal -- "equal
 2        dignity"?
 3   A    No.

 6   Q    Do you have any understanding in your -- with your
 7        background as to what's referred to or called the
 8        "time of application rule"?
 9   A    No, I don't.
```

*Id.* at 26:24-27:3, and 36:6-9.  Lindler's lack of subject matter knowledge as it relates to the controlling law of zoning and planning in South Carolina, and his admission that he took no efforts to find out whether or not the Court of Appeals had ever ruled on a zoning or land use moratoria is further evidence that warrants the exclusion of Lindler's report and testimony.

Lindler, incorrectly testified that Florence County's Comprehensive Plan regulated densities and that even though PD zoning was a permissible zoning category in the Future Land

Use designation of Residential Preservation which applied to the Tallevast property, Lindler still somehow believed that a PD zoning could not exceed the allowable dwelling units per acre of the other permissible.

```
13   Q    But so your -- the second sentence there where you
14        stated, "Therefore, any zoning category other than
15        R-1, R-2, R-3, or R-3A proposed for the property
16        located within the residential preservation area
17        would not conform to the comprehensive plan," would
18        it be a true statement that a planned development
19        is a zoning category that would comply with the
20        residential preservation area of the comprehensive
21        plan?
22   A    I would agree.  But with a caveat that it meets the
23        standards and characteristics of R-1, R-2, R-3, and
24        R-3A.
25   Q    Is there anything anywhere in the comprehensive

1         plan you can cite to, to support that caveat?
2    A    Within Florence County's comprehensive --
3    Q    Yes.
4    A    -- plan?  There may be.  I'm just not aware of
5         anything to that.  But that's typically how PDs

20   A    The comprehensive plan is really setting densities.
```

*Id*. at 28:13-29:5, 20.  A copy of the 2017 Florence County Comprehensive Plan ("Comprehensive Plan") that was in effect at all times relevant to this litigation is attached as Exhibit 3.  The words density and densities appear in this 374-page Comprehensive Plan a total of forty (40) times, none of which in a context that would support Lindler's testimony that the Comprehensive Plan sets or limits densities.  The following two goals contained in the Housing Element of the Comprehensive

Plan directly contradict Lindler's testimony, and show that the Comprehensive Plan encourages developments like the Jessamine Apartments:

> **GOAL 3**
> Encourage the development of higher density, affordable housing types near major employment nodes to promote jobs-housing balance.
>
> **GOAL 5**
> Promote the development of housing and provide a range of housing choices that meet the needs of persons of all income levels, of all age groups, and persons with special needs.
>
> **Implementation Strategy:** Inventory appropriate available land for residential development through the Land Use Element of the Comprehensive Plan. Direct high-density housing options to urban centers while maintaining the rural lifestyle of unincorporated areas.
>
> **Time Frame:** Continuous

*See* Exhibit 3 pg. 135-136.

> The stated purpose of the Future Land Use portion of the Comprehensive Plan was:
>
> "The purpose of the future land use section is to identify opportunities and limitations of future growth, and to better understand how future land development can occur in a productive, efficient, and sustainable manner.  While current land use regulations (zoning) affects where specific development occurs, the importance of establishing the vision of future land uses is paramount."

*Id*. at pg. 241.  There is no dispute that between the parties that the future land use designation that governed the Tallevast Property was Residential Preservation (RP) under the Comprehensive Plan. Contrary to the uninformed opinions of Lindler, the Residential Preservation (RP) future land use designation **ONLY** limited permissible zoning districts, it **DID NOT** limit permissible densities.

> **Future Land Use Designations and Objectives**
> **Residential Preservation (RP)** – Protect and sustain existing low density single-family residential areas, including property values and amenities, and provide for the growth of suburban or developing rural areas consisting of single-family homes and their accessory uses. **(Zoning Districts Permitted: R-1, R-2, R-3, R-3A, PD)**

*Id*.  Appendix G of the Comprehensive Plan titled Zoning Districts Interpretations provides the following interpretation specific to Planned Development (PD) zoning district:

> The intent of the Planned Development District is to encourage flexibility in the development of land in order to promote its most appropriate use; and to do so in a manner that will enhance public health, safety, morals, and general welfare. There is no minimum lot area for this zoning district, however, it is the intent to promote and encourage or require development in this form where appropriate in character, timing, and location, particularly in large undeveloped tracts.

*Id*. at pg. 366.

Lindler, incorrectly testified that the Future Land Use Plan, which is contained in the Comprehensive Plan, limits density, but was unable to cite to any portion of the Comprehensive Plan or a single credible source to support his opinion.

```
 8   Q    So the future land use plan does not limit density.
 9        It limits permissible zoning districts; correct?
10   A    No.  It limits density.
11   Q    Can you cite to any language where it says the
12        density is what's being limited versus the zoning
13        categories are what's being limited?
14   A    Can you restate that?
15   Q    Sure.  Is there anything you can cite to in the
16        Florence County comprehensive plan that would
17        support your contention that the comprehensive plan
18        limits density versus limits zoning -- permissible
19        zoning categories?
20   A    Not that I'm aware of.  Again, that is just
21        planning practice and general knowledge of
22        administration of comprehensive plans and zoning
23        ordinances.
```

*See* <u>Exhibit 2</u>, at 32:8-23.

All of Lindler's opinions should be deemed inadmissible for lack of reliability and substandard methodology. Further, Lindler's opinions are based on mere speculation and lack any supporting evidence. His methods certainly would not be relied upon by peers in the field. In addition to lack of qualifications and reliable methodology, Lindler's testimony should be excluded because it is not helpful to the jury in understanding the evidence or determining any fact in issue. As a result, there is not sufficient "fit" between his proposed testimony and this case. An expert opinion must be helpful to the finder of fact. *Fed. R. Evid.* 702. The helpfulness of an expert opinion requires more than mere relevance. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 748 (3rd Cir. 1994). All of Lindler's opinions should be deemed inadmissible for lack of reliability and not based on any recognized scientific data, research, clinical studies or literature and should not be introduced to the jury.

## CONCLUSION

As set forth above, Lindler lacks knowledge of the requisite facts to support his conclusions discussed above. Furthermore, his conclusions discussed above do not require any scientific, technical, or other specialized knowledge that would assises the trier of fact in this matter, and are an improper and impermissible effort by Defendants to invade the role of the Judge to advise the jury as to the law in this matter.

Based on the foregoing, the Court should find that Defendants have failed to meet their burden of showing that the report and certain expert opinions of Lindler's discussed above comply with the requirements of Federal Rule of Evidence 702. The Court should therefore exclude his report and certain expert testimony discussed above under *Daubert* and its progeny.

*(Signature on Following Page)*

Respectfully submitted,

By:  _s/ J. Taylor Powell_
    Ellis R. Lesemann (Fed. ID No. 7168)
    E-mail: erl@lalawsc.com
    J. Taylor Powell (Fed. ID No. 12265)
    E-mail: jtp@lalawsc.com
    LESEMANN & ASSOCIATES LLC
    418 King Street, Suite 301
    Charleston, SC 29403
    Phone: (843) 724-5155
    Fax: (843) 720-2312

    **_ATTORNEYS FOR PLAINTIFF_**
    **_DHD JESSAMINE, LLC_**

February 8, 2024
Charleston, South Carolina