| | |
|---|---|
| DHD JESSAMINE, LLC, | ) |
| | ) Civil Action No.: 4:22-cv-01235-JD |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) **DHD JESSAMINE, LLC'S DAUBERT** |
| WILLIAM D. TALLEVAST, V, | ) **MOTION TO EXCLUDE REPORT AND** |
| | ) **ANY TESTIMONY OF DEFENDANTS'** |
| Intervenor-Plaintiff, | ) **EXPERT WITNESS RODNEY DOOLEY** |
| | ) |
| | ) |
| vs. | ) |
| | ) |
| FLORENCE COUNTY, SOUTH CAROLINA; | ) |
| FRANK J. BRAND; JASON SPRINGS; | ) |
| ROGER M. POSTON; ALPHONSO | ) |
| BRADLEY; JERRY W. YARBOROUGH; | ) |
| STONEY C. MOORE; WAYMON MUMFORD; | ) |
| and WILLARD DORRIETY, JR., as the elected | ) |
| members of | ) |
| the FLORENCE COUNTY COUNCIL; and | ) |
| JOHN DOES 1-15, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Plaintiff DHD Jessamine, LLC ("Plaintiff") files this Daubert Motion and hereby moves the Court for an Order excluding the report and barring certain "expert" testimony of Rodney Dooley ("Dooley").[1]  Defendants have identified Dooley as an expert witness in the field of accounting. He has been identified as expected to testify in accordance with his report, a copy of which is attached as Exhibit 1.

Plaintiff moves to exclude the opinions, testimony, and report of Dooley as they fall woefully below the basic threshold requirements of Rule 702 of the Federal Rules of Evidence and

---

[1] This Motion sets forth the specific grounds for Plaintiff's request, including legal authorities that support the relief being sought. For this reason, in accordance with D.S.C. Local Civil Rule 7.04, Plaintiff has incorporated all necessary items and arguments within this Motion and has not filed a separate Memorandum.

*Daubert* such that his opinions will not assist the trier of fact to understand the evidence or to determine a fact in issue.

Furthermore, Dooley's admitted inability to cite to a single source to support his opinions, and his admitted lack of any understanding of how construction and development work in the Low-Income Housing Tax Credit industry, render all of his conclusions meritless and require his exclusion so that his own confusion as to the relevant facts does not mislead or confuse the jury as evidenced by the below testimony:

> Q     Would it be a fair statement that you are not well versed in affordable housing or low income housing tax credit development?
>
> A     A fair statement, yes.
>
> Q     Would it be fair that, other than internal other employees or the defense lawyers, that the only third parties that you spoke with in forming your opinions were a single-family developer in Florence and Mr. -- Is it Jones or Johns?
>
> A     Johns.
>
> Q     Dustin Johns.  Is that a fair statement that those are the only two third parties that you spoke with in forming your opinions in this case?
>
> A     Yes.

*See* Deposition Transcript of Rodney Dooley, attached as <u>Exhibit 2</u> at 77:16-78:7.

## LEGAL STANDARD

"Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993), *citing* 3 Weinstein & Berger, Weinstein's Evid. ¶ 702[02]. Therefore, expert evidence must be reliable. "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and

not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Cooper v. Smith & Nephew, Inc.,* 259 F.3d 194, 200 (4th Cir. 2001). For these reasons, under Federal Rule of Evidence 702, trial judges function as gatekeepers to ensure that any and all scientific testimony is not only relevant, but reliable. Specifically, Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702. Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) of the Federal Rules of Evidence, whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Daubert,* 509 U.S. at 592. In *Daubert,* the Supreme Court further distilled the trial court's analysis as follows:

1) Whether a theory or technique can be or has been tested;
2) Whether it has been subjected to peer review and publication;
3) The quality control procedures used to ensure reliability; and
4) Whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Daubert,* 509 U.S. at 592-594. The proponent of expert testimony must prove "by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chemical, Inc.,* 151 F. 3d 269, 276 (5th Cir. 1998), *cert. denied,* 526 U.S. 1064 (1999) (excluding expert opinion proffered in chemical exposure case as unreliable).

Furthermore, additional factors have been incorporated since *Daubert* was initially decided by the United States Supreme Court: whether the technique or theory has been developed solely for purposes of litigation, *Daubert,* 43 F.3d 1311, 1317 (9th Cir. 1995) (*Daubert* on remand); whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion, *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); whether the expert has

accounted for obvious alternative explanations, *Claar v. Burlington N. R.R.*, 29 F.3d 499, 502-503 (9th Cir. 1994); whether the expert is "being as careful as he would be in his regular professional work outside his paid litigation consulting," *Sheehan v. Daily Racing Forms, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997), *following Kumho Tire v. Carmichael*, 526 U.S. 137, 152 (1999), for the proposition that *Daubert* requires the trial court to assure itself that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field"; and, whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give, *Kumho Tire*, 526 U.S. at 1175.

In evaluating the admissibility of expert testimony, the Court acts as a "gatekeeper" whose primary task is to assess the reliability and relevance of the proffered evidence. *Moore* at 1174. The Court's inquiry as gatekeeper is a "flexible one" focusing on the principles and methodology used by the expert. *Daubert,* 509 U.S. at 594-95. The Court has broad latitude to consider whatever factors it deems useful in evaluating the reliability of proffered testimony. The factors evaluated by the Court obviously depend upon the type of expert testimony involved. The *Daubert* factors apply to all experts regardless of field. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149-50 (1999). The Court, in *Kumho*, clarified that the gatekeeper function applies to all expert testimony, not just testimony based on science, and went on to state that Court's "gatekeeper" function as established in *Daubert* charges the trial judge with the responsibility of excluding "unreliable" expert testimony. *Id*.

Even if otherwise admissible under Rule 702, expert testimony may still be properly excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury." *United States v. Dorsey,* 45 F.3d 809, 815 (1995). "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating

it." *Daubert*, 113 S.Ct. 2786, 509 U.S. 579 (citation omitted). "Because of this risk, the judge in weighing possible prejudiced against probative force under Rule 403… exercises more control over experts than lay witnesses." *Id.* at 595.

## ARGUMENT

### A. RODNEY DOOLEY'S FINDINGS AND CONCLUSIONS SHOULD BE EXCLUDED DUE TO RELIANCE ON FALSE INFORMATION, INCORRECT DATA, AND UNACCEPTED PREMISES

All of Dooley's opinions should be deemed inadmissible for lack of reliability and substandard methodology. Further, Dooley's opinions are based on mere speculation and lack any supporting evidence. His methods certainly would not be relied upon by peers in the field. In addition to lack of qualifications and reliable methodology, Dooley's testimony should be excluded because it is not helpful to the jury in understanding the evidence or determining any fact in issue. As a result, there is not sufficient "fit" between his proposed testimony and this case. An expert opinion must be helpful to the finder of fact. *Fed. R. Evid.* 702. The helpfulness of an expert opinion requires more than mere relevance. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 748 (3rd Cir. 1994). All of Dooley's opinions should be deemed inadmissible for lack of reliability and not being based on any recognized scientific data, research, clinical studies, or literature, and should not be introduced to the jury.

A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Expert opinion that is nothing more than the expert's untestable say-so is inadmissible as matter of law. *Joiner*, 522 U.S. at 146; *Weisgran v. Manley Co.*, 528 U.S. 440, 453 (2000) (contributes "nothing

to a 'legally sufficient evidentiary basis'"); *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d at 321 (3rd Ci. 2003) ("'must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation.'").

Therefore, considering the factors under *Daubert* and its progeny, Dooley should be precluded from testifying in this matter or attempting to discuss his report with the jury, as this would only confuse the jury, based on the evidence that the subject matter and nature of Plaintiff's damages have thoroughly confused Dooley. Dooley's opinions fail to meet any of the criteria for reliability, and are totally devoid of any scientific, technical, or other specialized knowledge, and contain absolutely no methodology that Dooley relied upon to reach his conclusion(s). Additionally, Dooley does not cite to a single peer reviewed study or methodology that he bases his conclusions on. Specifically, Dooley's methodology is inadequate for: (1) lack of personal examination; (2) lack of even a basic understanding of how low-income housing tax credit developments function, which is critical to opine on lost profits incurred by a blocked low-income housing tax credit development; (3) insufficient underlying data; and, (4) the absence of literature in his field supporting his theory." *See, e.g., Adams v. Pro Transportation, Inc.,* 2002 WL 801911, at 7 (D.Neb. Jan. 9, 2002), citing *Jaurequi v. Carter Mfg. Co., Inc.,* 173 F.3d 1076, 1082 (8th Cir. 1999) (discussing *Daubert*, 509 U.S. at 593-594).

## I. RODNEY DOOLEY'S OPINIONS REGARDING DEVELOPER FEES SHOULD BE EXCLUDED

Dooley's report, admittedly, did not consider any developer fee, and stated that without an executed syndication agreement, he was unable to determine the impact of a developer fee as it relates to Plaintiff's lost profits, or the arm's length nature of the developer fee. *See* Exhibit 1 pg. 1-2. At his deposition, Dooley was presented with a federal and state tax credit investor commitment letter on behalf of RBC Capital Markets, dated March 11, 2022. A copy of the RBC

Capital Markets Investor Commitment Letter is attached as <u>Exhibit 3</u>. As shown below, the entirety of Plaintiff's $840,000.00 developer fee was to be paid on or before July 1, 2023:



*See* <u>Exhibit 3</u>, pg. 7.

Even though Dooley's report did not contemplate any developer fees as part of his opinion of Plaintiff's lost profit damages, Dooley's testimony makes it abundantly clear to the Court that he has no understanding as to how developer fees are governed, when they are typically paid, or where they fit into the overall development budget of a LIHTC development.

> When you were forming your opinions and doing your work on this case, did you have any understanding as to whether or not developer fees are actually something that are set and controlled by SC Housing?
> A    No.
> Q    I'll try and ask it a better way. This is specific to low-income housing tax credit developments in South Carolina. Do you

> have any understanding for when and how a developer
> fee is paid to a developer versus other obligations
> relating to the project and the development budget?
>    A    Specifically, no.

*See* <u>Exhibit 2</u> at 24:1-6, 31:23-32:4.

For the reasons identified above, Dooley's opinions relating to developer fees associated with LIHTC developments should be excluded based on his total lack of any foundation or understanding of the subject matter. By Dooley excluding the $840,000.00 developer fee that would have been received in full between October 2022 and July 2023, the damages summary reflected in Exhibit A to Dooley's report is incorrect and contrary to the evidence in the record.

## II.    RODNEY DOOLEY'S OPINIONS REGARDING PURSUIT COSTS SHOULD BE EXCLUDED

Dooley's report was critical of Plaintiff's expert witnesses' report regarding the pursuit costs that Plaintiff incurred in the process of developing the Jessamine Apartments, prior to being blocked by Defendants. Dooley's report states that costs related to the project should reduce the expected net cash flows from the project, and that it was improper for Plaintiff's expert witnesses to consider these pursuit costs as part of the projected lost profits. *See* <u>Exhibit 1</u> pg. 2.

> Q    So is it your testimony that the $315,000
> of pursuit cost that my client incurred and that the
> planning and pursuit pays had to be deducted from
> the first year's cash flow of the development?
>    A    Yes.

*Id.* at 39:13-17. Dooley's opinion as stated in his report, and his deposition testimony demonstrate that he has a complete lack of foundation and understanding as to the actual manner in which LIHTC developments work, specific to a developer's pursuit costs and when those costs are reimbursed to the developer.

Dooley admitted that he does not have any understanding specific to LIHTC developments and pursuit costs, and **confirmed that he could not cite any literature that would support his opinions** regarding pursuit costs.

> Q    Do you have any understanding specific to low-income housing tax credit developments as to when those pursuit costs are reimbursed to a developer?
> A    I do not.
> Q    Have you seen or reviewed any construction loan closing statements for low-income housing tax credit related developments that would support your position that the $315,000 of pursuit costs would be deducted from the first year's cash flow?
> A    No.
> Q    Can you point to any literature that would support what your opinion is that the plaintiff's $315,000 of pursuit costs would be deducted from the first year's cash flow?
> A    No.

*Id.* at 40:2-18.

As confirmed in the deposition testimony of Holly Schaumber, the pursuit costs that developers incur relating to LIHTC developments is always incorporated into the overall development budget, and the developer is always reimbursed its pursuit costs at closing as the majority of these costs are "in basis" and the costs must be paid for by the development as these costs were included in calculating the Federal and State Tax Credits issued by SCSHFDA and syndicated to a Federal and State investor (RBC).  Mrs. Schaumber testified that this has been the case in every LIHTC development that she has been associated with over the course of her fifteen-year career, which includes the construction and development of over 1,200 residential units of

LIHTC housing and eighteen different LIHTC developments. Mrs. Schaumber also testified that she is not aware of a single instance where a developer's pursuit costs were reimbursed beginning in year one of a development's cash flows.

> Q    Of those ones you've been involved in, can you
>      explain the process of how pursuit costs are
>      treated that you or the -- or how the costs that
>      the developer incurs seeking out a deal, how are
>      those treated in terms of a development budget or
>      closing?  When are those paid?  That kind of
>      explanation to the extent you understand what I'm
>      asking.
>
> A    Yes.  So you're at-risk until award, and that's
>      just the nature of it.  So for instance, on -- we
>      submitted applications last week.  Anything that we
>      spend on those developments through award, if we
>      are not funded, is a cost to the job.  And once
>      you're funded though and you close, it's a
>      legitimate deal cost, and it's reimbursed when you
>      close construction.
>
> Q    Okay.  And that's prior to any lease-up or any cash
>      flow of the property?
>
> A    No.  It's in the -- the closing draw of
>      construction.  It's the very first funds that go
>      back are for your cost to get it through pre-
>      development.
>
> Q    Okay.  And that's how pursuit costs are treated on
>      every one of these deals --
>
> A    That's -- that is standard.

*See* Deposition Transcript of Holly Schaumber, attached as <u>Exhibit 4</u> at 67:6-68:9.

It is industry standard for basis-eligible pursuit costs related to predevelopment of a LIHTC project to be reimbursed at construction closing and accounted for as a development budget expense as these costs generate tax credits for the investor. This is LIHTC 101 and should have been understood by Dooley.

For the reasons identified above, Dooley's opinions relating to pursuit costs associated with LIHTC developments should be excluded based on his total lack of any foundation or understanding of the subject matter.

### III.   RODNEY DOOLEY'S OPINIONS REGARDING VACANCY RATES SHOULD BE EXCLUDED

Dooley's report stated that the 3% vacancy rate utilized by Plaintiff's expert witnesses is unreliable, and the **<u>ONLY</u>** source that Dooley could identify to support this opinion was the Shaw Research and Consulting, LLC market study ("<u>Shaw Market Study</u>") that Plaintiff commissioned for the Jessamine Apartments as one of the requirements of the 2021 Qualified Allocation Plan, ("<u>QAP</u>").  Dooley's report went on to state that the Shaw Market Study held less bias than Plaintiff's expert report. *See* <u>Exhibit 1</u> pg. 2.

In his effort to criticize the vacancy rate that Plaintiff's expert report utilized **<u>Dooley admitted that he never even read or reviewed the Shaw Market Study that he was seeking to rely on</u>** to support his opinion that a 7% vacancy rate was more reasonable than the 3% vacancy rate utilized by Plaintiff's expert:

> Q      Can you point to the portion of the report that you relied on in stating that 7 percent was more reasonable than the 3 percent that the plaintiff's expert used?
>
> A      I referenced the plaintiff's expert's

> report.
>
> Q    So when you -- The 7 percent, is it correct that you pulled that from the plaintiff's expert report and not actually the Shaw Research & Consulting report?
>
> A    That's correct.  My engagement was to make an analysis of the plaintiff's report itself.
>
> Q    Wouldn't you agree that in order to credibly analyze or criticize the plaintiff's report, the things that you cite and rely on in your report you should have reviewed?
>
> A    In hindsight, I think that would have been professional.

See <u>Exhibit 2</u> at 45:21-46:13.

Dooley admitted that the only step he took to attempt to corroborate that a 7% vacancy rate was reasonable was googling market research studies.

> Other than the Shaw Research & Consulting market study, did you consult anyone or any resources relating to rental rates or occupancy or vacancy rates?
>
> A    General research.  Not necessarily cite specific.  But I did corroborate that the 7 percent was a reasonable rate.
>
> Q    And how did you corroborate that?
>
> A    Just in general research.  Again, nothing specific cited.
>
> Q    Just tell me what you mean by "general research."  Is that just Googling?
>
> A    Market research studies, yeah.

> Other than the conversations that you
> just discussed and the Shaw Research study, is there
> anything else that you can point to that would show
> that the 3 percent vacancy rate used by plaintiff's
> expert is unreasonable?
>      A    Not other than the Shaw Research report
> that was done specifically for the project.

*Id.* at 41:10-22, 42:13-19.

Dooley had no idea that pursuant to the 2021 QAP, the 7% vacancy rate was actually a minimum underwriting threshold that applicants were required to utilize under the 2021 QAP. The 2021 QAP stated that for financial underwriting of LIHTC developments, that "the vacancy rate will be the greater of seven percent (7%) or as reprenseted in the market study." *See* 2021 QAP (ECF 1-1 pg. 18).

> When you were forming your opinions that
> are contained in your report, did you have any idea
> that the 7 percent vacancy rate was the minimum that
> could be used in market studies as set and
> controlled by South Carolina Housing under the 2021
> Qualified Allocation Plan?
>      A    No.

*See* <u>Exhibit 2</u> at 44:8-14.

After admitting that he never actually read any portion of the Shaw Market Study, while simultaneously citing it to support his opinion, **<u>Dooley admitted that it was unprofessional to rely on a source he has never reviewed or read to support his efforts to criticize the expert report of the Plaintiff</u>**. *Id.* at 46:8-13.

What is even more troubling than Dooley admitting that he never even read the Shaw Report, while attempting to rely on the Shaw Report, to support his opinion that a 7% vacancy rate was reasonable, is that there is no actual reference anywhere in the Shaw Report to a 7% vacancy

rate. If Dooley would have taken the time to actually read the Shaw Market Study, he would have quickly learned that the Florence market had a very high demand for affordable rental housing, as detailed below:

> Despite the ongoing COVID-19 pandemic, overall conditions for the Florence rental market appear extremely positive at the current time. Among the properties included in the survey, the overall occupancy rate was calculated at 98.3 percent – with 17 of the 21 stabilized developments at 98 percent occupancy or better, including 13 projects 100 percent occupied. Excluding the one facility still under initial lease-up, the adjusted occupancy rate is 98.9 percent.
>
> When breaking down occupancy rates by financing type, market-rate developments averaged 98.9 percent occupancy, while LIHTC units are 98.8 percent occupied (excluding The Belmont, which just opened on May 4, 2021) – clearly reflective of strong market conditions for both market-rate and affordable rental options throughout the area.

*See* the Shaw Markey Study, which is attached as <u>Exhibit 5</u> pg. 52 (emphasis added).

For the reasons identified above, Dooley's opinions as to what he believed is a reasonable vacancy rate to be used to calculate Plaintiff's lost profits associated with the Jessamine Apartments should be excluded based on his total lack of any foundation or understanding of the subject matter.

## IV. RODNEY DOOLEY'S OPINIONS REGARDING DISCOUNT RATES SHOULD BE EXCLUDED

Dooley's report is critical of the 4% discount rate that Plaintiff's expert witnesses utilized in their expert report that calculated Plaintiff's lost profits associated with the Jessamine Apartments. *See* <u>Exhibit 1</u> pg. 3. Dooley's report incorrectly claims that Plaintiff's expert utilized a risk-free rate of return rather than a risk adjusted rate of return, and when asked why he viewed 4% as a risk-free rate of return, Dooley testified that he relied on the 20-year bond rate.

Neither Dooley's report nor his testimony provided any citation to when the United States Treasury 20-year bonds had a 4% rate. Plaintiff's expert witnesses report on lost profits was dated

July 25, 2023, and on that date the United States Treasury 20-year bonds had a 4.14% rate.[2]  On March 4, 2022, the date that Defendants refused to accept and process Plaintiff's application for a certificate of zoning compliance, the United States Treasury 20-year bonds had a 2.23% rate.[3]  On March 17, 2022, the date that the Moratorium Ordinance received the third reading, United States Treasury 20-year bonds had a 2.60% rate.  Dooley's opinion that the 4% discount rate utilized by Plaintiff's expert was a risk-free rate of return is incorrect and is contrary to the publicly available data provided by the United States Treasury Department.

Dooley admitted that he did not conduct any research or avail himself of any information, other than what was provided to him by counsel for the Defendants, to assist him in forming his opinions regarding what an appropriate discount rate should be in this case. Dooley also admitted that he did not review or consider any transactions or sales of other LIHTC developments in South Carolina that would have shown him what discount rates were being utilized in arms-length transactions for developments similar to the Jessamine Apartments.

> In forming your opinions that are contained in your report, other than the information that was received by a subpoena to the plaintiff's expert and the plaintiff's complaint and what may have been sent to you by defense counsel, have you availed yourself of any documentation or literature as it relates specifically to discount rates of low-income housing tax credit developments?
>
> A    No.

[2] Source U.S. Department of the Treasury data Available at: https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value=2023 (last visited February 14, 2024).

[3] Source U.S. Department of the Treasury data Available at: https://home.treasury.gov/resource-center/data-chart-center/interest-rates/TextView?type=daily_treasury_yield_curve&field_tdr_date_value=2022 (last visited February 14, 2024).

> Q     Have you reviewed or considered any
> transactions or sales of other low-income housing
> tax credit developments in South Carolina in forming
> the opinions in your report?
>     A     No.

*See* Exhibit 2 at 57:6-19.

Dooley admitted that when an investor chooses an appropriate discount rate to be utilized in a real estate transaction, that the investor's perceived risk in the market would absolutely be something that would affect what discount rate was chosen. *Id*. at 59:22-25. Dooley testified that for real estate transactions with higher perceived risks, potential investors would demand a higher return, such that they would choose a higher discount rate, and that if a real estate transaction had a lower perceived risk an investor would choose a lower discount rate. *Id*. at 60:4-15.

Dooley admitted that he did not have any foundation or knowledge, specific to LIHTC developments, as to whether or not certain aspects of the development are riskier than other aspects of the development.

> Q     As it relates specifically to low-income
> housing tax credit developments, though, do you have
> any opinions as to whether or not certain aspects of
> the development are riskier than other aspects of
> the development?
>     A     No.

*Id*. at 63:6-11. Dooley could not identify any specific risk to support his opinion that a more appropriate discount rate would be 12.83%.

> Let me ask that a better way. What risk
> did you contemplate when you chose the mid point
> between a 10.26 percent discount rate and a 15.39
> percent discount rate?

```
        A      My general analysis was just that the
project held more risk than no risk at all, and
because of that risk and the best documented cited
source was a source within the file utilizing that
multiple and finding that average of the multiples.
        Q      How did you come to decide which multiple
was appropriate in your report?
        A      I took the average of the cite of
Bokesch.
        Q      Is there any literature that would
support the specific multiple you used in your
discount report?
        A      Not cited, no.
```

*Id*. at 71:1-17.

Dooley admitted that he had no foundation or understanding for what a capture rate would

mean or how a capture rate would influence an investor's perceived risk when determining an

appropriate discount rate for the Jessamine Apartments.

```
        Q      If you'll go back to what was No. 6, the
market study, the Shaw Research market study, and
flip to page 4 on the bottom right.  Do you see the
second-to-last black column entitled Capture Rates?
        A      I do.
        Q      Do you have any understanding for what
those numbers in the market study represent or how
those would influence risk indicators when picking a
discount rate for this project?
        A      I don't.
```

*Id*. at 71:18-72:2.

The Shaw Market Study, which Dooley admitted he never actually read even though he attempted to use it to support his opinions, provides the following explanation for the relationship between the overall capture rate of 4.3% and mark risks associated with the Jessamine Apartments.

*2. Capture and Absorption Rates*

   Utilizing information from the demand forecast calculations, capture rates provide an indication of the percentage of annual income-qualified demand necessary for the successful absorption of the subject property. An overall capture rate of 4.3 percent was determined based on the demand calculation (including renter household growth, substandard and/or overburdened units among existing renter households, and excluding any comparable activity since 2020), providing an indication of the positive overall market depth for the subject proposal. More specifically, the capture rate for units restricted at 20 percent AMI was calculated at 1.6 percent, while the 60 percent AMI capture rate was at 5.2 percent. As such, these capture rates provide a relatively positive indication of the need for affordable rental options locally and are well within acceptable industry thresholds and should be considered a positive factor.

*See* Exhibit 5 pg. 51.

Dooley's report states that it is appropriate to utilize a discount rate that is two to three times the risk-free rate, and referenced a report prepared by Mark Bokesch[4] to support his opinion that a more appropriate discount rate would be 12.83%. *See* Exhibit 1 pg. 3. Dooley admitted that he did not consider any literature or rely on any methodology in forming this opinion.

> Q    Is there any literature or methodology you can point to that would support any particular multiple being appropriate depending on the type of development?
> A    I could provide numerous articles. I don't have specific references with me today that cite increased multiples. But as far as a specific multiple, no.

[4] The report of Mark Bokesch referenced by Dooley, was a calculation of lost profits for Park West Development that was from an unrelated matter filed in the Charleston County Court of Common Pleas in 2014 that was the result of 240-unit market rate apartment development that was blocked by the Town of Mount Pleasant.

> Q    Did you consider any such article prior to forming your opinions in this case about the appropriate discount rate to be applied?
>
> A    No.

*See* <u>Exhibit 2</u> at 63:24-64:10. Dooley was not able to point to a single real estate appraiser or investor that relies on some multiple of the risk-free rate to determine what an appropriate discount rate would be for a real estate transaction.

> Q    Are you aware of any real estate appraisers or investors computing the discount rate for any given project as a multiple of the risk-free rate?
>
> A    No.

*Id*. at 67:10-14.

The inflated and unsupported discount rate purported by Dooley creates the largest discrepancy in damages for DHD Jessamine and demonstrates Dooley's lack of knowledge in assessing these transactions. One of the biggest risk factors for real estate development, including LIHTC, is the construction of the development community. These risks include interest rate risks during construction, cost increases, material shortages, and supply chain issues. The South Carolina State Housing and Finance Development Authority ("<u>SC Housing</u>") went to great lengths during the 2021 LIHTC cycle, of which Jessamine was funded, to provide additional sources of funds for developments which encountered issues related to cost overruns, interest rate increases, material delays, etc. At the time of Dooley's report, these additional sources from SC Housing were known about and the singular biggest risk factor in the development was no longer a risk.

Risk factors, which in turn would influence what an appropriate discount rate should be, vary greatly based on the track record of the developer and development team. The Plaintiff has a 30-year history in successful affordable developments. The architect, general contractor,

engineers, investors, lenders, and third-party consultants all have years of experience working directly with the Plaintiff on previous affordable developments, all of which have been successful. LIHTC projects as an asset class have one of the lowest default rates in commercial real estate because of the demand for this specific type of housing, significant regulatory oversight, and other guard rails put in place for projects of this nature.

For the reasons identified above, Dooley's opinions as to what he believed is a reasonable discount rate to be used to calculate Plaintiff's lost profits associated with the Jessamine Apartments should be excluded based on his total lack of any foundation or understanding of the subject matter.

## V.      RODNEY DOOLEY'S OPINIONS REGARDING LOSS PERIOD SHOULD BE EXCLUDED

Dooley's report utilized a ten-year hold period in his alternate calculations of Plaintiff's lost profits associated with the Jessamine Apartments. *See* Exhibit 1 pg. 4. Dooley utilized this ten-year period based on his incorrect contention that the compliance period associated with LIHTC developments was also ten-years.

> Q      What understanding do you have as it relates to the compliance period of the federal low-income housing tax credits and/or the South Carolina state tax credits?
>
> A      I know that the period of restriction begins at 10 years.  And that's the extent of that that I'm aware of.
>
> Q      When you say "the period of restriction," you said begins or it ends at 10 years?
>
> A      It ends at 10 years.

*Id.* at 51:18-52:2.  Compliance Period is a critical defined term as stated in Title 26 § 42 of the Internal Revenue Code.

**(1) Compliance period.**--The term "compliance period" means, with respect to any building, the period of **15 taxable years** beginning with the 1st taxable year of the credit period with respect thereto. 26 U.S.C.A. § 42 (West) (emphasis added).

Dooley testified that he used a loss period of ten-years because that was his understanding of when the restrictions on what could be done with a project ended, but conceded that he was unable to point to any literature that would support his opinion and that he was unable to identify a single South Carolina LIHTC development that was sold at the ten-year point.

> years.  Is that the -- What would you define as
> restrictions when you said it ended at the 10-year
> period?
>         A    I don't know the specifics.  My
> understanding is there's restrictions on what can be
> done with the project as far as liquidation.
>         Q    And based on that understanding, is that
> why you chose a 10-year hold period for the numbers
> you contemplate in your report?
>         A    Yes.
>         Q    Can you point to any literature that
> would support or identify a South Carolina
> low-income housing tax credit development that was
> sold after 10 years?

*Id*. at 54:12-55:1.  Dooley conceded that he understood why Plaintiff's expert used an 18-year loss period, but that he was unable to cite to a single source or point to anything to support his opinions that a ten-year loss period was more reasonable.

>         A    I can understand where the 18-year period
> came into play.  But as far as an analysis of lost
> profits, I am not comfortable with an 18-year
> window.
>         Q    Can you tell me why that is or what
> literature or outside information you would rely on
> to support your position that you don't believe that
> to be reliable?

```
A      I can't.
Q      That's just your opinion?
A      That is.
Q      But you can't point to anything that
you're basing it on?
A      No.
```

*Id*. at 29:3-16.

For the reasons identified above, Dooley's opinions as to what he believed is a reasonable loss period to be used to calculate Plaintiff's lost profits associated with the Jessamine Apartments should be excluded based on his total lack of any foundation or understanding of the subject matter.

## **CONCLUSION**

Dooley admitted that if any of the components that formed the basis of his analysis in this case are proven to be incorrect that his opinion could not be reliable at that point.

```
Q      If some of the components that relate to
your analysis are incorrect or inaccurate as it
relates to a low-income housing tax credit
development, would you agree that they would not be
reliable at that point?

A      Yes.
```

*Id*. at 79:20-80:1. Dooley was unable to provide anything close to a proper definition when asked to define a capitalization rate:

```
Q      Sure.  Let's start with, how would you
define a capitalization rate related to real estate?
A      So it's your ROI over your market value.
```

*Id*. at 65:5-7.

```
you did it.  Can you just again give me your
understanding of what is the definition of a cap
```

```
rate or how you compute a cap rate, what all goes
into that?
     A     Just the ROI divided by the value of the
property.
```

*Id*. at 74:24-75:4.  The understanding of how to calculate a capitalization rate or Cap. Rate is very basic knowledge that even the most unsophisticated real estate investors understand.  The formula for calculating a cap.  Rate is the annual net operating income (NOI) divided by the property's market value. There is no circumstance where ROI or return on investment would ever be considered when discussing cap rates in real estate development.  Conflating ROI and NOI when discussing cap rates would be tantamount to an Uber driver mixing up the market value of the car that he or she bought with the net return that he or she gets from driving that car for a living.

As set forth above Dooley's opinions are based on his incorrect assumptions being; (1) the Compliance Period of LIHTC developments was ten years when it is actually 15 years; (2) LIHTC developers' pursuit costs associated with a development are reimbursed from the development's cash flows beginning in year one, when it has been proven that these costs are paid to the developer at closing well in advance of any cash flow being generated from a development; (3) that the Shaw Market Study stated that 7% was a reasonable vacancy rate for the Jessamine Apartments, when it actually stated that LIHTC units considered in the Florence area are actually 98.8% occupied; and (4) Plaintiff's expert witnesses use of a 4% discount rate was a risk free rate of return.

As set forth above, Dooley lacks knowledge of the requisite facts to support his conclusions discussed above. Furthermore, his conclusions discussed above do not require any scientific, technical, or other specialized knowledge that would assist the trier of fact in this matter, and would only serve to confuse the jury in this matter. Finally, Dooley's opinions are inherently unreliable

and cannot serve as the foundation required for expert opinion and testimony under Federal Rule of Evidence 702.

Based on the foregoing, the Court should find that Defendants have failed to meet their burden of showing that the report and certain expert opinions of Dooley discussed above comply with the requirements of Federal Rule of Evidence 702. The Court should therefore exclude his report and certain expert testimony discussed above under *Daubert* and its progeny.

Respectfully submitted,

By:  *s/ J. Taylor Powell*
     Ellis R. Lesemann (Fed. ID No. 7168)
     E-mail: erl@lalawsc.com
     J. Taylor Powell (Fed. ID No. 12265)
     E-mail: jtp@lalawsc.com
     LESEMANN & ASSOCIATES LLC
     418 King Street, Suite 301
     Charleston, SC 29403
     Phone: (843) 724-5155
     Fax: (843) 720-2312

     ***ATTORNEYS FOR PLAINTIFF***
     ***DHD JESSAMINE, LLC***

March 5, 2024
Charleston, South Carolina