IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DHD Jessamine, LLC, | ) | Case No.: 4:22-cv-01235-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | **ORDER ON CROSS-MOTIONS FOR** |
| William D. Tallevast, V, | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Intervenor-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Florence County, South Carolina; Frank J. Brand; Jason Springs; Roger M. Poston; Alphonso Bradley; Jerry W. Yarborough; Stoney C. Moore; Waymon Mumford; and Willard Dorriety, Jr., as the elected members of the Florence County Council; and John Does 1–15, | ) | |
| | ) | |
| Defendants. | ) | |

This is a case about a development moratorium and a subsequent change in zoning that precludes low-income multi-family housing. Before the Court are Plaintiff DHD Jessamine, LLC's Motion for Partial Summary Judgment (DE 83) and Defendant Florence County's Motion for Summary Judgment on Behalf of Defendants (DE 89). Because there are genuine issues of material fact as to some (but not all) of DHD's claims, Florence County's motion is granted in part and denied in part. DHD's motion is granted.

## BACKGROUND[1]

### A.    The Property

Andrew Schaumber ("Schaumber") is a developer of low-income housing projects financed (in part) by state and federal tax credits.  In or around February 2021, Schaumber identified an un-zoned area of Florence County upon which he intended to develop a multifamily housing project called the "Jessamine."  (DE 105 at 3–4; DE 89-1 at 2.)  This un-zoned area consisted of three parcels of land bearing TMS numbers 90018-03-006, 90018-03-007, and 90018-03-008 (collectively, the "Property").  (DE 1 at 14 & n.7; DE 19 at 6.)  To pursue this opportunity, Schaumber formed DHD Jessamine, LLC ("DHD").  (DE 1 at 12–13; DE 67-4 at 1.)

The Property's zoning is in what is known as a "doughnut hole" because it is surrounded by land annexed by the City of Florence.  (DE 105-10; DE 89-7 at 7, Dorriety Dep. 22:13–19; DE 89-9 at 3, Springs Dep. 11:10–13; *id.* at 4, 20:16–18.)  What this means is that the surrounding land *is* zoned, but the Property is *not* zoned.  (*See* DE 89-14 at 3; DE 89-7 at 9–10, Dorriety Dep. 50:17–51:1.)  Furthermore, the surrounding land is zoned "neighborhood conservation," which "allows low-density, single-family housing, but does *not* allow multifamily housing."  (DE 89-14 at 3 (emphasis added).)

---

[1]    Because this is a motion for summary judgment, all facts reproduced are the undisputed facts.  Where the undisputed facts are relevant to the parties' cross-motions, the parties' differing views of such facts (and the reasonable inferences therefrom) are indicated.

**B.      Plaintiffs' Preparations to Develop the Property**

In February 2021, DHD began the process of applying for low-income housing tax credits ("LIHTCs") from state and federal authorities to finance the development of the Jessamine. (*See* DE 1 at 17; DE 89-1 at 2.) Among other things, this required DHD to obtain an interest in the property and provide evidence of its current zoning classification. (*See* DE 1-1 at 10.) Accordingly, on February 8, 2021, Schaumber Development, LLC, entered a "Purchase and Sale Agreement" with Intervenor-Plaintiff William Tallevast, V ("Tallevast") to acquire the Property.[2] (*See* DE 37-1.) The consideration for this purchase was $1,150,000.00. (*Id.*)

In further pursuit of the LIHTCs, on April 26, 2021, DHD sought and received a letter from Derrick Singletary, a Planner with Florence County. (*See* DE 67 at 3.) In the document—entitled a "Zoning Verification Letter"—Singletary advised, "[c]urrently multi-family housing units are allowed" on the Property. (DE 67-1 at 2.) However, Singletary cautioned DHD that "this letter is not zoning compliance approval nor does it give approval to begin any work," and that DHD must "complete applications for and receive approval of Zoning Compliance Certification and Building Permits (if required) prior to the commencement of any work." (*Id.*)

On May 24, 2021, DHD mailed letters to the Florence County Councilmembers advising them that DHD sought LIHTCs to develop "60 newly constructed apartment homes for families[]" on the Property. (DE 67-7 at 4–6.) In addition, Schaumber sent a pre-drafted support and pledge letter to Chairman Dorriety of the Florence County

---

[2]       Schaumber Development, LLC, is a member of DHD. (DE 1 at 12; DE 19 at 5–6.)

Council for his signature. (*See* DE 67-4.) Dorriety signed it. (DE 89-7 at 6.) The letter he signed stated that the Jessamine "would serve a great need" and that "Florence County would like to support your development by agreeing to cover the costs to supply and install a new fire hydrant . . . ." (DE 1-6 at 2.)

Several months later, after completing and submitting their LIHTC application, DHD was approved for annual LIHTCs in the yearly amount of $894,517.00 for ten years by both South Carolina and the federal government. (*See* DE 1 at 27; *see also* DE 1-11 at 2.)

## C.    Political Reaction to Plaintiff's Plan and Resulting Issues

On January 6, 2022, a representative of DHD attended a meeting "to discuss the Jessamine Apartments with many of the necessary department heads" of Florence County at one time. (DE 105-18 at 4.) At the meeting, "[a]t no time did any person associated with Florence County, . . . ever raise any concerns that they had with the proposed development . . . relating to traffic, stormwater, or public safety." (*Id.*) However, later that month, DHD became aware that residents of "adjacent neighborhoods" to the Property opposed the Jessamine. (DE 89-10 at 5.) Certain members of the Florence County Council testified that they began "getting calls every day" about it. (DE 89-8 at 16, Brand Dep. 30:8–10.) And as Councilmember Caudle recalled, "nearly all" of the callers who reached out to him referred to the Jessamine as "section [eight] housing . . . ." (DE 103-13 at 3, Caudle Dep. 28:3–22.)

On January 18, 2022, a meeting was held at the Florence Country Club where citizens expressed their views about the development of the Jessamine. (*See* DE 103-

10 at 8, Brand Dep. 52:1–9.)    Councilmember Brand and Chairman Dorriety attended.  (*See id.*)  Though no word-for-word evidence of those discussions exists, in a letter to Schaumber bearing that same date, Chairman Dorriety wrote that "[u]pon reflection, I am withdrawing my letter of April 27, 2021" because "I am unable individually to commit funding for a fire hydrant" and the same "must be done by a vote of Florence County Council."  (DE 105-8 at 2.)

Additionally, on January 25, 2022, a South Carolina Department of Transportation official who was present at the January 6, 2022, meeting, responded to Schaumber by email that a traffic study was now required for the Property.  (*See* DE 110-2 at 2.)  Earlier, on January 14, 2022, that same official noted in another email that he had "concerns with traffic" but that he would "*not* ask for a traffic study . . . ."  (DE 110-2 at 5 (emphasis added).)

## D.    The Moratorium on the Property

In late January 2022, according to Councilman Caudle, Chairman Dorriety had "a sense of urgency" about the Jessamine.  (DE 103-13 at 9, Caudle Dep. 52:8–18.)  Caudle further testified that "around January 27th" he had discussions with other council members about the Jessamine to the effect "that [the Florence County Council] had to do this at that time to stop this project[] . . . before their plans were approved or their permits were approved."  (*Id.*, Caudle Dep. 52:19–6.)

On January 27, 2022, during a special meeting of the Florence County Council, "Ordinance No. 17-2021/22" (the "Moratorium") received its first reading by title only. (DE 89-2 at 2–3.)  On February 17, 2022, during a regular meeting of the Florence

County Council,[3] the Moratorium received a second reading.  (DE 89-3 at 2–3.)  The text of the ordinance was produced at this time.  (DE 1-17 at 2.)  At this meeting, the Jessamine was also discussed.  (DE 89-3 at 3.)  The minutes of the meeting record citizens' concerns, such as that the road adjoining the Property "did not have sidewalks" and this fact "created a hazard for non-vehicular traffic."  (*Id.*)

On March 4, 2022, DHD attempted to obtain a Certificate of Zoning Compliance ("CZC").  (DE 89-13 at 2–3, Shawn Brashear Dep. 97:3–22; DE 105 at 8–9.)  DHD asserts that Singletary refused to accept DHD's application, instead only providing his card.  (DE 1 at 45.)  It is undisputed that no CZC was issued to DHD.

## E.    The Moratorium Becomes Law and the Property Rezoned

On March 17, 2022, the Florence County Council conducted the third and final reading of the Moratorium.  (DE 89-4 at 2–3.)  Accordingly, the final version of the Moratorium became law.  (DE 65-1.)  With the Moratorium in place for an indefinite period, on July 29, 2022, DHD's principal notified Tallevast of his intent to terminate the sale of the Property, ending development efforts.[4]  (DE 37-2 at 2–3.)

On November 17, 2022, the Florence County Council gave Ordinance No. 36-2022/23 ("Rezoning") its third and final reading, rezoning the Property to R-1.  (DE 89-6 at 2.)  R-1 zoning is low-intensity residential that does not permit multifamily developments.  (*Id.* at 4.)

---

[3]    A copy of the minutes of this meeting suggests it was a "Special Called Meeting" (DE 1-17 at 2), but like DHD's complaint, Florence County's answer suggests the meeting was a "regularly scheduled meeting."  (DE 19 at 15 ¶ 74.)

[4]    Later, in September 2022, the Florence County Planning Commission recommended approving re-zoning the Property to permit multifamily development.

F.    **This Lawsuit**

On April 15, 2022, DHD Jessamine, LLC, commenced this lawsuit.  (DE 1.)
Originally, Plaintiff sued the Florence County Councilmembers in their official and
individual capacities as well as fifteen fictitious defendants.  (*Id.* at 1.)  On June 26,
2023, Tallevast moved to intervene in this lawsuit (DE 35), which the Court
permitted.  (DE 36.)  On June 27, 2023, Tallevast filed his complaint.[5]  (DE 37.)

On May 12, 2023, DHD moved for partial summary judgment on its claim that
the "pending ordinance" doctrine—a matter of South Carolina law—does not apply to
Florence County's refusal to issue the CZC.  (DE 28.)  The Court denied summary
judgment (DE 64) and Plaintiffs' motion to reconsider.  (DE 115.)  On February 9,
2024, DHD again moved for partial summary judgment.  This time, DHD focused on
the issue of whether it had obtained "vested rights" in the CZC.  (DE 67.)  Again, the
Court denied summary judgment, finding genuine issues of material fact were in
dispute.  (DE 118.)

DHD has again moved for Partial Summary Judgment focusing on whether it
"has made a prima facie showing that the actions of Defendants have had a disparate
impact on African Americans[]" under the Fair Housing Act.  (DE 83 at 4.)  Florence
County also seeks summary judgment on DHD and Tallevast's claims.[6]  (DE 89.)

---

[5]    Tallevast only asserts claims against Florence County.  (DE 37 at 1 n.1.)

[6]    DHD's Complaint asserts eight causes of action: (1) Violation of Fair Housing Act of
1968, 42 U.S.C. § 3604; (2) Violation of Fair Housing Act of 1968, 42 U.S.C. § 3617; (3)
Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*; (4)  Violation of
Substantive Due Process under the South Carolina and United States Constitutions –
Violation of 42 U.S.C. § 1983; (5) Conspiracy to Interfere with Civil Rights; (6) Promissory
Estoppel; (7) Negligence/Gross Negligence; and (8) Declaratory Judgment.  (DE 1 at 56–68.)
Nevertheless, DHD does not oppose summary judgment on its "Third Cause of Action

Since the unopposed claims are resolved, the remaining claims in this lawsuit are claims for:

- disparate treatment under the Fair Housing Act, 42 U.S.C. §§ 3613(a), 3604;

- disparate impact under the Fair Housing Act, *Id.* §§ 3613(a), 3604, 3617;

- violation of DHD's and Tallevast's rights under the substantive aspect of the Due Process Clause of the Fourteenth Amendment;[7]

- violation of Tallevast's rights under the Takings Clause of the Fifth Amendment; and

- promissory estoppel under South Carolina law as to DHD.

_____

(Violation of Title V[I] of the Civil Rights Act of 1964), Fifth Cause of Action (Conspiracy to Interfere with Civil Rights – 42 U.S.C. 1985), Seventh Cause of Action (Negligence), and Eighth Cause of Action (declaratory judgment)." (DE 105 at 2 n.1.) DHD also asserts that it "withdraws its claims against the Individual Defendants and shall proceed solely against the County." (*Id.*)

Tallevast's Complaint also asserts six causes of action: (1) Violation of Contract Clause - 42 U.S.C. § 1983; (2) Regulatory Takings – Violation of 42 U.S.C. § 1983; (3) Violation of Substantive Due Process - 42 U.S.C. § 1983; (4) Tortious Interference with Contractual Relations and Prospective Contractual Relations; (5) Negligence/Gross Negligence; and (6) Declaratory Judgment. (DE 37 at 9–18.) That said, "Tallevast does not oppose the granting of partial summary judgment to Florence County as to its causes of action for (a) Violation of Contract Clause–Violation of 42 U.S.C. § 1983; (b) Negligence/Gross Negligence; (c) Tortious Interference With Contract, and (d) Declaratory Judgment." (DE 103 at 2.)

Accordingly, the Court grants summary judgment for Florence County on these claims.

[7]    Florence County argues that "monetary damages for alleged violation[s] of the South Carolina Constitution" are unrecoverable. (DE 89-1 at 6 n.4.) DHD appears to concede this point. (*See* DE 105 at 2 (arguing that "material questions of fact" exist only on its substantive due process claim brought pursuant to 42 U.S.C. § 1983).) The Court agrees with Florence County and dismisses the South Carolina Constitutional claim for want of a statutory cause of action to assert it. *Palmer v. State*, 427 S.C. 36, 46, 829 S.E.2d 255, 261 (S.C. Ct. App. 2019) (noting that "the South Carolina Constitution does not provide for monetary damages for civil rights violations and the legislature has not enacted an enabling statute").

As relief, DHD and Tallevast seek monetary relief (including compensatory and punitive damages) and injunctive relief. (*Id.* at 69–70.)

## STANDARD

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 322. "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (citation omitted). If the burden of proof at trial would be on the nonmoving party "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex Corp.*, 477 U.S. at 324. "[T]he burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. "If the moving party has not fully discharged this initial

burden of production, its motion for summary judgment must be denied . . . ." *Id.* at 332 (Brennan, J., dissenting).

Accordingly, once the movant has made this threshold demonstration, to survive the motion for summary judgment, pursuant to Rule 56(e), the nonmoving party must "go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (citation omitted). Under this standard, "the mere existence of a scintilla of evidence" in favor of the non-movant's position is insufficient to withstand the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Wai Man Tom*, 980 F.3d at 1037. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Cts*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles A. Wright et al., *Federal Practice & Procedure* § 2728 (3d ed. 1998)). "The court may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). "Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted and alterations adopted). A court

improperly weighs the evidence if it fails to credit evidence that contradicts its factual conclusions or fails to draw reasonable inferences in the light most favorable to the nonmoving party. *See id.* at 659–60.

## DISCUSSION

**A.    Cross-Motions on DHD's Claims Under the Fair Housing Act**

**1.    The Fair Housing Act Claims in Issue**

The Fair Housing Act ("FHA") was enacted as part of the Civil Rights Act of 1968. *See* Civil Rights Act of 1968, Pub. L. No. 90-284, §§ 801–19, 82 Stat. 73, 81–89 (codified as amended at 42 U.S.C. §§ 3601–19).  It was designed to provide "fair housing throughout the United States." 42 U.S.C. § 3601.  As regards DHD's claims, the operative text of the statute prohibits

> refus[al] to sell or rent after the making of a bona fide offer, or . . . refus[al] to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

*Id.* § 3604(a).  More broadly, § 3617 of that Act prohibits "interfere[nce] with" a person's "right granted or protected by section . . . 3604 . . . of this title." *Id.* § 3617.

The Supreme Court of the United States has held that the FHA's language reaches land-use decisions that restrict the development of multifamily housing when such decisions are unlawfully discriminatory based on race. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 539–40 (2015).  This includes decisions to enact zoning laws. *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.,* 488 U.S. 15, 18 (1988).  Further, in addition to "disparate

treatment" claims, "disparate-impact claims are [also] cognizable under the FHA." *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 424 (4th Cir. 2018).

DHD asserts both "disparate treatment" and "disparate impact" claims as regards the Moratorium and the Rezoning.[8] (DE 105 at 12 (noting that "the County has violated the FHA in both respects").) The former claim often, but not always, requires a prima facie showing of intent or motive. *See Thompson v. U.S. Dep't of Hous. & Urb. Dev.*, 348 F. Supp. 2d 398, 417 (D. Md. 2005) (noting "intent" under § 3604 "is defined consistently with the definition used in Equal Protection cases"); *cf. Palmer v. Fannie Mae*, 755 F. App'x 43, 45 (2d Cir. 2018) (summary order) (noting that under the FHA, "[b]ecause discriminatory intent is rarely susceptible to direct proof, litigants may make a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" (quoting another source)).

The latter claim—disparate impact—is proven according to a three-step burden-shifting framework. *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 542. Specifically,

> Under the first step, the plaintiff must demonstrate a robust causal connection between the defendant's challenged policy and the disparate impact on the protected class. . . . . Under the second step, the defendant has the burden of persuasion to state and explain the valid interest served by their policies. . . . . Under the third step of the framework, and in order to establish liability, the plaintiff has the burden to prove that the defendant's asserted interests could be served by another practice that has a less discriminatory effect.

---

[8]    DHD also claims that Singletary's refusal to issue the CZC is a component of these FHA violations (DE 105 at 10), along with Florence County Council's failure to act on the Planning Commission's vote recommending multifamily development on the Property in September 2022. *See supra* text accompanying note 4.

*Reyes*, 903 F.3d at 424 (quotation marks, citations, and parentheticals omitted).  As noted herein, the parties' summary judgment motions overlap only on the *first step* of the *latter claim*—disparate impact.

### 2.    The Parties' Arguments

DHD asserts that it has made a prima facie showing that Florence County violated the Fair Housing Act, by establishing that the Moratorium and the Rezoning constituted a disparate impact on minorities—namely, African Americans.[9]  (DE 83 at 4.)  It has proffered an expert report that purports to demonstrate this via three methods.  (*Id.* at 5; *see* DE 83-1.)  Because an FHA claim is decided according to a burden-shifting framework, DHD urges that it has sufficiently carried its *initial* burden, and it is entitled to partial summary judgment to that effect.  (*Id.* at 5.)

Florence County denies that it violated the FHA and equally moves for summary judgment on the entirety of DHD's "disparate treatment" and its "disparate impact" claims under the FHA.  (DE 99 at 2–3; *see* 89-1 at 13.)  Florence County claims that "neither the Moratorium itself nor the denial of Plaintiff's [CZC] constitute a policy or practice for purposes of a disparate-impact claim," but even if they did, a "clear[]" and "legitimate rationale" justified these actions.  (*Id.* at 16.)  Moreover, Florence County contends that DHD's expert report suffers from the absence of a "robust causal connection" between the denial and disproportionate

---

[9]    The Court uses this term because the parties use it (though they sometimes use other terms too, such as "Black") to refer to the "protected class members" in this case.  (*See, e.g.*, DE 83-1 at 14.)  The Court expresses no view on the propriety of such usages as a matter of accuracy, grammar, or otherwise.

impact on minorities (*id.* at 17) and, finally, that other factors weigh strongly in Florence County's favor. (*Id.* at 18.)

### a. Florence County's Motion for Summary Judgment on FHA Disparate-Treatment Liability

A prima facie claim for disparate treatment liability can be established by a showing of a racially discriminatory intent or motive. *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 524. The Fourth Circuit Court of Appeals has approved judicial consideration of the following as a sufficient analysis of intent or motive:

- "the historical background of the challenged decision;"

- "the specific sequence of events leading up to the challenged decision;"

- "departures from normal procedural sequence;"

- "the legislative history of the decision;" and

- "the disproportionate impact of the official action—whether it bears more heavily on one race than another."

*N. Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 221 (4th Cir. 2016) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977) (alterations adopted)).

Of course, DHD disputes that summary judgment is appropriate on its FHA disparate-treatment claim. (DE 105 at 24.) Both it and Florence County point to circumstantial evidence supporting their theories of this case under each of these so-called "*Arlington Heights* factors." Because much of the evidence is testimonial or

otherwise requires a credibility determination—as is shown below[10]—summary judgment is inappropriate.

Beginning with the historical background of the Moratorium and the Rezoning, DHD points to the evidence of initial support of the Jessamine—particularly, Chairman Dorriety's April 27, 2021, letter of support.[11] (DE 105-4 at 2.) DHD then pivots to the subsequent erosion of support and the initial enactment of the Moratorium to satisfy this *Arlington Heights* factor. (DE 105 at 25–26.)

Florence County responds with evidence pointing the other way. (DE 110 at 18.) In one email, for example, a Florence resident notes that her opposition to the Jessamine was not based on "racial discrimination" and that she "do[es]n't care what color the people are who would have been renting from the development. They could be any color on the spectrum for all I care." (DE 110-1 at 5.)

Turning to the sequence of events leading up to the initial enactment of the Moratorium, DHD points to deposition testimony and (particularly) to an email sent by Councilmember Brand. In that email, Brand stated in response to a citizen's concerns about a retention pond and traffic congestion that "anything I can possibly do to halt this project , I WILL DO MY BEST!!!!!!!!!" (DE 105-21 at 2.) DHD presses that this illustrates "plac[ing] the whims of his constituents above the law" (DE 105

---

[10]    The Court addresses the fifth factor—"disproportionate impact"—in the section of the opinion dealing with "disparate treatment." *See infra* § A.2.b.

[11]    Florence County argues elsewhere that this letter was actually drafted by Schaumber, not Dorriety, and that Dorriety's submission of the letter was based on a misapprehension about another Councilmember's support. (DE 90 at 2; *see* DE 89-7 at 4–5, Dorriety Dep. 13:10–14:18.)

at 32), and in conjunction with other of Brand's testimony (*see* DE 103 at 14), suggests an intent to knowingly disregard the FHA. Florence County responds by pointing out that this email was in "response to a citizen voicing rational, non-racial concerns" and that it does not suggest the Councilmember would violate the FHA. (DE 110 at 20.)

Next, DHD argues that Florence County deviated from the "normal procedural sequence" by pointing to testimony from the County Administrator who suggested that the Moratorium involved "circumvention" of ordinary processes. (DE 105 at 30.) And, as a matter of legislative history, DHD presses without citation to the record that unlike all other special called meetings, *no* prior notice was given of the meeting to enact the Moratorium. (*Id.* at 31.) Florence County responds that deviations were "slight" and "it would be difficult to find the implementation of an ordinance which *didn't* include *some* different applications of procedures . . . ." (DE 110 at 19.)

Also, Florence County points to other circumstantial evidence of non-race-based concerns that citizens had with the Jessamine that it contends were sufficient bases to lead to the Moratorium and the Rezoning. (DE 89-1 at 14–15.) Particularly, opposition based on an absence of sidewalks (DE 89-3 at 3); opposition based on "protect[ing] and sustain[ing] existing low-density single-family residential areas including property values and amenities . . ." (DE 89-5 at 4); and opposition based on "traffic" and drainage concerns. (*Id.* at 4–5.)

DHD responds with circumstantial evidence of its own. For example, DHD points to Chairman Dorriety's deposition testimony that no records of discussion about concerns with doughnut holes "with other council members" exist. (DE 105-15

at 3–4, Dorriety Dep. 23:23–24:3.)  DHD also points to a January 2022 news article that quotes an "anonymous Florence resident" as saying "[t]hey are putting a glorified section eight complex in the middle of a very nice part of Florence."  (DE 105 at 26; DE 105-7 at 3.)  Florence County replies that the quote is "fraught with obvious evidentiary issues" but that aside, no evidence suggests "that any councilmember was even aware of or considered th[e] quote."  (DE 110 at 16.)

Viewed in the light most favorable to DHD, much of this evidentiary material is ambiguous.  But even where it is not, the evidence in the record largely is testimonial.  To evaluate such evidence requires determinations of credibility—determinations inappropriate at summary judgment.  *Liberty Lobby, Inc.*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict.").

Because Florence County has failed to prevail on its claim that *no* prima facie disparate treatment claim lies, Florence County's motion for summary judgment on DHD's disparate-treatment claim under the FHA must fail.

**b.    Cross-Motions for Summary Judgment on Disparate-Impact Liability**

To establish a sufficient prima facie case of disparate-impact liability under the FHA, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has *caused* the exclusion [complained of] *because of their membership in a protected group*."  *Reyes*, 903 F.3d at 425 (emphasis added) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).

DHD points to its expert report as establishing "disproportionate impact of the official action." (DE 105 at 25.) In the report, DHD's expert analyzed subpoenaed records obtained from "every one" of twenty-two "existing and completed" LIHTC-funded developments "located in Florence County as of . . . April 15, 2022," in addition to Census data. (DE 83 at 5–6; *see* DE 83-1 at 13.) Because approximately seventy-eight percent of the residents of the subpoenaed developments[12] self-identified as African American, the expert could extrapolate "the expected numbers of the Jessamine by race." (DE 83-1 at 15.) Using three tests on these data, the expert concluded the Rezoning—which rezoned the Property to single-family use—would disproportionately harm African Americans. (*See id.* at 20 (so concluding under the "*Turtle Creek*" test); *see id.* at 22–23 (so concluding under the "four-fifths" test); *see id.* at 24 (so concluding under the chi-square test).) The expert concluded that the Moratorium perpetuated housing segregation and suboptimal outcomes for "potential LIHTC residents . . . ." (*Id.* at 43.)

Because both parties move for summary judgment on a prima-facie claim, the Court must consider the report in the light most favorable to each party in turn. Beginning with DHD's motion and taking the facts in the light most favorable to Florence County, the facts in the report identified above satisfy the Court that partial summary judgment in DHD's favor is appropriate. There is at least *some* statistical evidence suggesting a disproportionate effect exists. Florence County's response is that the expert report suffers from an absence of a "causal connection" because it

---

[12]    Of the twenty-two that were subpoenaed, the expert only used nineteen. (DE 83-1 at 14.)

purportedly only shows that, because of the Moratorium and the Rezoning, the original tax credits destined for use on the Property were sent elsewhere "to be re-awarded to another low-income housing project." (DE 89-1 at 17.) But Florence County directs this Court to no legal authority in support of the sufficiency of such metaphysical speculation. And this argument wholly ignores the report. Taking the facts in the report in Florence County's favor does not mean the Court can ignore it—especially when Florence County does not put forward any other data.

The Supreme Court has urged defendants in disparate-impact cases that if they "discern[] fallacies or deficiencies in the data offered by the plaintiff," they are "*free to adduce countervailing evidence of* [*their*] *own.*"  *Watson*, 487 U.S. at 996 (emphasis added).  Florence County has not adduced countervailing evidence.  The Court notes Florene County has not deposed DHD's expert. (*See, e.g.*, DE 83 at 2–3.) As it stands, with nothing to support its criticism of DHD's expert report, Florence County's concession (albeit with a caveat) that "a jury *could* agree" with the expert report's conclusion that a disparate impact resulted from the Moratorium and the Rezoning is telling. (DE 99 at 3 (footnote omitted).)

Considering the same facts in the light most favorable to DHD—because Florence County also moves for summary judgment—the Court is left with little doubt that summary judgment in Florence County's favor is inappropriate. The data suggest that the Moratorium and Rezoning—which foreclosed multifamily housing—does adversely impact African Americans.  Florence County countermands that "potential residents might have found housing in other, equally desirable locations

throughout Florence City or Florence County." (DE 99 at 3–4.) Assuming that this is a reasonable inference to draw in Florence County's favor (because it is factually unsupported), it (again) does nothing to address the report's conclusions. DHD has provided statistical evidence suggesting a disparate impact of the Moratorium and the Rezoning on African Americans—as is its burden. *See Inclusive Cmtys. Project, Inc.,* 576 U.S. at 543; *see also Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir. 1982). Florence County's unsupported argument attempts to transform the prima facie burden of an FHA case into proof of a negative, which is not what the law requires. DHD has set forth a prima facie FHA claim.

However, prevailing on a prima facie showing of a disparate impact is not the end of the line. Florence County has moved for summary judgment on the *entirety* of DHD's FHA disparate-impact claim. Therefore, Florence County now "has the burden of persuasion" and "must 'state and explain the valid interest served by their policies.'" *Reyes*, 903 F.3d at 424 (quoting *Inclusive Cmtys. Project, Inc.*, 576 U.S. at 541)). And if, viewing of the facts most favorable to DHD, there is no genuine issue of material fact *and* Florence County has discharged its burden, the same once again shifts to DHD "to prove that the defendant's asserted interests 'could be served by another practice that has a less discriminatory effect.'" *Reyes*, 903 F.3d at 424 (*Inclusive Cmtys. Project, Inc.*, 576 U.S. at 528)).

Florence County points to the issue of closing so-called doughnut holes as "clearly important" and a "compelling necessity . . . ." (DE 110 at 23–24.) DHD responds that such explanations are "either pretextual or *post hoc* justifications" for

the Moratorium and the Rezoning. (DE 105 at 16.) The Court cannot conclude that no issue of material fact exists as to the validity of this asserted interest, much less that judgment as a matter of law is appropriate. For example—and in addition to the other "motive" evidence already noted—no records of any discussion of doughnut holes *prior* to DHD's attempts to develop the Property exist. (DE 105-15 at 3–4, Dorriety Dep. 23:23–24:3.) And though Florence County offers countervailing arguments (DE 110 at 22–25), it does not refute DHD's point that "[n]o documents" about doughnut holes were provided in discovery. (DE 105 at 18.) Viewed in the light most favorable to DHD, this and other evidence[13] counsel against summary judgment in Florence County's favor. As a result, the Court need not proceed to the third step, and Florence County's motion must be denied.

For these reasons, DHD's motion for partial summary judgment that it has established a prima facie showing of disparate impact claim is granted. Accordingly, Florence County's motion for summary judgment on DHD's claims under the FHA is denied.

## B. Florence County's Rule 56 Motion on DHD and Tallevast's Constitutional Claims Under 42 U.S.C. § 1983

### 1. Florence County's Liability Under *Monell*

Before reaching DHD and Tallevast's substantive due process claims, Florence County asserts it has no *Monell* liability under Section 1983 because "Plaintiff has not alleged or shown a specific policy that is in itself unconstitutional." (DE 89-1 at

---

[13] Tallevast devotes nearly one third of his response brief to setting forth testimonial evidence that suggests the absence of any documented concerns over doughnut holes. (DE 103 at 20–29.)

29.)  Further, it presses that "the denial of a permit" by Singletary is "not an overarching policy" and that "the ordinances in this case do not constitute a 'policy,' . . . [because] this was a one-time decision by Florence County council to address the do[ugh]nut hole issue in Florence County."  (*Id.*)  Plaintiffs DHD and Tallevast disagree.  They contend that the enactment of the Moratorium and the Rezoning constitute a policy or custom.  (DE 103 at 31; DE 105 at 38–39.)

It is axiomatic that "[m]unicipalities are not liable under respondeat superior principles for all constitutional violations of their employees . . . ."  *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).  Instead, such governmental entities are only liable under 42 U.S.C. § 1983 "when *execution of a government's policy or custom*, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent *official policy*, inflicts the injury . . . ."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (emphases added).

*Monell* and its progeny make clear that there are several routes available to plaintiffs to prove that a challenged "policy or custom" is an "official" one.  *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  One method is to show evidence of "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).  Another is to show that the decision or conduct complained of was made by an individual with "final policymaking authority" as a matter of state and local law.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  But those are not the obvious cases.  As the Supreme Court has held,

> a municipality may be liable under § 1983 for a single decision by its *properly constituted legislative body*—whether or not that body had taken similar action in the past or intended to do so in the future— because *even a single decision by such a body unquestionably constitutes an act of official government policy.*

*Pembaur*, 475 U.S. at 480.  Such is the case here.

No one contends that Florence County's "legislative body"—the Florence County Council—was not "properly constituted" as a matter of state law.  In fact, this Court earlier rejected DHD and Tallevast's contention that the Florence County Ordinances did not permit the Council to enact the Moratorium.   (DE 64.) Accordingly, there can be no question that the enactment of the Moratorium and the Rezoning were official policies of the local government.[14]

Thus, the Court denies Florence County's motion for summary judgment on DHD and Tallevast's 42 U.S.C. § 1983 claims insofar as Florence County asserts its challenged actions were not a policy or custom under *Monell*.

### 2.    DHD's and Tallevast's § 1983 Claims

Florence County asserts that it is entitled to summary judgment on DHD's and Tallevast's claims under the substantive aspect of the Due Process Clause of the Fourteenth Amendment.[15]   To establish a violation of substantive due process, DHD

---

[14]    As regards the denial of DHD's CZC application, whether Singletary was or was not a final policymaker as a matter of state law is a closer question.  The Court need not answer it, though, since it is undisputed that Singletary's refusal to act was expressly pursuant to instruction "to implement" the Moratorium—which is a policy—from the "staff level . . . ." (*See* DE 28-5 at 5, Singletary Dep. 11:15–18.)

[15]    The parties do not dispute that the required elements of a lawsuit under 42 U.S.C. § 1983 are satisfied in this case. Accordingly, the Court addresses only the constitutional violation.

and Tallevast must "demonstrate (1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that *no process* could cure the deficiency." *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 827 (4th Cir.1995). In addition, Florence County asserts that it is entitled to summary judgment on Tallevast's claim under the Takings Clause of the Fifth Amendment. (DE 89-1 at 24–25.)

Relevant to these claims, DHD and Tallevast contend that Florence County's "refusal to even accept" the CZC application violated the Fourteenth Amendment. (DE 105 at 34; *see* DE 103 at 9–10.) Florence County moves for summary judgment based on several arguments. First, that it is undisputed that Plaintiffs failed to seek relief in South Carolina state court, and Florence County believes this is fatal to DHD and Tallevast's substantive due process claim.[16] (DE 89-1 at 5–7; DE 110 at 2–7.) Second, that as a matter of law, the so-called "pending ordinance" doctrine prevented issuance of the CZC. (DE 89-1 at 7–9.) Third, Florence County contests Tallevast's possession of any vested right in the CZC (DE 110 at 13–15), among other matters.

Despite repeated skirmishes on these claims (among others) by the parties, the parties have yet to fully develop these issues under the context of applicable law including the Florence County Code ("Zoning Ordinance") and the South Carolina Local Government Comprehensive Planning Enabling Act of 1994 ("Planning Act").

---

[16]    Florence County also asserts a "public necessity" argument. (DE 89-1 at 9.)

*See* S.C. Code Ann. § 6-29-310 *et seq.*  That said, the parties are directed to brief the

following matters:

(1)    As regards the CZC:

    (a)    the requirements and procedure by which a CZC is issued by Florence County, including any discretion to deny a CZC application;

    (b)    the requirements and procedure by which a building permit is issued by Florence County following the issuance of a CZC; and

    (c)    the similarities or differences, if any, between a CZC and a building permit under the Planning Act or the Zoning Ordinance and the legal significance of such similarities and differences, if any, to the parties' positions on DHD and Tallevast's claims.

(2)    How DHD or Tallevast acquired a property interest in a CZC, and the effect(s), if any, of the Florence County ordinance entitled "Vested Rights Ordinance," Florence County Code §§ 25-31 through 25-36, on DHD's and Tallevast's substantive due process claim.

(3)    The available "process[(es)] [that] could cure the deficiency," *Tri Cnty. Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 440 (4th Cir. 2002) by DHD or Tallevast under the Planning Act or Zoning Ordinance, if any, concerning the deprivation of the CZC (e.g. the March 4, 2022, inaction by Singletary, the Florence County Planner, on DHD's CZC application).

(4)    The effect(s), if any, of the Fourth Circuit Court of Appeals' recent application of the South Carolina pending ordinance doctrine in *Adams Outdoor Advert. Ltd. P'ship v. Beaufort Cnty.*, 105 F.4th 554, 563 (4th Cir. 2024), on the parties' arguments.

(5)    The existence of any additional secondary (or, preferably, primary) authority, if any, in which a similar "pending-ordinance" rule to South Carolina's was applied to the Moratorium, whether in the context of a challenge pursuant to a substantive due process claim or not.

The parties' memoranda shall comply with the following rules:

(1)    the parties' memoranda shall be filed no later than **December 11, 2024**;

(2)    the parties' respective positions must be supported by affidavits or citations to the factual record;

(3)    the parties are directed, unless deemed unnecessary by a party, to respond to the opposing side's arguments on these issues.[17]

To that end, the Court denies Florence County's motion for summary judgment on DHD and Tallevast's substantive due process claims and Tallevast's takings claim under 42 U.S.C. § 1983 without prejudice.[18]  The Court will revisit this matter after

---

[17]    In all other respects, the parties' memoranda shall comply with the Local Rules of this Court (including those rules governing response and reply). Once the Court has received these materials, it will take them under advisement as to Florence County's motion for summary judgment on the substantive aspect of the Due Process Clause of the Fourteenth Amendment and on Tallevast's Fifth Amendment takings claim.

[18]    Regarding Tallevast's takings claim, Tallevast asserts a regulatory taking under *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). (DE 103 at 32–33.) "*Penn Central* requires this Court to balance 'a complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action." *Clayland Farm Enters., LLC v. Talbot Cnty.*, 987 F.3d 346, 353 (4th Cir. 2021) (quoting another source).

In this analysis, "[t]he first two factors—economic effects and investment-backed expectations—are '[p]rimary among th[e] factors.'" *Id.* (quoting another source). The first factor, economic effects, is, as a practical matter, undisputed. Tallevast contends the Property (while unzoned) was valued at $1,150,000.00, but after the Rezoning (in which it was changed to R-1), it appraised at $350,000.00. (*Compare* DE 89-1 at 24 (Florence County's argument that the rezoning diminished Plaintiff Tallevast's property "roughly 69.6%"), *with* DE 103 at 33 (Tallevast's argument that the diminution is "a staggering 70% reduction in value").) "And yet [the Fourth Circuit Court of Appeals] has found that a hypothetical *83 percent diminution in value was insufficient to establish a regulatory taking*." *Clayland Farm Enters., LLC*, 987 F.3d at 354 (emphasis added). That court "has also noted that other circuits have found no regulatory taking when presented with diminutions in value of 75 percent and 92.5 percent." *Id.* Thus, the Court notes that the first factor weighs strongly in Florence County's favor.

As for the second factor, reasonable investment-backed expectations, "[a] takings claim must be premised on a preexisting property right." (*Id.*) Given the briefing directed by the Court on the question of preexisting property rights, the Court declines to address Florence County's motion for summary judgment on Tallevast's takings claim until this matter is fully briefed.

the supplemental briefing is completed by way of renewed motions on this matter or Judgment Independent of the Motion under Rule 56(f), Fed. R. Civ. P.

### 3.    DHD's Promissory Estoppel Claim

DHD contends that "[i]t was expected and foreseeable" by Florence County that DHD "would rely on the unambiguous commendation and financial support for the Jessamine," including "the agreement to commit $10,000.00 . . . towards the installation of a fire hydrant" and "assurances from multiple members of Florence County's planning and zoning departments that the Property was an 'ideal location' for the Jessamine [and] that no issues would affect Plaintiff's ability to successfully develop the Jessamine." (DE 1 at 66.)

"Promissory estoppel is a quasi-contract remedy." *N. Am. Rescue Prods., Inc. v. Richardson*, 411 S.C. 371, 379, 769 S.E.2d 237, 241 (2015). This means that it applies only to prevent "perpetration of a fraud or would result in other injustice." *Id.* (quoting another source). In such narrow circumstances, a plaintiff can obtain relief if it establishes "(1) the presence of an unambiguous promise; (2) the promisee reasonably relied upon the promise; (3) the reliance was expected and foreseeable by promisor; and (4) the promisee was injured as a result of reliance upon the promise." *Davis v. Greenwood Sch. Dist. 50*, 365 S.C. 629, 634, 620 S.E.2d 65, 67 (2005).

Fundamentally, and contrary to DHD's protestations, it did not receive an unambiguous promise that "no issues would affect Plaintiff's ability to successfully develop the Jessamine." (DE 1 at 66.) DHD presses that the "Zoning Verification Letter could not be any more unambiguous," and in conjunction with the "Chairman's

Promise of Support," and "other actions by the County," Florence County (through its agents) made the purported promise. (DE 105 at 40–43.) Though not entirely clear, DHD also appears to rely on the original un-zoned nature of the Property. (DE 105 at 39.)

The aggregate of these facts does not make a promise. Of the specific evidence relied on, this Court has already held that the verification letter is not as it is billed by DHD. (*See* DE 118 (noting "[t]he letter expressly stated that it was '*not zoning compliance approval*' and it does not 'give approval to begin any work'" (emphasis added) (quoting another source)). And even assuming Chairman Dorriety's letter *was* an unambiguous promise—which it was not, since it was "contingent on the developer receiving approved permit plans from Florence County"—it could only be so *as regards funding for a fire hydrant*. (*See* DE 105-4 at 5.) Where a purported promise is subject to another's approval, reliance is unreasonable. *Davis*, 365 S.C. at 635, 620 S.E.2d at 68. And construing the letter as a general "assurance" of some kind is not germane to what the law requires because mere "assurances" do not necessarily suffice to create an "unambiguous promise."[19] *N. Am. Rescue Prods., Inc.*, 411 S.C. at 380, 769 S.E.2d at 242. Thus, Dorriety's subsequent withdrawal of support—whatever else it may imply—cannot create a claim of promissory estoppel.[20]

---

[19]    Nor is it the actual promise DHD asserts was breached in its complaint: a guarantee that the Property could be developed exactly as DHD desired. (DE 1 at 66.)

[20]    Though this Court has concluded that a fact issue remains as "to purported informal approvals Plaintiffs received" in assessing DHD's *good faith* (*see* DE 118), this does not mean that summary judgment for Florence County is inappropriate on this promissory estoppel claim.

Therefore, no genuine issue of material fact exists, and Florence County's motion for summary judgment is granted in this respect.

## **CONCLUSION**

For the reasons set forth above, the parties' cross-motions for summary judgment are granted in part and denied in part, as follows[21]:

1.    DHD Jessamine, LLC's, Motion for Partial Summary Judgment (DE 83), is **GRANTED**.

2.    Florence County's Motion for Summary Judgment on Behalf of Defendants (DE 89), is **GRANTED IN PART** and **DENIED IN PART**, as follows:

    a.    the motion is **GRANTED** as to William D. Tallevast, V's:

        i.    Count One ("Violation of Contract Clause – Violation of 42 U.S.C. § 1983") as against Florence County;

        ii.    Count Four ("Tortious Interference with Contractual Relations and Prospective Contractual Relations") as against Florence County;

        iii.    Count Five ("Negligence/Gross Negligence") as against Florence County; and

        iv.    Count Six ("Declaratory Judgment – Illegality of Ordinance No. 17-2021/22") as against Florence County.

    b.    the motion is **GRANTED** as to DHD Jessamine, LLC's:

        i.    Counts One through Eight (all counts) as against:

            1.    Frank J. Brand;

            2.    Jason Springs;

---

[21]    As stated in footnote 18, the Court denies without prejudice DHD Jessamine, LLC and William D. Tallevast, V's claims for relief under 42 U.S.C. § 1983, including Tallevast's takings claim, until the parties brief the matters discussed *supra* § B.2 of this opinion.

3.     Roger M. Poston;

4.     Alphonso Bradley;

5.     Jerry W. Yarborough;

6.     Stoney C. Moore;

7.     Waymon Mumford;

8.     Willard Dorriety, Jr.; and

9.     John Does 1–15.

ii.    Count Three ("Violation of Title VI of the Civil Rights Act of 1964") as against Florence County;

iii.   Count Four ("Violation of Substantive Due Process under the South Carolina and United States Constitutions – Violation of 42 U.S.C. § 1983") only as regards the South Carolina Constitution as against Florence County;

iv.    Count Five ("Conspiracy to Interfere with Civil Rights – 42 U.S.C. § 1985") as against Florence County;

v.     Count Six ("Promissory Estoppel") as against Florence County;

vi.    Count Seven ("Negligence/Gross Negligence") as against Florence County; and

vii.   Count Eight ("Declaratory Judgment – Illegality of Ordinance No. 17-2021/22") as against Florence County.

c.    In all other respects, Florence County's motion is **DENIED**.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
November 20, 2024