IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| DHD Jessamine, LLC, | Case No.: 4:22-cv-01235-JD |
| Plaintiff, | |
| and | |
| William D. Tallevast, V, | **ORDER** |
| Intervenor-Plaintiff, | |
| vs. | |
| Florence County, South Carolina, | |
| Defendant. | |

This is a case about a development moratorium and a subsequent change in zoning that stopped the construction of a low-income housing project. Before the Court is Plaintiff DHD Jessamine, LLC's "Motion to Exclude Report and Any Testimony of Defendants' Expert Witness Rodney Dooley." (DE 84.) Because Dooley's testimony is largely—but not entirely—within the boundaries of Rule 702, Fed. R. Evid., DHD's motion is granted in part and denied in part.

## BACKGROUND

On April 15, 2022, DHD sued Florence County, its councilmembers, and certain fictitious defendants seeking, among other things, redress for violation of DHD's rights and to vindicate the rights of certain minorities and low-income families with children because of the conduct of Defendants. (DE 1.) On March 5, 2024, DHD

1

moved to exclude certain expert testimony by Rod Dooley, a witness proffered by Florence County. (DE 84.) On March 19, 2024, Florence County responded in opposition. (DE 98.) On March 26, 2024, DHD replied. (DE 101.) Since then, the Court has granted in part and denied in part cross-motions for summary judgment. (DE 119.)

## **LEGAL STANDARD**

District courts "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 589 (1993). Rule 702 of the Federal Rules of Evidence was amended in response to *Daubert* and its progeny to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702, Fed. R. Evid. The proponent of an expert witness's testimony bears the burden of proving that such testimony meets the requirements of Rule 702 by a preponderance of evidence. *See Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n. 10). As the text of the rule suggests, district courts have a "special obligation" as gatekeepers. *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 147 (1999). This means that regardless of the content of the expert testimony, "a district court must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." *United States v. Smith*, 919 F.3d 825, 835 (4th Cir. 2019).

Beginning with qualifications, "[t]he test is whether, under the totality of the circumstances, the witness can be said to be qualified as an expert in a particular field through any one or more of the five bases enumerated in Rule 702—knowledge, skill, experience, training, or education." *Santos v. Posadas De Puerto Rico Assocs., Inc.*, 452 F.3d 59, 64 (1st Cir. 2006).

Turning to methodology, the court must consider "whether the reasoning or methodology underlying the testimony" is reliable. *Daubert*, 509 U.S at 592–93. Certain nonexclusive factors address the reliability of a particular theory or technique, namely, whether the theory or technique:

(1) can be and has been tested;

(2) has been subjected to peer review and publication;

(3) has a known or potential rate of error; and

(4) has attained general acceptance in the pertinent scientific community.

*See id.* at 593–94. Of course, given the district court's role regarding all expert testimony, "some of *Daubert*'s questions can help to evaluate the reliability even of experience-based testimony." *Kumho Tire Co.*, 526 U.S. at 151. But in any given case, which of these factors are applicable "depends upon the particular circumstances of the particular case at issue." *Id.* at 150. And importantly, the focus "must be solely

3

on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

Finally, relevance is determined by ascertaining whether the testimony is sufficiently tied to the facts of the case such that it will aid the jury in resolving a factual dispute. *See id.* at 593; *see also* Rule 402, Fed. R. Evid.

However, "the trial court's role as a gatekeeper is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 631 (4th Cir. 2018) (alteration omitted) (quoting another source).

## DISCUSSION

### A.    The parties' arguments

DHD presses that Dooley's expert report is entirely deficient. DHD contends the report "will not assist the trier of fact to understand the evidence or . . . determine a fact in issue." (DE 84 at 2.) DHD also contends that Dooley possesses a "lack of qualifications and reliable methodology . . . ." (*Id.*) On the latter point, DHD primarily attacks five of Dooley's conclusions on the basis of "reliance on false information, incorrect data, and unaccepted premises . . . ." (*Id.* at 5.) In support, DHD points to excerpts of Dooley's deposition testimony, the entire transcript of which DHD attached to its motion. (DE 84-1.) Florence County responds that DHD's counsel's "lay-assertions" are insufficient to challenge Dooley's opinions, and the proper method is "cross-examination, using proper channels of impeachment . . . ." (DE 98 at 6.)

B.    **Dooley's qualifications**

The Court begins with Dooley's qualifications. Rule 702 permits expert testimony from persons who are "qualified by knowledge, skill, experience, training, or education" if the same helps the trier of fact. Rule 702, Fed. R. Evid. "Generally, the test for exclusion of expert testimony is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered." *United States v. Rouse*, No. 22-4479, 2024 WL 2044630, at *1 (4th Cir. May 8, 2024) (per curiam) (quoting *Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989)); *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("The witness'[s] qualifications to render an expert opinion are . . . liberally judged by Rule 702."). Of course, "[t]he notion that *Daubert* . . . , requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000) (Posner, J.)

In its October 2023 expert disclosure, Florence County provided Dooley's resume. That document provides that Dooley became a certified public accountant in 2008. (DE 50-1 at 2.) Beginning in 2006, Dooley worked as a staff accountant at "Dooley and Company, LLC," and now is the sole principal of that entity. (*Id.*) His resume notes further that his clients include "local governments" and that his experience includes "financial planning and governmental accounting." (*Id.*) Dooley also noted in his deposition testimony that he has "received valuation courses" and "general annual education" pursuant to "CPA policy." (DE 84-2 at 13; Dooley Tr. 11:12–17; 11:18–22.)

Heeding the well-established principle articulated by Judge Posner, DHD declines to challenge Dooley's credentials directly. Instead, DHD couches its concerns in terms of his purported absence of a "basic knowledge that even the most unsophisticated real estate investors understand" (DE 84 at 23) and a lack of "aware[ness] of ANY of the particulars of low-income housing tax credit development." (DE 101 at 2.) In this connection, *Thomas J. Kline, Inc.*, is instructive. In that pre-*Daubert* case, the Fourth Circuit Court of Appeals concluded that the district court abused its "considerable discretion" in permitting an unqualified expert to testify about the possible antitrust implications of a credit-extension decision. *Thomas J. Kline, Inc.*, 878 F.2d at 800. The court of appeals began by observing that the expert admitted that she was "not an economist" but instead worked primarily on "analyses of companies' financial health." *Id.* at 799. Additionally, the expert had no published works on "price discrimination, credit, or antitrust generally" and she "had no personal experience in making credit decisions." *Id.* Her education, too, did not "include[] any training in the area of antitrust or credit."[1] *Id.* at 800.

The facts here are distinguishable. DHD recognizes that its own expert report's calculations are generated according to accounting principles. (*See, e.g.*, DE 84 at 11 (noting that "pursuit costs related to predevelopment of a LIHTC project" are "to be reimbursed at construction closing and accounted for as a development budget expense").) Dooley's experience and education, while generalist in nature, includes both "financial planning" and accounting. (DE 50-1 at 2.) Here, Florence County

---

[1] As is discussed below, the court of appeals also analyzed the expert's conclusions. *Thomas J. Kline, Inc.*, 878 F.2d at 799–800.

leveraged Dooley's education and his fifteen-plus years of experience in accounting and financial planning to "provide an analysis of the summary of damages" that DHD's own expert put forth. (DE 84-1 at 2.) In that endeavor, Dooley applies accounting principles—which even DHD does not contend is outside Dooley's purview—to challenge DHD's damage calculations. (*See, e.g.*, DE 84-1 at 2 (criticizing DHD's expert's sole use of a "discounted[-]cash[-]flow method to value the lost profits").) Thus, Dooley's specialized knowledge of accounting principles could be helpful to the trier of fact.

In contrast, one of the foundational problems in *Thomas J. Kline, Inc.* was the expert's *complete absence* of education or experience in economics or antitrust. Such a dearth of experience is not present here. So DHD's attempt to exclude Dooley's report allegedly because "Dooley lacks any knowledge of the requisite facts to support his conclusions" (DE 101 at 3), misses the mark because "questions regarding the factual underpinnings of the expert witness'[s] opinion affect the weight and credibility of the witness'[s] assessment, not its admissibility." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (alterations adopted and quotation marks omitted).

Therefore, the Court concludes that under the circumstances of the case, Dooley's education and experience clears the relatively low threshold of sufficient qualification to be helpful to the trier of fact under Rule 702, Fed. R. Evid.

## C.     The reliability of Dooley's expert report

DHD equally attacks Dooley's expert report arguing that it is unreliable and that it will not be helpful to the trier of fact. Specifically, DHD contends Dooley's unwarranted assumptions, lack of information, and insufficient methodology infect his conclusions about:

- developer fees;
- pursuit costs;
- vacancy rates;
- multiples of the risk-free discount rate; and
- loss periods.

(DE 84 at 5–22.) As an initial matter, expert testimony as to damages from lost future earnings can, in some circumstances, be helpful to the trier of fact. *See, e.g.*, *Murphy v. Nat'l R. R. Passenger Corp.*, 547 F.2d 816, 818 (4th Cir. 1977) (noting "expert testimony or actuarial tables on the present value of future lost earnings may be admitted"). But generalities about reliability are insufficient, and courts must engage in a case-by-case analysis. *Kumho Tire Co.*, 526 U.S. at 150 (noting that "the gatekeeping inquiry must be tied to the facts of a particular case" (quotation marks omitted)). In "soft sciences" like accounting, "expert testimony is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ." *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341 (E.D.N.Y. 2016).

### a.  Developer fees

DHD contends that Dooley "has no understanding as to how developer fees are governed, when they are typically paid, or where they fit into the overall development budget of a LIHTC development." (DE 84 at 7–8.) DHD points to Dooley's admission to that effect during his deposition. (*Id.*) But as DHD itself acknowledges, Dooley noted in his report that his "summary *does not consider* a development fee" because he did not have sufficient information to "determine[] who would be paying" it, but he only "reserve[d] the right to modify" his report in the light of receiving that information. (DE 84-1 at 3 (emphasis added).) DHD has not shown that Dooley has not—or will not—acquire such information.

The opinion Dooley does offer is a general concern about "extrapolating" such a fee over "18 years based on a 2.5% interest rate . . . ." (*Id.*) But this appears to be no more than a general accounting matter about which he is qualified to testify. DHD offers no reason to think otherwise. If DHD believes Dooley's conclusions are wrong, that testimony can be impeached on cross-examination. Thus, the Court declines DHD's invitation to exclude entirely Dooley's report, his testimony, and his opinion on developer fees.

### b.  Pursuit costs

DHD next challenges Dooley's conclusion that "pursuit costs" appear to be doubled in DHD's expert's report because as "costs related to the project" they should "reduce the expected net cash flows" and should not be added "to the projected lost profits." (DE 84-1 at 3.) DHD contends—and Dooley admits—that he "does not have any understanding *specific* to LIHTC developments and pursuit costs . . . ." (DE 84 at

9

9 (emphasis added).) DHD further points to testimonial evidence suggesting instead that it is "industry[-]standard" for pursuit costs to be "reimbursed at construction closing and accounted for as a development budget expense . . . ." (*Id.* at 11.) But like DHD's previous argument, the Court finds this insufficient to justify exclusion. Dooley's opinion is simply an application of general principles of accounting about which he is qualified to render an opinion. Whether he is right or wrong in this instance can be brought out through cross-examination. *See Thomas J. Kline, Inc.*, 878 F.2d at 799 (noting that "[o]ne knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion"). Thus, the Court declines to entirely exclude from Dooley's report or his testimony his opinion on pursuit costs.

### c. Vacancy rates

DHD attacks next Dooley's assertion in his expert report that the "market study completed for [t]he Jessamine project concluded a vacancy projection of 7%[,]" and this number was more appropriate for a damages calculation than "the expert adjusted vacancy rate of 3%" because, as an "independent assessment," the market study "holds less bias . . . ." (DE 84-1 at 3.) DHD points to Dooley's deposition testimony in which he testifies that he failed to read the market study itself, which would have suggested that the seven percent was simply an artificial bound used in the application for LIHTCs. (DE 84 at 13.)

DHD's argument that Dooley has a "total lack of any foundation or understanding of the subject matter" carries some force. (*Id.* at 14.) To begin with,

10

unlike the developer fees or pursuit costs, Dooley does not apply any accounting acumen to this conclusion. Instead, his opinion is based on an uncritical acceptance of a citation in DHD's expert's market report. Though Dooley did not grasp the relevant distinction—that the LIHTC "Qualified Application Plan" requires, for purposes of financial underwriting, that the minimum vacancy rate must be *assumed* to be the larger of seven percent or what a market study reveals, (*see* DE 1-1 at 19)—this fact by itself is not *necessarily* sufficient for exclusion. What is sufficient, though, is when "the expert's opinion [is not] supported by 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 378 (N.D. Fla. 2017) (quoting *Kumho Tire Co.*, 526 U.S. at 152). As one district court has put it,

> First, the expert must conduct some sort of independent investigation or verification to ensure that the data he or she plans to use is both accurate and helpful to the court in light of the disputed issues. Second, that investigation should be sufficiently thorough such that the expert has gained a working familiarity with the borrowed data so that the expert can demonstrate the data's reliability. Blind adherence to data of unknown origin does not suffice in federal court.

*Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa. 2015).

Here, despite opining that DHD's expert's report was "bias[ed]" as regards the asserted vacancy rate (DE 84-1 at 3), Dooley unreasonably declined to avail himself of the facts to support—or even form—such an opinion. (DE 84-2 at 48, Dooley Tr. 46:2–7.) As Dooley himself acknowledged with the benefit of hindsight, venturing an opinion under the circumstances was unprofessional. (DE 84-2 at 48, Dooley Tr. 46:8–13.) Dooley's testimony on this point must be excluded.

### d.     Risk-free discount rate multiplier

DHD further attacks Dooley's opinion that DHD's expert's report should not have used a risk-free rate of return in calculating the net-present-value of DHD's future cash flows. (DE 84-1 at 4.) Basically, DHD argues that Dooley's accounting-based critique fails because Dooley does not have sufficient knowledge about LIHTC developments to understand that projects like the Jessamine are low risk. (*See* DE 84 at 16–20.) Though Dooley testified that he could provide "numerous articles" in support of determining which of any number of "particular multiple[s]" was an appropriate discount rate for a given class of project, curiously, he testified that he failed to consult "any such article" before rendering his opinion. (DE 84-2 at 66, Dooley Tr. 63:24–64:10.) However, Dooley noted that he consulted an expert report by C. Mark Bokesch that DHD itself provided to its experts as a template for generating their report. (*Id.* at 19.) Dooley testified:

> I utilized Bokesch's report just to underscore the fact that *in my professional experience* the rate for a development project, whether it's market or -- Well, I'll leave it at market. Because as I've testified, the low-income tax credit has not been considered. *The risk-free rate is a baseline that is not comparable to a rate that when risk is assumed to develop a project*.

(DE 84-2 at 64, Dooley Tr. 62:14–21 (emphases added).) Thus, though DHD's contentions about Dooley's admittedly thin data and his methodology have some force here, "questions regarding the factual underpinnings of the expert witness'[s] opinion affect the weight and credibility of the witness'[s] assessment, not its admissibility." *Bresler*, 855 F.3d at 195 (alterations adopted and quotation marks omitted). Thus, the Court declines to exclude Dooley's opinion on discount rates.

### e. Loss periods

Finally, Dooley suggests that DHD's expert's use of an eighteen-year loss period "was only considered due to the internally prepared proforma [that] was prepared as a projection based on an 18-year note," and thus, contains an "unreasonable [] assum[ption]" that DHD would not have mitigated its damages. (DE 84-1 at 4.) For this reason, Dooley contends, a ten-year "loss period" is "most appropriate" as the applicable period for accounting for losses. (*Id.*) DHD contends that Dooley missed the mark on his opinion because 26 U.S.C. § 42(i)(1) establishes a "compliance period" of fifteen years for LIHTC developments and points to the fact that Dooley testified he could not support his ten-year loss period with any data. (*See* DE 84 at 21.) Florence County's response offers no other testimony or evidence to rehabilitate Dooley's concession on this point.

"[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In light of the statutory compliance period for LIHTCs, Dooley's unsupported assumption that ten years is the "most appropriate" compliance period, his admitted absence of experience in LIHTCs, his opinion crosses the line into the kind of expert *ipse dixit* ("he himself said it") the Supreme Court cautioned against. This does not, in principle, infect Dooley's questioning of DHD's mitigation of damages in the relevant period. But because Dooley's unsupported assumption as to a ten-year compliance period is

13

unjustified, to the extent Dooley is to offer testimony about mitigation in justification of the ten-year period, it must be excluded, too.

The Court is aware that "rejection of expert testimony is the exception rather than the rule." Rule 702, Fed. R. Evid., advisory committee's note to 2000 amendments. Indeed, the proper crucible for expert opinions themselves is the adversary process. However, due to the extraordinarily thin predicates of some of Dooley's opinions, as well as Dooley's unwarranted assumptions, the Court must exclude portions of Dooley's testimony as set forth herein.

## CONCLUSION

For these reasons, the Court grants DHD's motion to exclude (DE 84) in part, to the extent that Dooley is precluded from offering opinions at trial or in his expert report about:

(1)   vacancy rates; and

(2)   a ten-year loss period.

In all other respects, the Court denies DHD's motion regarding Dooley's testimony at trial and Dooley's opinions in his expert report.

**IT IS SO ORDERED.**

*/s/ Joseph Dawson, III*
Joseph Dawson, III
United States District Judge

Florence, South Carolina
December 9, 2024