IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DHD JESSAMINE, LLC, | ) | CASE NO.: 4:21-cv-03746-JD |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM ORDER &** |
| FLORENCE COUNTY, SOUTH CAROLINA, | ) | **OPINION** |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter arises under the Fair Housing Act ("FHA"). During trial, both parties moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. Among the issues presented, Defendant Florence County, South Carolina ("Florence County"), moved for judgment as a matter of law on the question of whether punitive damages are legally available against a local-governmental entity under the FHA. The Court deferred ruling at that time and later denied the motion from the bench.

Because this issue presents a substantial and, within the Fourth Circuit, unresolved question of statutory interpretation, the Court issues this Memorandum Order and Opinion to articulate the reasoning underlying its determination. The Court concludes that the FHA authorizes punitive damages against local-governmental entities when warranted by the evidence and consistent with the statute's remedial purposes.

1

## I. BACKGROUND

For a comprehensive account of the factual background and procedural history of this case, the Court refers to its prior opinions in this matter.[1]

On October 30, 2025, DHD rested its case-in-chief. Florence County then moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure on the issues of liability and on the availability of punitive damages. (DE 179.) The Court deferred ruling at that time. DHD subsequently filed a written response (DE 176), and Florence County filed a reply (DE 177).

On November 4, 2025, at the close of Florence County's case-in-chief, it renewed its motion. DHD likewise moved for judgment as a matter of law in its favor on both liability and punitive damages. As explained on the record, the Court found that each party had presented sufficient evidence from which a reasonable jury could find in its favor under the FHA. The Court further concluded that punitive damages are not categorically unavailable against a local-governmental entity under the statute. The Court advised that a written order would follow to set forth its reasoning in full on punitive damages.

## II. STANDARD

Rule 50 of the Federal Rules of Civil Procedure, in pertinent part, provides:

[i]f a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

---

[1] *See, e.g.*, *DHD Jessamine, LLC v. Florence Cnty., S.C.*, No. 4:22-CV-01235-JD, 2024 WL 6841758, *1–3 (D.S.C. Nov. 20, 2024); *DHD Jessamine, LLC v. Florence County, S.C.*, No. 4:22-cv-01235-JD, 2025 WL 2658281, *1–2 (D.S.C. July 16, 2025).

(A)   resolve the issue against the party; and

(B)   grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

Rule 50(a), Fed. R. Civ. P. As with any request for judgment as a matter of law, such motion "may be granted only if, viewing the evidence in a light most favorable to the non-moving party . . . and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party." *Plyler v. Cox*, 145 F.4th 501, 508 (4th Cir. 2025).

## III.   DISCUSSION

**A.   The Text and Structure of the Fair Housing Act Demonstrate Congress's Intent to Permit Punitive Damages Against Local Governments[2]**

The question presented is whether the FHA authorizes punitive damages against local-governmental entities. DHD contends that it does, relying on the statutory text and established interpretive principles. (DE 176 at 7.) Florence County maintains the opposite position, invoking several decisions that extend the United States Supreme Court's reasoning in *City of Newport v. Fact Concerts, Inc. ("Fact Concerts")*, 453 U.S. 247 (1981), a case interpreting 42 U.S.C. § 1983, to bar punitive-damage awards against local governments.[3] (DE 177 at 1–3.)

---

[2] The Court uses the term "local governments" to include both municipalities and county governments.

[3] The Court notes that Florence County elected not to advance this legal argument at any stage during the two years this matter has been before the Court.

No binding precedent within the Fourth Circuit resolves this question. Accordingly, the Court examines Congress's intent as expressed in the FHA's text, structure, and legislative development, guided by the Supreme Court's interpretive framework for analogous civil rights statutes. *Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) ("[S]tatutory interpretation begins, as always, with the language of the statute." (quoting another source)).

1. **The FHA's Statutory Text and Relevant Amendments**

The FHA was enacted as Title VIII of the Civil Rights Act of 1968. *See* Civil Rights Act of 1968, Pub. L. No. 90-284, §§ 801–19, 82 Stat. 73, 81–89 (codified as amended at 42 U.S.C. §§ 3601–19). The statute declares as its purpose "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

To enforce this guarantee, Congress authorized an "aggrieved person" to pursue relief for discriminatory housing practices in one of two ways. Since 1968, an aggrieved person has been entitled to "commence a civil action" directly in federal court. *Id*. § 3613(a)(1)(A). Beginning with the 1988 Fair Housing Amendments Act, Congress also created an administrative enforcement process allowing such complaints to be filed with the Department of Housing and Urban Development ("HUD").[4] *Id*. §§ 3610–3612.

---

[4] The 1988 amendments to the FHA—effective in 1989—did not restrict an aggrieved person to a single forum, thereby permitting the pursuit of both administrative and judicial remedies in certain circumstances. The exception is that once a complaint has proceeded to a final hearing and determination before HUD, the complainant is barred from subsequently filing a civil suit based on the same allegations. 42 U.S.C. § 3613(a)(3).

Notably, under the version of § 3613(c) in effect prior to the 1988 amendments, a prevailing private plaintiff could recover equitable relief, "actual damages[,] and not more than $1,000 punitive damages," as well as reasonable attorney's fees and costs. 42 U.S.C. § 3613(c) (1982). The statutory text imposed no express limitation based on the defendant's status and contained no exemption for local-governmental entities.

As noted, in 1988, Congress amended the FHA. *See* Fair Housing Amendments Act of 1988 ("FHAA"), Pub. L. No. 100-430, 102 Stat. 1619. Among its several substantive revisions to the FHA, two amendments are particularly probative here. First, Congress removed the $1,000 cap on punitive damages recoverable in private FHA lawsuits. *Id.* § 8, 102 Stat. at 1633. So, as presently codified, the statute authorizes courts to "award to the plaintiff actual and punitive damages" without qualification or limitation. 42 U.S.C. § 3613 (c)(1).

Second, Congress expressly contemplated enforcement actions involving state and local governments. In establishing the procedures for administrative complaints, Congress required that when a matter "involves the legality of any State or local zoning or other land use law or ordinance," the Secretary of HUD must refer the complaint to the Attorney General for "appropriate action" under its civil-enforcement authority. FHAA, § 8, 102 Stat. at 1628 (codified as amended at 42 U.S.C. § 3610(g)(2)(C)); *see also id.* § 8, 102 Stat. at 1634 (codified as amended at 42 U.S.C. 3614(b)(1)(A)). The Attorney General, in turn, is empowered to seek "civil penalt[ies]" for pattern-or-practice violations or cases referred by HUD, in amounts

5

ranging from $50,000 to $100,000. *Id.* § 8, 102 Stat. at 1630 (codified as amended at § 3614(d)(1)(A), (C)).

### 2. Judicial Interpretation of the FHA

The United States Supreme Court has interpreted the FHA on multiple occasions. Its interpretive approach in those cases provides useful guidance here.

To begin, the Supreme Court has emphasized that the FHA must be construed broadly to effectuate its remedial purpose. In *Trafficante v. Metro. Life Ins. Co.*, the Court observed that "[t]he language of the Act is broad and inclusive," reflecting Congress's intent to confer standing "as broadly as is permitted by Article III of the Constitution."[5] 409 U.S. 205, 208-09 (1972).

The Supreme Court has also recognized that traditional common-law principles inform the FHA's application. In *Meyer v. Holley*, the Court held that "ordinary tort-related vicarious liability rules" govern the statute, confirming that Congress legislated against the backdrop of established tort doctrines. 537 U.S. 280, 285–92 (2003).

More recently, in *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court concluded that the FHA encompasses claims based on disparate impact. 576 U.S. 519, 533 (2015). In reaching

---

[5] To be sure, Justice Douglas emphasized that broader congressional policies—particularly the goal of promoting racial integration—should inform interpretation of the statute. As compelling as that policy remains, this Court is cautious in assigning interpretative weight to isolated statements by individual legislators during floor debates. *See Trafficante*, 409 U.S. at 211. As Justice Scalia and Bryan Garner observe, "the purpose [of a text] is to be described as concretely as possible, not abstractly." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 57 (2012).

6

that conclusion, the Court relied on interpretive parallels between the FHA and other civil rights statutes, most notably Title VII of the Civil Rights Act of 1964. *Id.* at 535. The Court also found significant that Congress, in enacting the 1988 amendments, chose not to disturb the uniform line of lower-court decisions recognizing disparate-impact liability under the FHA. *Id.* at 536.

Guided by these precedents, the Court now turns to the specific arguments Florence County advances against the plain text of the FHA.

B.     **The Arguments Against Congress's Chosen Text Are Unavailing**

    1.     *The Supreme Court's Decision in* Fact Concerts *Does Not Control Where Congress Has Expressly Chosen to Depart from the Background, Common-Law Rule*

        **(a)**     The *Fact Concerts* Decision

Florence County's argument does not rest on the language of the FHA itself. Instead, it relies on decisions that have extended the reasoning of *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), to the FHA. (DE 177 at 1–3.) But neither *Fact Concerts* nor those derivative cases can override the plain terms of the FHA.

*Fact Concerts* arose under 42 U.S.C. § 1983. The plaintiffs alleged that the City of Newport had violated their First and Fourteenth Amendment rights by canceling a scheduled concert. 453 U.S. at 249–52. A jury returned a verdict for the plaintiffs, awarding both actual and punitive damages against the municipality. *Id.* at 252–53. The First Circuit affirmed on procedural grounds, but the Supreme Court granted certiorari and reversed as to punitive damages. *Id.* at 254.

The Court approached its analysis under § 1983 in its usual manner—examining the statutory text, the common law as it existed in 1871, the legislative

7

history surrounding the Sherman Amendment, and the policy considerations underlying the asserted immunity. *Id.* at 258–71. Notable for present purposes is the Court's threshold acknowledgment that § 1983 contains *no* express reference to immunities: because "Congress . . . expressed no intention" on that issue, the Court held that the scope of immunity must be derived "by implication." *Id.* at 258.

After surveying the historical record, the Court turned to the policies underlying punitive damages "and their relationship to the goals of § 1983." 453 U.S. at 266. The Court explained that punitive damages serve principally to punish and deter misconduct. *Id.* at 266–70. It concluded, however, that neither rationale justified punitive damages against a municipality: punishment would "punish[] only the taxpayers, who took no part in the commission of the tort," *id.* at 267, and deterrence was unlikely to be effective because substantial compensatory awards already provided sufficient incentive for compliance. *Id.* at 268–69. The Court, therefore, determined that deterrence would be better served by imposing personal liability on the individual officials responsible for the constitutional violation. *Id.* at 269–70.

The Supreme Court's holding was narrow and explicit: punitive damages are not available against local governments in § 1983. *Fact Concerts* did not purport to construe the FHA or any other statutory scheme containing express authorization for punitive damages. The Court now, therefore, turns to the manner in which lower courts have treated *Fact Concerts* in the FHA context.

   **(b)**    **Other District Courts' Treatment of *Fact Concerts***

Although *Fact Concerts* did not arise under the FHA, a number of federal district courts have extended its reasoning from the § 1983 context to FHA cases. Indeed, courts often cite *Fact Concerts* for the broad proposition that punitive damages are unavailable against local governments. *See* Robert G. Schwemm, Gilead: *Municipal Liability for Punitive damages Under the Fair Housing Act*, 57 Conn. L. Rev. 1053, 1069 at nn.103–04 (2025) (collecting cases).

In most instances, the citation to *Fact Concerts* in an FHA decision appears with little or no accompanying analysis. *See, e.g.*, *White v. City of Annapolis*, 439 F. Supp. 3d 522, 549 (D. Md. 2020); *Brooker v. Altoona Hous. Auth.*, No. 3:11-CV-95, 2013 WL 2896814, at *27 (W.D. Pa. June 12, 2013); *but see Hisps. United of DuPage Cnty. v. Vill. of Addison, Ill.*, 958 F. Supp. 1320, 1331 (N.D. Ill. 1997) (careful analysis). Even where courts have addressed the issue, their reasoning has often been conclusory, asserting either that the FHA does not "explicitly authorize punitive damages" against municipalities, or that public policy weighs against such awards. *Jennings v. Hous. Auth. of Baltimore City*, No. CIV. WDQ-13-2164, 2014 WL 346641, at *9 (D. Md. Jan. 29, 2014).

The principal authority on which Florence County relies illustrates this trend. In *5-Star Athlete Development, LLC v. City of Shelby*, a minority-owned developer alleged that the City of Shelby's actions unlawfully obstructed its residential development project. No. 1:21-CV-323-MR-WCM, 2022 WL 4287921, at *1–2 (W.D.N.C. May 26, 2022), *rep. and recommendation adopted*, No. 1:21-CV-00323-MR-WCM, 2022 WL 3136957 (W.D.N.C. Aug. 5, 2022). In recommending dismissal of the

9

punitive-damages claim, the magistrate judge concluded—without analysis—that the plaintiff was required to show punitive damages were "available against a municipality for violations of the FHA." *Id.* at *6. The recommendation relied solely on a string citation to other district court decisions, each of which in turn cited *Fact Concerts*.[6] *Id.*

But *5-Star Athlete Development, LLC*—like the authorities on which it relies—did not engage with the critical textual and structural distinction between § 1983 and the FHA. Nor did those decisions consider the Supreme Court's interpretative approach to the FHA or the policy rationales that might justify or foreclose importing the reasoning in *Fact Concerts* into a statutory scheme that expressly authorizes punitive damages.

### (c) The Second Circuit's Decision in *Gilead Community Services, Inc.*

One federal court of appeals has directly confronted the question at issue here. In *Gilead Community Services, Incorporated v. Town of Cromwell*, the Second Circuit Court of Appeals affirmed in part a punitive-damages award against a municipality under § 3604(c) of the FHA. 112 F.4th 93, 107 (2024). Its reasoning is persuasive.

Gilead Community Services ("Gilead") was a nonprofit organization providing housing and support services to individuals with disabilities. *Id.* at 96. In 2015, Gilead purchased property in Cromwell, Connecticut, to operate a group home. *Id.* After public opposition emerged, town officials aligned themselves with local

---

[6]   The plaintiff-developer also brought claims under other federal statutes. None of those, however, authorized punitive damages.

residents and took a series of actions to impede the project, including issuing cease-and-desist letters, demanding private information about residents, and interfering with Gilead's state licensing process. *Id.* at 96–97. These actions were accompanied by police encounters and other efforts to dissuade Gilead from proceeding. *Id.*

Gilead and a related nonprofit brought suit against the town under several civil-rights statutes. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 97. As to the FHA, they asserted claims under § 3604(c), (f)(1) and (2), and § 3617. *Id.* at 97–98. The claims against the officials were dismissed before trial, but a jury found the town liable under the FHA and awarded both compensatory and punitive damages. *Id.* at 98.

On appeal, the Second Circuit resolved several issues of statutory interpretation. First, it reaffirmed that the FHA does not impose a "but-for" causation standard. *Id.* at 98–101. Second, it rejected the argument that *Monell*-type "policy or custom" liability applies to municipal defendants under the FHA. *Id.* at 101–02. Finally—and most relevant here—the court considered and rejected the town's contention that the FHA does not authorize punitive damages against municipalities. *Gilead Cmty. Servs., Inc.*, 112 F.4th at 102–03.

The Second Circuit began with the text. *Id.* at 103–04. It reasoned that *Fact Concerts* arose in a materially different context—one in which Congress had provided no statutory authorization for punitive damages. In contrast, the FHA "easily and unequivocally rebut[ted]" that presumption through its explicit authorization of both "actual and punitive damages" in § 3613(c)(1). *Id.* at 103. The court also drew support from analogous decisions interpreting other federal statutes employing similar

11

remedial language. *Id.* It concluded, consistent with the FHA's text and legislative history, that Congress intended to permit punitive-damage awards against municipal defendants. *Id.*

This Court finds that the Second Circuit's analysis appropriately centers on the statute's text and structure. Although factual and procedural differences distinguish *Gilead* from this case,[7] its reasoning correctly recognizes that Congress, through the 1988 FHAA, displaced any common-law presumption against local-governmental exposure to punitive damages. Given the contrary conclusions reached by several district courts, however, further discussion of the statutory and policy considerations is warranted below.

### 2.    *Express Inclusion of Local Governments in § 3613 Is Unnecessary*

As the Second Circuit observed, the text and structure of the FHA are sufficient to demonstrate Congress's intent to depart from the common-law prohibition on punitive damages against local governments. *See Gilead Cmty. Servs., Inc.*, 112 F.4th at 102–03 ("[T]he FHA itself refutes the claim that punitive damages were an afterthought in this context.").[8] Although additional statutory evidence supports this conclusion, several points bear emphasis.

---

[7]    *Gilead* involved a different provision of the FHA than the one DHD asserts here. It also addressed municipal liability arising from "actions taken by town officials in the scope of their employment," rather than liability premised on a *Monell-type* "policy or custom." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 101. By contrast, the alleged FHA violations in this case—the enactment of a development moratorium and a downzoning—constitute official policies of Florence County. *See DHD Jessamine, LLC*, 2024 WL 6841758, at *9–10.

[8]    *See* Schwemm, 57 Conn. L. Rev. at 1058 n.15.

*First*, the FHA's broad language—and the Supreme Court's long-standing instruction that it be interpreted broadly—compel the inference that Congress intended its substantive prohibitions to reach local governments. *See Trafficante*, 409 U.S. at 209. Federal appellate courts have consistently applied § 3604(a) to municipalities and their officials, even before the 1988 amendments. *See, e.g.*, *Smith v. Town of Clarkton*, 682 F.2d 1055, 1059 (1982) (affirming liability under pre-1988 § 3604 against town and its officials); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 145 (3d Cir. 1977) (affirming finding of liability under pre-1988 § 3604(a) against housing and redevelopment authorities); *United States v. City of Black Jack*, 508 F.2d 1179, 1188 (8th Cir. 1974) (affirming finding of liability under pre-1988 §§ 3604(a), 3617 against city). When Congress enacted the FHAA in 1988 without disturbing this settled understanding, it implicitly ratified that construction.[9] *See Inclusive Communities Project, Inc.*, 576 U.S. at 536. Accordingly, it would have been unnecessary—and indeed redundant—for Congress expressly to name local governments in § 3613.

Second, other provisions of the 1988 amendments confirm that Congress contemplated local-governmental liability. In defining prohibited "handicap" discrimination, Congress explicitly referenced actions taken by "a State or unit of general local government." FHAA, § 6(a), 102 Stat. at 1620. Likewise, the statute's public-enforcement provisions authorize the Attorney General to seek "civil

---

[9]     The dearth of court of appeals authority to the contrary before 1988 does not support the opposite conclusion. *See Phillips v. Hunter Trails Cmty. Ass'n*, 685 F.2d 184, 191 (7th Cir. 1982) (dicta leaving open possibility of punitive-damages liability against local governments).

13

penalt[ies]" against local governments in cases analogous to those that may also be pursued through private civil actions. *Compare* 42 U.S.C. § 3613(c)(1), *with id.* § 3614(d)(1)(C). As the court in *Hispanics United of DuPage County v. Village of Addison* recognized, such civil penalties are "similar" in nature to punitive damages and reinforce Congress's intent to permit their recovery against local governments. 958 F. Supp. at 1331.

*Third*, reading the 1988 FHA amendments *in pari materia* with the 1991 amendments to Title VII further dispels any ambiguity. The Supreme Court has long recognized the FHA's close kinship to Title VII. *Traficante*, 409 U.S. at 209; *cf. Inclusive Communities Project, Inc.*, 576 U.S. at 533 (noting that "cases interpreting Title VII and the ADEA provide essential background and instruction" regarding the FHA). In 1991, Congress amended Title VII to authorize punitive damages but explicitly excluded local governments from such liability. Civil Rights Act of 1991, Pub. L. 102-166, § 102, 105 Stat. 1071, 1073 (codified as amended at 42 U.S.C. § 1981a(b)(1)).[10] Congress's decision to include that limitation in Title VII—but not in the FHAA, enacted just three years earlier—strongly suggests that no such exclusion

---

10  This provision explains:

> A complaining party may recover punitive damages under this section against a respondent (*other than a government, government agency or political subdivision*) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

Civil Rights Act of 1991, § 102, 105 Stat. at 1073 (emphasis added).

14

was intended in the latter.[11] *Cf. Alvarez Ronquillo,* 151 F.4th at 528 (explaining that "outside sources like a 'closely related federal statute' can offer 'further evidence' of the meaning of a 'generic federal definition'" (quoting another source)); *Hall v. Greystar Mgmt. Servs., L.P.,* 637 F. App'x 93, 98 (4th Cir. 2016) (explaining that "[b]ecause Title VII and the FHA employ similar language and 'are part of a coordinated scheme of federal civil rights laws enacted to end discrimination,' much of our FHA jurisprudence is drawn from cases interpreting Title VII" (citations omitted)).

To be sure, *Fact Concerts* can be read to require a statute-by-statute inquiry into whether Congress intended to abrogate the common-law rule against punitive damages for local governments. *See* Schwemm, 57 Conn. L. Rev. at 1069–70. The Supreme Court has reaffirmed that the common-law presumption persists absent clear statutory authorization. *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 129 (2003) ("Since municipalities' common law resistance to punitive damages still obtains, '[t]he general rule today is that no punitive damages are allowed unless expressly authorized by statute.'" (quoting *Fact Concerts*, 453 U.S. at 260 n.21)).

Here, however, Congress's express authorization of "actual and punitive damages" in § 3613(c)(1)—broadened by the FHAA—and coupled with the statute's established application to local governments, satisfies that standard. Nevertheless,

---

[11]     Indeed, other statutes amended between 1968 and 1988 mirror a congressional intent to exclude government entities. *See* Equal Credit Opportunity Act Amendments of 1976, Pub. L. 94-239, § 6, 90 Stat. 251, 253–54 (codified as amended at 15 U.S.C. § 1691e) (providing civil liability for punitive damages for "[a]ny creditor, *other than a government or governmental subdivision or agency*" (emphasis added)).

15

because *Fact Concerts* also invoked considerations of policy, the Court turns briefly to whether the FHA's purposes support punitive damages against local governments.

    3.    ***The Policy Reflected in the FHA and FHAA Supports Punitive Damages Against Local Governments***

If punitive damages serve the twin purposes of punishment and deterrence, Congress has unmistakably signaled that both purposes are to be advanced through the FHA. The Court assumes, as did the Supreme Court in *Cook County v. United States ex rel. Chandler*, that local governments remained immune from punitive damages at common law as late as 2003. *See* 538 U.S. at 129.

In the 1968 FHA, Congress declared it to be "the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." *See* Pub. L. No. 90-284, § 801, 82 Stat. 73, 81 (codified at 42 U.S.C. § 3601). This expression of national policy necessarily informs the breadth of the enforcement authority Congress conferred. From the outset, the Supreme Court has recognized that "complaints by private persons are the primary method of obtaining compliance with the [FHA]." *Trafficante*, 409 U.S. at 209. A remedy with genuine deterrent force thus aligns squarely with Congress's purpose in enacting the FHA.

The FHAA reaffirmed and strengthened that remedial scheme. Congress expressly described the FHAA's dual purpose as follows:

> The purposes of [the FHAA], as amended, are twofold. One is to fulfill the promise made to the American people twelve years ago by the enactment of [the FHA]. That law effectively proscribed housing practices with the intent or effect of discriminating on account of race, color, national origin or religion,' *but it failed to provide an effective enforcement system to make that promise a reality*. This bill seeks to fill that void by creating an administrative enforcement system (subject to

16

> judicial review) within [HUD], and *by improvements lessening barriers to the use of court enforcement by private litigants and the Department of Justice.* Secondly, [the FHAA] extends the principle of equal housing opportunity to handicapped persons, who, like the other classes protected by [the FHA], have been the victims of unfair and discriminatory housing practices.

U.S. House of Representatives, Committee on the Judiciary, Report 100-711: the Fair Housing Amendments Act of 1988 13, 100th Cong. (1988) (emphasis added).

This legislative history reinforces that Congress intended the FHA and FHAA to deter and eradicate discriminatory housing practices. Deterrence, of course, is one of the central aims of punitive damages. Even the Supreme Court in *Fact Concerts*—despite its skepticism in the § 1983 context—acknowledged that punitive damages may have some deterrent effect on local governments. 453 U.S. at 268–69. Whether other deterrent mechanisms might be more effective is immaterial; after all, "Congress made its own policy judgment when it enacted and amended the FHA[ ] . . . ." *Gilead Cmty. Servs., Inc.*, 112 F.4th at 104. This Court's duty is to apply the statute as written, not to graft upon it an unwritten exemption.[12] As the Eleventh Circuit has observed, "[a] court cannot read an implicit exception for municipal agencies into the express provision of the Act that permits punitive damages against [them]." *Truesdell v. Thomas*, 889 F.3d 719, 725 (11th Cir. 2018).

The Court recognizes that punitive-damages awards may impose financial strain on local governments. Yet Congress was well aware of that concern long before

---

[12] In light of all the statutory evidence, the interpretive rule that that federal courts "presume the availability of all appropriate remedies *unless* Congress has expressly indicated otherwise," *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 66 (1992) (emphasis added), likely applies, here, too.

17

1988. *See Fact Concerts*, 453 U.S. at 266 n.27 (quoting legislative debates on what became § 1983). Congress has demonstrated, in other statutes, that it knows how to limit punitive-damage exposure when it intends to do so. *See supra* notes 10–11 and accompanying text. It did not do so here.

Additionally, punitive damages under the FHA are not automatic. Courts uniformly require a heightened showing of culpability—an "evil motive or intent" or "reckless or callous indifference to the federally protected rights of others." *United States v. Rupp*, 68 F.4th 1075, 1080 (8th Cir. 2023); *see also Gilead Cmty. Servs., Inc.*, 112 F.4th at 105. Thus, punitive liability arises only in cases of egregious or intentional misconduct.

Finally, the Court's holding today is a narrow one. It does not address the availability of punitive damages in every category of FHA claim or in cases of purely disparate impact. Nor does it resolve whether common-law or statutory vicarious-liability principles govern local-governmental exposure. The holding here is limited to what the statute plainly provides: that punitive damages may be awarded against a local government for intentional violations of the FHA based on official acts or policies. *See Smith & Lee Assocs., Inc. v. City of Taylor, Mich.*, 102 F.3d 781, 798 (6th Cir. 1996) (noting that civil penalties under a similar provision, § 3614, are "especially appropriate" against municipalities when they intentionally discriminate).

Here, DHD asserts a claim for disparate-treatment liability under the FHA. (*See* Compl. ¶¶ 162–171, DE 1 at 57–59.) Accordingly, as that statute provides, punitive damages are available against Florence County.

## C.   Sufficient Evidence Supporting Punitive Damages

In its October 30, 2025, motion, Florence County argued that the evidence presented at trial was insufficient to permit a reasonable jury to award punitive damages against it. The Court disagrees, for the reasons stated on the record. The trial evidence, viewed in the light most favorable to DHD, provides a legally sufficient basis from which a reasonable jury could conclude that the County acted with the requisite intent or reckless indifference to federally protected rights.

## IV.   CONCLUSION

For the reasons set forth above, the Court concludes that the Fair Housing Act authorizes punitive damages against local-governmental entities when warranted by the evidence and consistent with the statute's remedial purposes. This conclusion accords with the text, structure, and history of the Act, and with Congress's expressed intent to provide meaningful deterrence against discriminatory housing practices.

Accordingly, Defendant Florence County's motion for judgment as a matter of law on the issue of punitive damages is **DENIED**.

**IT IS SO ORDERED**.

Joseph Dawson, III
United States District Judge

Florence, South Carolina
November 12, 2025